Michael Luskin, Chapter 11 Trustee
        -and-
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Telephone:   (212) 597-8200
Facsimile:   (212) 974-3205

*Proposed Attorneys for the Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                              :
                                                    :       Chapter 11
AMPAL-AMERICAN ISRAEL CORP.,                        :
                                                    :       Case No. 12-13689 (SMP)
                Debtor.              :
                                                    :
-------------------------------------------------------------X

## CHAPTER 11 TRUSTEE'S MOTION
## TO CONVERT TO CHAPTER 7 OR DISMISS

       Michael Luskin, the Chapter 11 Trustee ("Trustee"), hereby moves for an order pursuant to section 1112(b) of the Bankruptcy Code converting this Chapter 11 case to Chapter 7 or dismissing it. In support, the Trustee respectfully represents as follows:

### I.    INTRODUCTION

       The Trustee brings this motion to convert or dismiss because the Debtor's estate is administratively insolvent and is experiencing continuing losses, and it is unlikely that the Debtor will be able to confirm a feasible plan of reorganization. Following months of litigation among the Debtor, the Committee, the Debtor's controlling shareholder and certain other officers and directors, the Court directed the appointment of the Trustee. Upon investigation of the assets, liabilities and financial condition of the Debtor, the Trustee has determined that there are insufficient funds to sustain this case in chapter 11 and there are insufficient prospects of

securing exit financing sufficient to pay the approximately $4.5 million in currently accrued and unpaid administrative expenses (almost entirely professionals' fees), let alone the ongoing needs of a restructured company post-confirmation.  Converting the case would allow a Chapter 7 trustee to use what little cash there is on hand to proceed with the sale of the Debtor's assets (principally operating subsidiaries in Israel) and prosecute ongoing arbitrations and other claims without the overhang of the Debtor's current administrative obligations.  Alternatively, the case could be dismissed.

## II.    FACTUAL BACKGROUND

1. On August 29, 2012 (the "Petition Date"), Ampal-American Israel Corporation ("Ampal" or the "Debtor") filed a voluntary petition for relief under chapter 11. The Debtor was authorized to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108.

2. The Debtor is a non-operating holding company, primarily engaged in investing in businesses in Israel or businesses that are Israel-related.  The Debtor's subsidiaries have not filed for chapter 11 protection in the United States.  However, the Debtor's principal operating subsidiary, Gadot Chemical Tankers and Terminals Ltd., is now in receivership in Israel, and at least one other subsidiary, Merhav-Ampal Group, Ltd., is in litigation with one of its lenders and has had its principal source of cash garnished in Israel.

3. As the Court is aware, there has been considerable strife among the Committee, the Debtor, and Yosef A. Maiman, the Debtor's controlling shareholder, since the commencement of the bankruptcy proceedings.  The dispute is described at length in the Court's April 5, 2013 Memorandum Decision and Order that resulted in the appointment of the Trustee. Among the areas in dispute have been the retention of professionals, the termination of

exclusivity, corporate governance, including the appointment of a chief restructuring officer, and the various proposed plans of reorganization.

### Plan and Disclosure Statement[1]

4. For a time, there were competing plans of reorganization (the Committee's and the Debtor's); most recently, by Order entered on February 27, 2013, the Modified Disclosure Statement Relating to the Second Amended Chapter 11 Plan of Reorganization of Ampal-American Israel Corporation proposed by the Official Committee of Unsecured Creditors (the "Plan") was approved. (Dkt. No. 208.) Solicitation of votes was held in abeyance pending certain regulatory approvals in Israel.

5. As of the Petition Date, the Debtor's liabilities were comprised of (i) approximately $234.5 million outstanding under the Debtor's Series A, Series B, and Series C Debentures, and (ii) approximately $115.5 million in various other general unsecured claims, mostly of Israeli banks. Generally, the Plan calls for distributions to holders of allowed unsecured claims of either (i) 100% of the Preferred Stock of the Reorganized Debtor or (ii) the Cash Payment if the Equity Buyout Option is exercised pursuant to Section 4.6 of the Plan. The Series B and Series C Debentures have sinking funds (totaling in excess of $14 million) and these funds are to be distributed pro rata to the holders of the Series B and Series C Debentures. The Plan does not provide for any distribution on account of Intercompany Claims (with certain exceptions). Holders of Equity Interests will retain their shares of Class A stock and will have the right to exercise the Equity Buyout Option by making a cash investment in the Debtor in specified amounts. The Plan also provides for cash distributions to holders of Allowed

---

[1] Capitalized terms are defined in the Modified Disclosure Statement Relating to the Modified Second Amended Chapter 11 Plan of Reorganization of Ampal-American Israel Corporation Proposed by the Official Committee of Unsecured Creditors. (Dkt. No. 208-1.)

-3-

Administrative Expense Claims (subject to the terms of the Post-Confirmation Budget), Allowed Professional Claims, Allowed Priority Tax Claims, and Allowed Priority Claims, from the proceeds of proposed exit financing. There is, however, no committed exit financing in place. And, as noted, the solicitation process cannot begin until regulatory approvals are received in Israel.

6. In addition, the Plan requires that the Debtor's shares be listed on NASDAQ. However, NASDAQ suspended trading in the Debtor's stock in August 2012 and commenced proceedings to delist the Debtor's stock. In January 2013, a NASDAQ hearing panel issued an order delisting the stock. The Debtor appealed, and by decision dated April 19, 2013, the NASDAQ Listing and Hearing Review Council provided Debtor until August 16, 2013 to comply with NASDAQ's listing requirements and, failing that, the Debtor will be delisted. Currently, it is not at all clear that the Debtor will be able to meet NASDAQ's shareholder equity, share price and market capitalization requirements by this deadline.

7. The Debtor also has no audited financials for 2012 and has not retained an accounting firm to conduct the audit. Accordingly, the Debtor is likely to be in default of its SEC filing obligations.

8. The Plan requires exit financing. None is likely without audited financials and the Debtor does not have sufficient cash on hand to retain an accountant to provide them. For this reason alone there is no reasonable prospect of confirming the Plan.

**Administrative Claims**

9. By Order entered on November 26, 2012, Brown Rudnick LLP ("Brown Rudnick") was retained as counsel to the Official Committee of Unsecured Creditors of Debtor effective as of October 12, 2012. (Dkt. No. 74.)

10. By Order entered on November 28, 2012, Bryan Cave LLP ("Bryan Cave") was retained as counsel to the Debtor pursuant to section 327(a) of the Bankruptcy Code. (Dkt. No. 77.)

11. By Order entered on December 20, 2012, Houlihan Lokey Capital, Inc. ("Houlihan Lokey") was retained as investment banker and financial advisor to the Debtor. (Dkt. No. 116.)

12. Both Brown Rudnick and Bryan Cave filed Fee Applications for reimbursement of expenses and compensation for services. (Dkt. Nos. 119 and 123, collectively the "Interim Fee Orders"). On January 22, 2013, the Court entered Orders allowing payment of the Interim Fee Orders. (Dkt. Nos. 150 and 153.)

13. Subsequently, Brown Rudnick filed an Application for Issuance of an Order to Show Cause Directed to the Board of Directors of Ampal-American Israel Corporation (the "OSC Application") due to the Debtor's failure to pay the entirety of the amount payable under the Interim Fee Orders. (Dkt. No. 170.) According to the Independent and Non-Independent Directors' objection to the OSC Application, the Debtor did not have sufficient liquidity to pay Brown Rudnick the amounts due under the Fee Order. (Dkt. No. 179.)

14. Through March 2013, Bryan Cave has incurred approximately $1.75 million in fees and expenses; $250,000 has been paid. Houlihan Lokey has incurred $650,000; $250,000 has been paid. The Debtor's claims processor, Epiq Systems, Inc., has incurred $280,000; none has been paid. Brown Rudnick has incurred $2.5 million; $250,000 has been paid. In total, $5.18 million in professional fees have been incurred; $750,000 has been paid and over $4.4 million remains unpaid.

15.     In order to implement the Plan, the Trustee would need to retain additional professionals, including accountants to perform an audit, Israeli counsel to assist with regulatory and litigation matters and asset sales and financings in Israel, and U.S. bankruptcy counsel of his own.[2] The Trustee estimates that fees for these professionals would be at least $500,000, and likely considerably more.

**Debtor's Assets**

16.     Debtor's principal assets consist of the following:

(a)    <u>Cash on hand</u>.  There is approximately $130,000 in unrestricted cash on hand in two accounts in New York.  The Trustee is in the process of taking control of them.  All other cash in New York is frozen, subject to setoff claims, and will require litigation to obtain.

(b)    <u>Bay Heart</u>.  This is a shopping center in Israel.  The Debtor holds an indirect 37% interest in it; there are two other partners.  Efforts to sell or finance Bay Heart prepetition were unsuccessful.  The Trustee estimates that it would take 3-6 months to complete a financing or sale; he would require Israeli counsel and appraisers.

(c)    <u>EMG Arbitrations</u>.  These are four arbitrations against Egypt for breach of contract (and other claims) arising out of a natural gas pipeline project.  The claims are for hundreds of millions of dollars, but will take approximately two years to prosecute at a cost of approximately $4 million. The arbitrations are being handled by Freshfields on behalf of the Debtor and certain of its affiliates.  The Debtor's share of the costs has not been determined, but whatever it is, the Debtor has no cash to make current payments.

---

[2] The Trustee proposes to retain Luskin, Stern & Eisler LLP as his counsel, <u>nunc pro tunc</u> to his appointment date.

Freshfields has not yet been retained under section 327(e), but would have to be if the case is to proceed.

(d)    <u>Claims vs. Insiders</u>.  The Committee has previously advised the Court of potential claims against certain insiders for various (alleged) breaches of fiduciary duty, etc.  There is also a claim against the Debtor's controlling shareholder on a $20 million guaranty relating to an ethanol plant investment.  These claims are all hotly disputed and are unlikely to be resolved without extensive litigation.

(e)    <u>Miscellaneous</u>.  The Debtor has various other assets (tax refunds, interests in a country club and a wind farm, etc.) but none can be liquidated quickly, all are of uncertain value, and some (<u>e.g.</u>, the tax refund) may be disputed.

17.    In short, apart from the $130,000 in the two New York accounts, there is no cash at hand and none likely to be available without expensive and time-consuming litigation.

### III.    ARGUMENT

#### A.    <u>Applicable Standard</u>

This case should be converted to chapter 7 or dismissed.  Section 1112(b) of the Bankruptcy Code governs the conversion or dismissal of a Chapter 11 case.  It provides that, on request of a party in interest, and after notice and a hearing, "the court <u>shall</u> convert a case under [Chapter 11] to a case under chapter 7 or dismiss [it], whichever is in the best interest of creditors and the estate [if the movant establishes cause]."  11 U.S.C. § 1112(b)(1) (emphasis added); <u>see also</u> <u>In re MF Global Holdings Ltd.</u>, 465 B.R. 736, 742 (Bankr. S.D.N.Y. 2012) ("[A bankruptcy] court may dismiss a chapter 11 case or convert it to a case under chapter 7 'for cause' as long as it is in the best interests of both the creditors and the estate... [A] bankruptcy

judge has wide discretion to determine whether cause exists to dismiss or convert a case under § 1112(b)." (citations omitted)).

While the term "cause" is not defined by the statute, section 1112(b)(4) provides some examples, which are meant to be non-exclusive, any one of which may constitute "cause" for either the conversion or dismissal of a Chapter 11 case. The one that is relevant here is subsection (A): "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). While the burden of showing cause rests with the moving party, In re Loco Realty Corp., 2009 Bankr. LEXIS 1724 at *4-5 (Bankr. S.D.N.Y. 2009), that burden can be met either by demonstrating the existence of one or more of the statutory grounds enumerated in section 1112(b)(4) or by showing other cause. See 11 U.S.C. §1112(b)(4); In re State St. Assocs., L.P., 348 B.R. 627, 638 (Bankr. N.D.N.Y. 2006) ("[w]hile the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, not exhaustive has not.") (citing In re 3 Ram, Inc., 343 B.R. 113,117 (Bankr. E.D.Pa. 2006)).

The inquiry under section 1112(b)(4)(A) is two-fold: First, the Court must determine whether there has been a substantial or continuing loss to the estate by evaluating the present condition of the Debtor. Second, the Court must determine whether the Debtor is able to rehabilitate itself. See In re FRGR Managing Member LLC, 419 B.R. 576, 581 (Bankr. S.D.N.Y. 2009); see also In re Vallambrosa Holdings, L.L.C., 419 B.R. 81, 88-90 (Bankr. S.D. Ga. 2009) (noting that the section is written in the conjunctive and that both factors must be met).

B.  **Continuing Loss & Diminution**

Cause exists to convert or dismiss this case because there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

The Debtor's cash on hand (only $130,000) has been virtually exhausted and there is no quick means of generating the necessary cash to fund the ongoing administrative expenses that would be incurred to confirm the currently proposed Plan (at least $500,000), let alone to fund the Plan itself (at least $5 million and probably much more). The Debtor's main operating subsidiary is in receivership in Israel and will likely be sold, generating no cash for the Debtor, and a large portion of another subsidiary's funds have been garnished in Israel, eliminating another possible source of cash. The Debtor requires (but cannot retain) accountants and Israeli and U.S. bankruptcy counsel and arbitration counsel, but cannot do so with the overhang of the $4.5 million in unpaid professional fees it currently has. The Debtor's other assets, such as real estate in Israel, claims against insiders, and the EMG arbitration claims, are illiquid. The Debtor's administrative insolvency and inability to fund ongoing chapter 11 expenses constitute cause for conversion or dismissal. See, e.g., In re BH S&B Holdings LLC, 439 B.R. 342, 347-349 (Bankr. S.D.N.Y. 2010) (cause existed under section 1112(b)(4)(A) where the debtor continued to incur monthly losses with no prospect of further funding from third parties); In re Gateway Access Solutions, Inc., 374 B.R. 556, 563-64 (Bankr. M.D. Pa. 2007) (cause existed under section 1112(b)(4)(A) where there was sharp decline in debtor's cash position and no factual basis to support debtor's principal's testimony that debtor could reorganize); In re FRGR Managing Member LLC, 419 B.R. at 581 (same).

### C. No Plan Possible

Cause also exists to convert or dismiss this case because there is no reasonable likelihood of rehabilitation. 11 U.S.C. §1112(b)(4)(A). Whether there is a likelihood of rehabilitation is not a "technical [test] of whether the debtor can confirm a plan, but rather, whether the debtor's business prospects justify continuance of the reorganization effort." In re Vallambrosa Holdings, 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009) (quoting In re Original IFPC S'holders, Inc., 317 B.R. 738, 742 (Bankr. N.D. Ill. 2004); see also In re BH S&B Holdings LLC, 439 B.R. at 348 (cause existed to convert chapter 11 case to chapter 7, in part, because the debtor's financial statements reflected continuing losses and the debtor's intention to liquidate established there was no likelihood of rehabilitation).

Here, the Debtor's reorganization requires exit financing, the Debtor's shares being listed on NASDAQ, and it being in compliance with its SEC filing requirements. None of this can happen in short order: the Debtor has no audited 2012 financials and cannot afford to retain accountants to prepare them; in any event, they will take months. In the meantime, it cannot satisfy its SEC filing obligations. The Debtor is unlikely to satisfy any of NASDAQ's equity, capitalization and other requirements, so its shares will not be listed on NASDAQ after August 16, 2013. There can be no exit financing without financials and resolution of the Debtor's regulatory issues. It is simply not reasonable to expect rehabilitation under these circumstances.

### D. Convert or Dismiss

This is not a case where the Debtor has any prospect of successfully reorganizing its business. Rather, this is a case where there is a finite "pot" of assets and claims to liquidate. This could be done by a Chapter 7 trustee. A Chapter 7 trustee could retain his own

professionals and pay them out of the limited funds on hand without having to pay the related administrative costs of the Chapter 11 proceeding. See 11 U.S.C. § 726(b) (priority of chapter 7 expenses in converted case).

Alternatively, the Court could dismiss the case. To do so, the Court must determine dismissal, as opposed to conversion, is in the best interests of the creditors and the estate. In re BH S&B Holdings, LLC et al., 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) (citing 7 Collier on Bankruptcy ¶ 1112.04). There is no "bright-line test to determine [whether] conversion or dismissal is in the best interests of creditors and the estate." In re Westhampton Coachworks, Ltd., 2010 Bankr. LEXIS 4967 at *15 (Bankr. E.D.N.Y. December 21, 2010); In re Tuscan Sun Ristorante, Inc., 2010 Bankr. LEXIS 4316 at *10 (Bankr. E.D.N.Y. November 29, 2010). Courts look to multiple factors to determine which better serves the interests of creditors and the estate. As to creditors, courts will consider: (1) whether some creditors received preferential payments and whether equality of distribution would be better served by conversion rather than dismissal; (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) whether the debtor would simply file a further case upon dismissal; and (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors. See 7 Collier on Bankruptcy ¶ 1112.04[7]. In assessing the interests of the estate, courts will determine (1) whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (2) whether any remaining issues would be better resolved outside the bankruptcy forum; (3) whether the estate consists of a "single asset"; (4) whether the debtor had engaged in misconduct; (5) whether creditors are in need of a chapter 7 case to protect their interests; (6) whether a plan has been confirmed and whether any

-11-

property remains in the estate to be administered; and (7) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.  Id.

In weighing these factors, the possible benefits of conversion must be weighed against the incremental costs to the estate. Where a trustee would impose an unaffordable burden, dismissal may well be in the estate's best interests.  See In re Midwest Props. of Shawano, LLC, 442 B.R. 278, 286 (Bankr. D. Del. 2010).  However, where there is a prospect of the recovery of assets, conversion may be in the best interests of the estate and the creditors despite these costs.  See BH S&B Holdings, 439 B.R. at 351.  Additionally, if "[t]he creditors . . . are better served by the centralized collection and disbursement provided by the bankruptcy process," then conversion, rather than dismissal, is in the best interests of creditors and serves as the preferred remedy.  In re Babayoff, 445 B.R. 64, 82 (Bankr. E.D.N.Y. 2011) (citing Coachworks, 2010 Bankr. LEXIS 4967 at *7).

The Chapter 11 Trustee respectfully suggests that conversion rather than dismissal is more appropriate at this time.  Among the various considerations cited above, the following favor conversion:

1. Consolidated Prosecution of Claims

(a) Avoidance Actions.  There may be preference and other avoidance actions that can only be brought in bankruptcy.

(b) Claims vs. Insiders.  Claims under New York law and New York law-governed contracts (including insured claims under the Debtor's D&O policies) should be investigated and evaluated by a neutral party like a Chapter 7 Trustee, and their prosecution supervised by the Trustee.

-12-

    (c) <u>EMG Arbitrations</u>.  The Debtor is a claimant in one of the arbitrations and an interested party in all.  The Chapter 7 Trustee could retain and pay Freshfields, which the Debtor could not do without the benefit of section 726(b).

    2.  <u>Coordinated Workout and Asset Sales in Israel</u>.  The Debtor's subsidiaries are embroiled in litigation in Israel and are likely to continue to be.  A negotiated resolution will only be possible if there is a neutral representative, unconnected to current ownership, that can act for the Debtor.  The Chapter 7 Trustee could fulfill that role.  The Chapter 7 Trustee and his professionals (lawyers, accountants, appraisers) could serve a similar role with respect to the sale of the Debtor's subsidiaries' assets in Israel.

    3.  <u>Possible Financing of Liquidation and Litigation</u>.  As noted, it will take considerable money for anyone – the Chapter 11 Trustee or a Chapter 7 Trustee – to oversee a workout, the liquidation of assets, and the evaluation and prosecution of litigation.  Obtaining financing in Chapter 11 is not possible, nor is the Debtor likely to obtain financing outside bankruptcy.  However, a Chapter 7 Trustee may be able to obtain a modest amount of debtor-in-possession financing sufficient to enable him to retain professionals and jump-start the liquidation process; such financing would not be available to pay Chapter 11 administrative expenses.

    4.  <u>Sufficient Cash on Hand for the Chapter 7 Trustee</u>.  The $130,000 cash on hand should be sufficient for the Chapter 7 Trustee to retain counsel and attempt to obtain debtor-in-possession financing or free up frozen funds in New York or Israel.  In the event that fails, the case could then be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court enter an order converting this case to Chapter 7 or, failing that, dismissing this case and granting such other and further relief as may be deemed just and proper.

Dated: April 19, 2013

>/s/ Michael Luskin
>Michael Luskin, Chapter 11 Trustee
>
>LUSKIN, STERN & EISLER LLP
>Eleven Times Square
>New York, New York 10036
>Telephone: (212) 597-8200
>Facsimile: (212) 974-3205
>
>*Proposed Attorneys for the Chapter 11 Trustee*