Hearing Date: **January 23, 2014**
Hearing Time: **10:00 A.M.**

NACHAMIE SPIZZ COHEN & SERCHUK, P.C.
Attorneys for **Alex Spizz, Chapter 7 Trustee**
425 Park Avenue
New York, NY 10022
(212) 754-9400
Alex Spizz, Esq.
Janice B. Grubin, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                                            Chapter 7

AMPAL-AMERICAN ISRAEL CORPORATION,          Case No. 12-13689 (SMB)

                                    Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**NOTICE OF CHAPTER 7 TRUSTEE'S MOTION PURSUANT TO 11 U.S.C. §§105(a) AND 362(d) AND FED.R.BANKR.P. 4001(d) AND 9019(a), FOR APPROVAL OF STIPULATION AND AGREED ORDER BETWEEN CHAPTER 7 TRUSTEE, BANK HAPOALIM B.M., AND AMPAL ISRAEL LTD., MODIFYING AUTOMATIC STAY AND RESOLVING BANK HAPOALIM B.M.'S ALLEGED SECURITY INTEREST IN DEBTOR'S BANK DEPOSITS AND CLAIM AGAINST DEBTOR'S WHOLLY OWNED SUBSIDIARY**

**PLEASE TAKE NOTICE** that upon the motion dated December 27, 2013 (the "Motion") of Alex Spizz, the Chapter 7 trustee (the "Trustee") of the above-captioned debtor, Ampal-American Israel Corporation ("Debtor"), by his counsel, Nachamie Spizz Cohen & Serchuk, P.C., the Trustee will move before the Honorable Stuart M. Bernstein, United States Bankruptcy Court Judge, in his Courtroom at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, on the **23rd day of January, 2014 at 10:00 A. M.**, or as soon as counsel can be

heard, for an order approving the proposed Stipulation and Agreed Order between the Chapter 7 Trustee, Bank Hapoalim B.M. and Ampal Israel Ltd., modifying the automatic stay and resolving Bank Hapoalim B.M.'s alleged security interest in Debtor's bank deposits and claim against Debtor's wholly owned subsidiary. (A copy of the proposed Stipulation and Agreed Order is annexed to the Motion as Exhibit "A".)

**PLEASE TAKE FURTHER NOTICE**, that any objections to the Motion must be filed with the Clerk of the Bankruptcy Court with a copy delivered to the Chambers of the Honorable Stuart M. Bernstein and served upon: (i) Nachamie Spizz Cohen & Serchuk, P.C., attorneys for the Trustee, 425 Park Avenue, New York, New York 10022, Attn: Alex Spizz, Esq. and Janice B. Grubin, Esq.; and (ii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Andrew D. Velez-Rivera, Esq.

Dated: New York, New York
       December 27, 2013

NACHAMIE SPIZZ COHEN & SERCHUK, P.C.
Attorneys for Alex Spizz, Chapter 7
Trustee for Ampal-American Israel Corporation,
Debtor

By:  _____
       Alex Spizz
       Janice B. Grubin
       Arthur Goldstein
       Jill Makower
425 Park Avenue
New York, New York 10022
(212) 754-9400

|                | |
|----------------|-----------------|
| **Hearing Date:** | **January 23, 2014** |
| **Hearing Time:** | **10:00 A. M.** |

NACHAMIE SPIZZ COHEN & SERCHUK, P.C.
Attorneys for **Alex Spizz, Chapter 7 Trustee**
425 Park Avenue
New York, NY 10022
(212) 754-9400
Alex Spizz, Esq.
Janice B. Grubin, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                                           Chapter 7

AMPAL-AMERICAN ISRAEL CORPORATION,             Case No. 12-13689 (SMB)

                                    Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**CHAPTER 7 TRUSTEE'S MOTION PURSUANT TO 11 U.S.C. §§105(a) AND 362(d) AND FED.R.BANKR.P. 4001(d) AND 9019(a), FOR APPROVAL OF STIPULATION AND AGREED ORDER BETWEEN CHAPTER 7 TRUSTEE, BANK HAPOALIM B.M., AND AMPAL ISRAEL LTD., MODIFYING AUTOMATIC STAY AND RESOLVING BANK HAPOALIM B.M.'S ALLEGED SECURITY INTEREST IN DEBTOR'S BANK DEPOSITS AND CLAIM AGAINST DEBTOR'S WHOLLY OWNED SUBSIDIARY**

**TO:   THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE**

Alex Spizz, the Chapter 7 trustee (the "Trustee") of Ampal-American Israel

Corporation, the Chapter 7 debtor herein (the "Debtor"), submits this motion (the

"Motion") for approval, pursuant to sections 105(a) and 362(d) of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 4001(d) and 9019(a) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), of a certain "Stipulation and

Agreed Order Between Chapter 7 Trustee, Bank Hapoalim B.M. and Ampal Israel Ltd.

282115v4

Modifying Automatic Stay and Resolving Bank Hapoalim B.M.'s Alleged Security Interest in Debtor's Bank Deposits and Claim Against Debtor's Wholly Owned Subsidiary" dated December 26, 2013 (the "Stipulation") by and between the Trustee, Bank Hapoalim B.M. ("BH") and Ampal Israel Ltd. ("Ampal Israel"), annexed hereto as **Exhibit "A"**, and respectfully represents:

## JURISDICTION

1.      This Court has subject matter jurisdiction to consider and determine this Motion pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

## FACTS

**A.**      **General**

2.      On August 29, 2012 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of the Bankruptcy Code.

3.      On September 25, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee").

4.      On April 8, 2013, the Court ordered the appointment of a Chapter 11 trustee and the Office of the U.S. Trustee thereafter designated Michael Luskin as Chapter 11 trustee.

5.      Michael Luskin, as Chapter 11 trustee, moved to convert this case to Chapter 7 on the grounds that, among other things, the Debtor was administratively insolvent.

6.      By Order dated May 2, 2013 (the "Conversion Date"), the Court converted the case to one under Chapter 7.

7.      On May 3, 2013, the Office of the U.S. Trustee appointed Alan Nisselson as

interim Chapter 7 trustee.

8.    On May 20, 2013 (the "Election Date"), Alex Spizz was elected Chapter 7 Trustee of the Debtor pursuant to section 702 of the Bankruptcy Code and was duly qualified thereafter.

## B.    The PrepetitionTransactions Between BH And The Debtor

9.    Prior to the Petition Date, BH, as lender, and the Debtor, as borrower, entered into a Committed Line of Credit Agreement dated as of June 5, 1992 (the "Agreement") providing for a Committed Line of Credit (the "Facility") to the Debtor.

10.    Prior to the Petition Date, BH made a loan to the Debtor, evidenced by a promissory note dated as of June 27, 2008 in the amount of $3,500,000.00 (the "2008 Note").

11.    The 2008 Note was guaranteed by Ampal Israel, a wholly-owned subsidiary of the Debtor organized under the laws of the State of Israel pursuant to a certain Deed of Continuing Guarantee Unlimited in Amount (the "Guarantee").

12.    The Debtor and BH entered into a Letter Agreement dated as of July 29, 2011 (the "Letter Agreement") which amended the Agreement and, _inter alia_, (i) converted the Facility to a term loan to the Debtor in the principal amount of $3,500,000.00 (the "Term Loan"), which Term Loan was evidenced by a promissory note dated as of July 29, 2011 (the "2011 Note") made by the Debtor in favor of BH, bearing a maturity date of June 30, 2018, and (ii) provided that the 2011 Note replaced and suspended, but did not extinguish, the debt evidenced by the 2008 Note.

13.    The 2011 Note provides:

> 10.    Execution of Promissory Note: Borrower understands that by signing this Note the Borrower is agreeing to all of the terms as contained in this Note and all other Terms and Conditions and Rider(s).

2011 Note, §10.

14.    The Terms and Conditions annexed to the 2011 Note state that "[e]very Account of Borrower with the Bank shall be subject to a lien and to being set off against the Liabilities..." (Terms and Conditions, § C), and define the term "Liabilities" as "(a) any and all of the Debt evidenced by this Note, and any and all other Debt of Borrower to, or held or to be held by, the Bank in any jurisdiction worldwide for its own account or as agent for another or others, whether created directly or acquired by Transfer or otherwise, and (b) any and all obligations of any other Party with respect to any of such Debt." (Terms and Conditions, § N(19)).

## C.    The Debtor's Bank Accounts With Bank Hapoalim B.M.

15.    As of the Petition Date, the Debtor was the owner and account holder of three bank accounts at BH, two in BH branches in the United States (the "U.S. Accounts") and one in a BH branch in Israel (the "Israel Account" and, together with the U.S. Accounts, the "Accounts").

16.    The Debtor's U.S. Accounts consist of (a) a time deposit account held in the Americas Tower BH branch (Dept. or Branch No. 002) in New York, New York, account number 0170009526 ("Time Deposit Account"), and (b) a DDA checking account held in the BH New York branch (Dept. or Branch No. 001), located in New York, New York, account number 0170009501 (the "DDA Account").

17.    The Debtor's Israel Account is held at Branch 600 in Tel Aviv, Israel and bears account number 631593.

18.    As of the Petition Date, the balances in the Debtor's U.S. Accounts were as follows: (a) $500,157.27 in the Time Deposit Account; and (b) $144,498.71 in the DDA Account.

19.    The Debtor's Bankruptcy Schedules indicate that the balance in the

4

Debtor's Israel Account as of the Petition Date was $123,389.52.[1]

20.    BH implemented an administrative freeze on the Accounts, and the funds in the Accounts (the "Deposited Funds").

21.    Upon the filing of the Debtor's Chapter 11 Petition, BH made demand upon Ampal Israel based on the Guarantee, and in March 2013 set off $760,000 of Ampal Israel's funds which were on deposit with BH in Israel ("AI Set Off") and applied said funds against all amounts due BH pursuant to the Loan Documents.

22.    BH asserted a security interest in the Deposited Funds contained in the Accounts and advised the Debtor that it was prepared to seek appropriate court authority with respect to the Debtor's Accounts to apply the Deposited Funds to the Debtor's outstanding obligations to BH.

23.    BH had settlement discussions with the Debtor, the Chapter 11 trustee and the interim Chapter 7 trustee.

**D.    Bank Hapoalim B.M.'s Proof of Claim**

24.    On February 22, 2013, BH filed a proof of claim in the Debtor's case,

---

[1] This is the amount in U.S. Dollars. Nir Bernstein, who had been the Debtor's Vice President and Controller and who signed the Debtor's Bankruptcy Schedules, advised the Trustee that Schedule "B" listed the Israel Account three times, because it contained funds in U.S. Dollars, in Euros and in New Israeli Shekels. As of the Petition Date, the funds contained in the Israel Account totaled $123,389.52 in U.S. Dollars, as reflected on Schedule "B" of the Debtor's Bankruptcy Schedules.

docketed as Claim No. 8 (the "BH POC"), in the amount of $3,523,488.56 as of the Petition Date, which BH asserts is partially secured by the Deposited Funds (the "BH Claim"). (A copy of the BH POC is annexed hereto as **Exhibit "B"**.)

## THE SETTLEMENT

25.    On December 26, 2013, the Trustee, BH and Ampal Israel entered into the Stipulation to resolve (a) BH's alleged security interest in the Deposited Funds held in the Debtor's Accounts at BH and (b) BH's claim against the Debtor's wholly owned subsidiary, Ampal Israel, based on the Guarantee. The salient terms of the Stipulation are as follows:

- Upon entry of a final non-appealable order approving the Stipulation, BH's alleged security interest in Debtor's Deposited Funds shall be deemed resolved as follows: (a) Three Hundred Thousand Dollars ($300,000.00) of the Deposited Funds shall be immediately delivered by BH and paid to the Trustee, (b) BH shall have all right, title and interest in all but $300,000.00 of the Deposited Funds (the Deposited Funds less the $300,000.00 to be paid to the Debtor's estate is hereinafter referred to as the "Remaining Funds"), (c) the Remaining Funds shall be applied by BH in reduction of the BH Claim, (d) the automatic stay shall be deemed modified pursuant to Bankruptcy Code section 362(d) solely to permit BH to deduct the Remaining Funds from the Accounts and apply them in reduction of the BH Claim, (e) BH's alleged lien shall be deemed released on each of the Accounts and the BH Claim shall be deemed wholly unsecured, and (f) the BH Claim shall be deemed amended to incorporate the terms agreed to in the Stipulation.

- The Trustee, Ampal Israel and BH agree that BH's percentage of Ampal Israel's debts will be fixed at 6.475% and further agree that BH will receive that percentage out of any distributions made subsequent to the date of the Stipulation to unsecured creditors of Ampal Israel up to the amount of BH Claim. "Distributions" will include any payments to unsecured creditors other than (i) those made in the ordinary course of business,(ii) payments for goods or services rendered prior to January 1st, 2013 and (iii) payments for employees and VAT claims. Such percentage will not be changed or amended as a result of the recovery stipulated in Section 2 of the Stipulation or any future recovery on the account of BH Claim. Also, such percentage will not be changed or amended (for better or worse) as a result of any findings, decisions or changes made in

the claims of any creditor of Ampal Israel (including, but only, claims made by any of its affiliates) toward Ampal Israel.

- BH will not commence, or continue with, any legal or other proceedings against Ampal Israel, including but not only any collection proceedings with respect to BH Claim, as long as the Chapter 7 proceedings are taking place. However, in the event that: (i) no distribution is made by Ampal Israel to its creditors, including BH during a period of 36 months from the date of the approval of the Stipulation, or (ii) a Triggering Event occurs, BH will be immediately entitled to commence any legal proceedings in order to enforce its rights (with no change in BH's percentage as stated in Section 3 of the Stipulation). A "Triggering Event" shall be (i) the appointment of a receiver, commencement of dissolution proceedings or other insolvency proceedings against Ampal Israel, or (ii) an attachment or voluntary or involuntary lien or encumbrance on assets of Ampal Israel of at least $150,000, provided however that such attachment or lien are not removed within 45 days.

- Notwithstanding anything contained in the Stipulation, the Trustee acknowledges that the Debtor and Ampal Israel are liable to BH in the principal amount of $3,500,000, less the AI Set Off and the Remaining Funds when applied ("Principal Balance"), plus continuing interest, attorney's fees and expenses to be agreed upon by the parties or determined by the Bankruptcy Court, all as set forth in the Loan Documents.

- The Trustee waives any right to challenge the Principal Balance of the BH POC, but reserves the right to challenge the remaining portion of the claim.

26.    The Trustee believes that the settlement is in the best interest of the Debtor's estate.

## REQUEST FOR RELIEF

27.    By this Motion, the Trustee seeks approval of the Stipulation pursuant to Bankruptcy Code sections 105(a)[2] and 362(d)[3] and Bankruptcy Rules 4001(d)[4] and

---

[2] Bankruptcy Code section 105(a) authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

[3] Bankruptcy Code section 362(d)(1) provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling,

9019(a).[5]

## THE STIPULATION SHOULD BE APPROVED

28.     Bankruptcy Rule 9019(a) grants the bankruptcy court authority to approve

settlement of legitimate disputes in bankruptcy cases. In re Drexel Burnham Lambert

Group, 140 B.R. 347, 349 (S.D.N.Y. 1992); In re WorldCom, Inc., 347 B.R. 123, 136-

---

modifying, or conditioning such stay—

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]

11 U.S.C. §362(d)(1).

[4] Bankruptcy Rule 4001(d)(1) provides, in pertinent part:

> (d) AGREEMENT RELATING TO RELIEF FROM THE AUTOMATIC STAY, PROHIBITING OR CONDITIONING THE USE, SALE, OR LEASE OF PROPERTY, PROVIDING ADEQUATE PROTECTION, USE OF CASH COLLATERAL, AND OBTAINING CREDIT.

> (1) *Motion; Service.*

> (A) *Motion.* A motion for approval of any of the following shall be accompanied by a copy of the agreement and a proposed form of order:

>> (i) an agreement to provide adequate protection;
>> (ii) an agreement to prohibit or condition the use, sale, or lease of property;
>> **(iii) an agreement to modify or terminate the stay provided for in § 362;**
>> (iv) an agreement to use cash collateral; or
>> (v) an agreement between the debtor and an entity that has a lien or interest in property of the estate pursuant to which the entity consents to the creation of a lien senior or equal to the entity's lien or interest in such property.

Fed.R.Bankr.P. 4001(d)(1)(A) (emphasis added).

[5] Bankruptcy Rule 9019(a) provides, in pertinent part, that "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

282115v4                                                                8

137 (Bankr. S.D.N.Y. 2006).

29.    The decision to approve a settlement lies within the discretion of the bankruptcy court. Fischer v. Pereira (In re 47-49 Charles Street, Inc.), 209 B.R. 618 (S.D.N.Y. 1997); In re Prudential Lines, Inc., 170 B.R. 222, 246 (S.D.N.Y. 1994), citing In re Texaco, Inc., 84 B.R. 893 (Bankr. S.D.N.Y.), appeal dismissed, 92 B.R. 38 (S.D.N.Y. 1988); WorldCom, 347 B.R. at 136-137.

30.    A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before it may approve the settlement. In re MF Global, Inc., 2013 Bankr. LEXIS 427 at *12 (Bankr. S.D.N.Y. Jan. 31, 2013); In re Drexel Burnham Lambert Grp., Inc., 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968)). See also Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re SageCrest II), Nos. 3:10cv978 (SRU), 3:10cv979 (SRU), 2011 U.S. Dist. LEXIS 3517, 2011 WL 134893, at *8-9 (D. Conn. Jan. 14, 2011); Cousins v. Pereira (In re Cousins), No. 09 Civ. 1190(RJS), 2010 U.S. Dist. LEXIS 136139, 2010 WL 5298172, at *3 (S.D.N.Y. Dec. 22, 2010); In re Chemtura Corp., 439 B.R. 561, 593-94 (Bankr. S.D.N.Y. 2010); In re Lehman Bros. Holdings, 435 B.R. 122, 134 (S.D.N.Y. 2010).

31.    Courts have developed standards to evaluate if a settlement is fair and equitable, and, to that end, courts in this Circuit have set forth factors for approval of settlements based on the original framework announced in Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968). See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. N.Y. 2007)(citing TMT Trailer Ferry). See also 10 Collier on Bankruptcy P 9019.02 (15th ed. rev.)  Those interrelated factors

9

are: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining." Motorola, 478 F.3d at 462, citing WorldCom, 347 B.R. at 137 (Bankr. S.D.N.Y. 2006).

32.    It is not necessary for the bankruptcy court to conduct a "mini trial" on the issue. Worldcom, 347 B.R. at 137; Drexel Burnham Lambert, 140 B.R. at 349.  The Court need only "canvass the issues" to determine if the "settlement falls below the lowest point in the range of reasonableness." In re Teltronics Serv., Inc., 762 F.2d 185, 189 (2d Cir. 1985); Worldcom, 347 B.R. at 137.

33.    It is respectfully submitted that when this Court "canvasses" the issues surrounding the proposed settlement, it should conclude, as the Debtors have, that the settlement does not "fall below the lowest point in the range of reasonableness". See Teltronics, 762 F.2d at 189.

## APPLICATION OF THE 9019 FACTORS TO THE STIPULATION

34.    As demonstrated below, the relevant factors militate strongly in favor of approval of the Stipulation.

(1)    The Balance Between The Litigation's Possibility
       Of Success And The Settlement's Future Benefits

35.    BH asserts a lien on the Deposited Funds.  As stated above, the BH POC asserts a claim in the amount of $3,523,488.56 as of the Petition Date, and alleges that it is partially secured by the Deposited Funds.

36.    The Terms and Conditions annexed to the 2011 Note provide that "Every account of Borrower with the Bank shall be subject to a lien and to being set off against the Liabilites…".  (Terms and Conditions, §C.)

37.    Bankruptcy Code section 553[6] does not create a right of setoff, but rather

---

[6]    Bankruptcy Code Section 553, entitled "Setoff", provides:

   **(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—**

   (1) the claim of such creditor against the debtor is disallowed;

   (2) such claim was transferred, by an entity other than the debtor, to such creditor—

   (A) after the commencement of the case; or

   (B) (i) after 90 days before the date of the filing of the petition; and

   (ii) while the debtor was insolvent (except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561; or

   **(3) the debt owed to the debtor by such creditor was incurred by such creditor—**

   **(A) after 90 days before the date of the filing of the petition;**

   **(B) while the debtor was insolvent; and**

   **(C) for the purpose of obtaining a right of setoff against the debtor** (except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561).

11 U.S.C. § 553 (emphasis added).

preserves whatever right exists under applicable non-bankruptcy law. In re The
Funding Group, Inc., 146 F. 3d 136, 138-139 (2d. Cir. 1998).

38.    Bankruptcy Code section 506 governs the amount of a secured claim. "In
general, section 506(a) provides that the existence of a right of setoff under
nonbankruptcy law establishes the existence of a secured claim for purposes of the
section if the setoff right under nonbankruptcy law is preserved in section 553 of the
Code." 4-506 Collier on Bankruptcy P 506.03. Section 506(a) provides that:

> An allowed claim of a creditor ... that is subject to setoff under
> section 553 of this title, is a secured claim ... to the extent of the
> amount subject to setoff ... and is an unsecured claim to the extent
> that ... the amount so subject to setoff is less than the amount of
> such allowed claim.

11 U.S.C. §506(a).

39.    Thus, pursuant to Bankruptcy Code section 506(a), if BH has a right of
setoff against the Debtor's Deposited Funds, then BH has a lien on the Deposited
Funds to the extent of the amount subject to setoff. See N. Am. Energy Conservation,
Inc. v. Interstate Energy Res., Inc. (In re N. Am. Energy Conservation, Inc.), 2000 U.S.
Dist. LEXIS 15084 (S.D.N.Y. Oct. 10, 2000) ("Indeed, a setoff claim takes on particular
importance in the context of bankruptcy, as it, in effect, 'elevates an unsecured claim to
secured status to the extent that the debtor has a mutual, pre-petition claim" against the
party asserting setoff'"); 5-553 Collier on Bankruptcy P 553.06. As demonstrated below,
it is unclear whether BH has a right of setoff. It is the Trustee's position that BH may be
precluded from having any right of setoff. BH disputes that position.

40.    A creditor bears the burden of proving its right of setoff and must establish
the following three criteria: (1) the debtor must owe a debt to the creditor which arose
pre-petition; (2) the debtor must have a claim against the creditor which arose pre-
petition; and (3) the debt and claim must be mutual. Geron v. Schulman (In re Manshul

Constr. Corp.), 2000 U.S. Dist. LEXIS 12576 at *159-60 (S.D.N.Y. Aug. 29, 2000).

See also In re Ionosphere Clubs, Inc., 164 B.R. 839, 841 (Bankr. S.D.N.Y. 1994) (citing

Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030 (5th Cir. 1987)). Once the

technical requirements of setoff are satisfied, a court "must scrutinize the right of setoff

in light of the Bankruptcy Code's goals and objectives. Manshul Constr. Corp., 2000

U.S. Dist. LEXIS 12576 at *160 (S.D.N.Y. Aug. 29, 2000). These goals include . . .

equitable treatment of all creditors." Id., quoting Ionosphere Clubs, 164 B.R. at 841

(quotation omitted).

41.    Even if the technical requirements of setoff are satisfied, there are

exceptions to the right of setoff, as discussed below.  Moreover, although set-off is

favored, a court may invoke equitable considerations and deny set-offs in the interests

of justice.  Manshul Constr. Corp., 2000 U.S. Dist. LEXIS 12576 at *160 (concluding

that setoff was unwarranted where the defendants "transferred millions of dollars out of

Manshul and to an offshore account in order to defraud the creditors of Manshul and

Allan Schulman.").

42.    Bankruptcy Code section 553(a) carves out an exception to a bank's

general right of setoff to the extent that:

> (3) the debt owed to the debtor by such creditor was incurred by such
> creditor –
> (A) after 90 days before the date of the filing of the petition;
> (B) while the debtor was insolvent; and
> (C) for the purpose of obtaining a right of setoff against the debtor.

Pereira v. Summit Bank, 2001 U.S. Dist. LEXIS 1712 (S.D.N.Y. 2001) at *30.  See also

5-553 Collier on Bankruptcy P 553.01 ("section 553(a)(3) bars setoff if the creditor

became indebted to the debtor for the purpose of obtaining a right of setoff and the debt

was incurred within 90 days before the commencement of the debtor's case while the

debtor was insolvent.").

43.    In order to determine whether §553(a)(3)(C) is satisfied where bank deposits are at issue, courts look at whether the deposits were made in good faith and in the ordinary course. In the bankruptcy context, a bank's right of setoff applies only to deposits made in good faith, accepted in the due course of the bank's business of accepting deposits, and subject to withdrawal at the will of the debtor. See Official Comm. of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re Bennett Funding Group, Inc.), 212 B.R. 206, 215-16 (2d Cir. BAP 1997), aff'd, 146 F.3d 136 (2d Cir. 1998)("Generally, courts are wary about any possible deliberate manipulation of the amounts deposited either by the debtor or the creditor...if a bank can show that it accepted the deposits in good faith, that the deposits were made in the due course of the bank's business of accepting deposits, and that the deposits were subject to withdrawal at the will of the debtor, then §553(a)(3) may not apply."); Pereira, 2001 U.S. Dist. LEXIS 1712 at *31-32 (concluding that section 553(a)(3) precluded the exercise of setoff); Katz v. First Nat'l Bank of Glen Head, 568 F.2d 964, 970 (2d Cir. 1977); Miller v. Wells Fargo Bank Int'l Corp., 540 F.2d at 548, 557 (2d Cir. 1976) (the right of setoff "does not apply where a deposit is accepted by a bank with an intent to apply it on a pre-existing claim against the [debtor]."); In re Bohlen Enters., Ltd., 78 B.R. 556, 560-61 (Bankr. N.D. Iowa 1987) ("If the deposits are not accepted in the ordinary course of business, or are procured, accepted, or built up for the real purpose of allowing the bank to obtain a setoff, the deposits will be considered preferential in effect and the right of setoff is lost under §553(a)(3). The deposit is condemned whether the malevolent purpose is on the part of the debtor, the bank, or a third party transferring funds into the debtor's bank account.").

44.    While the Trustee believes he may be successful if he were to seek to

deny setoff under section 553(a)(3) or upon equitable grounds, the Trustee acknowledges that there are always risks in litigation.

45.    The Trustee believes that the interest of the creditors and all parties in interest are best served by the settlement in that the settlement resolves disputes with BH fairly and eliminates the litigation risk associated with BH's alleged lien. Under the Stipulation, the BH Claim will be deemed unsecured, the estate will immediately receive $300,000 from the Accounts, and the Remaining Funds will be applied by BH in reduction of the BH Claim without the Trustee having to seek to avoid BH's alleged lien or draft, file, or prosecute a claim objection. The Trustee also believes that fixing BH's percentage of Ampal Israel's debts at 6.475% is a reasonable compromise of the position taken by BH and Ampal Israel.

46.    The Stipulation also serves the interest of creditors in that, although the Trustee waives any right to challenge the Principal Balance of the BH POC, the Stipulation preserves the Trustee's right to challenge the remaining portion of the BH POC.

(2)    The Likelihood of Complex And Protracted Litigation, With
Its Attendant Expense, Inconvenience, And Delay, Including
The Difficulty In Collecting On The Judgment

47.    The secured claim that BH alleges is substantial. As stated above, the BH POC was filed in the amount of $3,523,488.56. The BH POC (annexed hereto as **Exhibit "B"**) alleges that it is secured by collateral having a value of $767,888.00. There would likely be an undue delay in the administration of the Debtor's case and in the making of distributions if the Stipulation is not approved by the Bankruptcy Court, and if the Trustee were instead forced to litigate with BH.

(3)    The Paramount Interests of The Creditors

48.    The paramount interest of creditors is served by the Stipulation. It is desirable and beneficial to creditors that all the issues be fully and finally settled in the manner and upon the terms and conditions set forth in the Stipulation.

(4)    Whether Other Parties In Interest Support The Settlement

49.    This factor weighs in favor of the Stipulation. The Trustee believes that the bond holders who represent over 95% of the unsecured claims support the Stipulation.

(5)    The "Competency and Experience of Counsel" Supporting the Settlement

50.    This factor militates in favor of approval of the settlement. The settlement was negotiated by experienced bankruptcy counsel – Nachamie Spizz Cohen & Serchuk, P.C. on behalf of the Trustee, and Andrew Gold, Esq. of Herrick Feinstein on behalf of BH. Ampal Israel was represented by its Director, Shlomi Kelsi, and counseled by Ofer Shapira, an experienced insolvency attorney in Israel.

(6)    The Nature And Breadth of Releases To Be Obtained by
       Officers and Directors

51.    No releases of officers or directors are being provided in the Stipulation.

(7)    The Extent To Which The Settlement Is The Product of
       Arm's Length Bargaining

52.    The Stipulation is the product of arm's length bargaining between the Trustee and BH.

53.    Based on the foregoing, it is clear that the relevant factors weigh heavily in favor of approval of the Stipulation. The Trustee believes that the terms of the Stipulation are fair and reasonable and in the best interests of the Debtor's estate.

## COMPLIANCE WITH BANKRUPTCY RULE 4001(d)

54.    Bankruptcy Rule 4001(d)(1)(A) requires that a motion for approval of an

agreement to modify or terminate the automatic stay be accompanied by a copy of the agreement and a proposed form of order.  A copy of the proposed Stipulation and Order is annexed to this Motion.   This Motion therefore satisfies the requirements of Bankruptcy Rule 4001(d)(1)(A).

55.    Bankruptcy Rule 4001(d)(1)(B) requires that this Motion list or summarize the location of the material provisions of the agreement modifying the stay.  This Motion summarizes the material provisions of the agreement to lift the stay pursuant to Bankruptcy Code section 362(d).   The terms of the Stipulation providing for stay relief are set forth in paragraph 2 of the Stipulation.

56.    Based on the foregoing, the Trustee respectfully requests that this Court approve the Stipulation pursuant to Bankruptcy Code sections 105(a) and 362(d) and Bankruptcy Rules 4001(d) and 9019(a).

## NOTICE

57.    Notice of this Motion has been given in accordance with this Court's Order Granting Chapter 7 Trustee's Motion to Limit Notice and to Establish Case Management Procedures, entered on September 12, 2013 [Docket No. 342].

## NO PRIOR MOTION

58.    No previous request for the relief sought herein has been made by the Trustee to this or any other Court.

## CONCLUSION

59.    The Trustee respectfully requests that the Court approve the Stipulation annexed hereto as **Exhibit "A"**, and that the Court grant such other and further relief as to this Court appears just and proper.

Dated:  New York, New York
        December __27__, 2013

                              NACHAMIE SPIZZ COHEN & SERCHUK, P.C.
                              Attorneys for Alex Spizz, Chapter 7 Trustee

                        By: _____
                              Alex Spizz, Esq.
                              Janice B. Grubin, Esq.
                              Arthur Goldstein, Esq.
                              Jill Makower, Esq.
                              425 Park Avenue
                              New York, NY 10022
                              (212) 754-9400

**EXHIBIT "A"**

NACHAMIE SPIZZ COHEN & SERCHUK, P.C.
Attorneys for **Alex Spizz, Chapter 7 Trustee**
425 Park Avenue
New York, NY 10022
(212) 754-9400
Alex Spizz, Esq.
Janice B. Grubin, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK
-------------------------------------------------x

In re:                                                     Chapter 7

AMPAL-AMERICAN ISRAEL CORPORATION,                         Case No. 12-13689 (SMB)

                              Debtor.
-------------------------------------------------x

**STIPULATION AND AGREED ORDER BETWEEN CHAPTER 7
TRUSTEE AND BANK HAPOALIM B.M. MODIFYING AUTOMATIC
STAY AND RESOLVING BANK HAPOALIM B.M.'S ALLEGED
SECURITY INTEREST IN DEBTOR'S BANK DEPOSITS AND CLAIM
AGAINST DEBTOR'S WHOLLY OWNED SUBSIDIARY**

**IT IS HEREBY STIPULATED AND AGREED** by and between (i) Alex Spizz, as

the Chapter 7 trustee (the "Trustee") of the above-captioned debtor, Ampal-American

Israel Corporation (the "Debtor"), (ii) Bank Hapoalim B.M. ("BH"), through their

respective counsel, and (iii) Ampal Israel Ltd. ("Ampal Israel"), as follows:

WHEREAS, on August 29, 2012 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy

Code") in this Court; and

283488v2

WHEREAS, on September 25, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee"); and

WHEREAS, on April 8, 2013, the Court ordered the appointment of a Chapter 11 trustee and the Office of the U.S. Trustee thereafter designated Michael Luskin as Chapter 11 trustee; and

WHEREAS, by Order dated May 2, 2013 (the "Conversion Date"), the Court converted the Debtor's case to one under Chapter 7; and

WHEREAS, on May 3, 2013, the Office of the U.S. Trustee appointed Alan Nisselson as interim Chapter 7 trustee; and

WHEREAS, on May 20, 2013 (the "Election Date"), Alex Spizz was elected Chapter 7 Trustee of the Debtor pursuant to section 702 of the Bankruptcy Code and was duly qualified thereafter; and

WHEREAS, on February 22, 2013, BH filed a proof of claim (the "BH POC") in this case in the amount of $3,523,488.56 as of the Petition Date, which BH asserts is partially secured by the Deposited Funds (as defined below) ("BH Claim").

WHEREAS, prior to the Petition Date, BH, as lender, and the Debtor, as borrower, entered into a Committed Line of Credit Agreement dated as of June 5, 1992 (the "Agreement") providing for a Committed Line of Credit (the "Facility") to the Debtor; and

WHEREAS, prior to the Petition Date, BH made a loan to the Debtor, evidenced by a promissory note dated as of June 27, 2008 in the amount of $3,500,000.00 (the "2008 Note"); and

**WHEREAS,** the 2008 Note was guaranteed by Ampal Israel LTD., a wholly-owned subsidiary of the Debtor organized under the laws of the State of Israel. pursuant to a certain Deed of Continuing Guarantee Unlimited in Amount (the "Guarantee"); and

**WHEREAS,** the Debtor and BH entered into a Letter Agreement dated as of July 29, 2011 (the "Letter Agreement") which amended the Agreement and, inter alia, (i) converted the Facility to a term loan to the Debtor in the principal amount of $3,500,000.00 (the "Term Loan"), which Term Loan was evidenced by a promissory note dated as of July 29, 2011 (the "2011 Note") made by the Debtor in favor of BH, bearing a maturity date of June 30, 2018, and (ii) provided that the 2011 Note replaced and suspended, but did not extinguish, the debt evidenced by the 2008 Note (the Term Loan, the 2008 Note, the Letter Agreement, the 2011 Note and the Guarantee are hereby collectively referred to as the "Loan Documents"); and

**WHEREAS,** annexed to the 2011 Note are "Terms And Conditions" which provide that "[e]very Account of Borrower with the Bank shall be subject to a lien and to being set off against the Liabilities..." (Terms And Conditions, § C), and defines the term "Liabilities" as "(a) any and all of the Debt evidenced by this Note, and any and all other Debt of Borrower to, or held or to be held by, the Bank in any jurisdiction worldwide for its own account or as agent for another or others, whether created directly or acquired by Transfer or otherwise, and (b) any and all obligations of any other Party with respect to any of such Debt." (Terms And Conditions, §N(19)); and

**WHEREAS,** as of the Petition Date, the Debtor was the owner and account holder of three bank accounts at BH, two in BH branches in the United States (the "U.S.

Accounts") and one in a BH branch in Israel (the "Israel Account" and, together with the U.S. Accounts, the "Accounts"); and

WHEREAS, the Debtor's U.S. Accounts consist of (a) a time deposit account held in the Americas Tower BH branch (Dept. or Branch No. 002) in New York, New York, account number 0170009526 ("Time Deposit Account"), and (b) a DDA checking account held in the BH New York branch (Dept. or Branch No. 001), located in New York, New York, account number 0170009501 (the "DDA Account"); and

WHEREAS, the Debtor's Israel Account is held at Branch 600 in Tel Aviv, Israel and bears account number 631593; and

WHEREAS, according to the Debtor's bank statements generated by BH, and according to the Debtor's Schedules, as of the Petition Date, the balances in the Debtor's U.S. Accounts were as follows: (a) $500,157.27 in the Time Deposit Account; and (b) $144,498.71 in the DDA Account; and

WHEREAS, the Debtor's Bankruptcy Schedules indicate that as of the Petition Date, the balance in the Debtor's Israel Account was $123,389.52;[1] and

WHEREAS, BH implemented an administrative freeze on the Accounts and the funds in the Accounts (the "Deposited Funds"); and

WHEREAS, upon the filing of the Debtor's petition, BH made demand upon Ampal Israel based on the Guarantee and in March of 2013 set off $760,000 of Ampal Israel's funds which were on deposit with BH in Israel ("AI Set Off") and applied said funds against all amounts due BH pursuant to the Loan Documents; and

---

[1]  This is the amount in U.S. Dollars. Nir Bernstein, who had been the Debtor's Vice President and Controller and who signed the Debtor's Schedules, advised the Trustee that the Debtor's Schedule "B" listed the Israel Account three times, because that account contained funds in U.S. Dollars, in Euros and in New Israeli Shekels. The sum of all funds contained in the Israel Account totals $123,389.52 in U.S. Dollars, as reflected on Schedule "B" of the Debtor's Bankruptcy Schedules.

**WHEREAS**, BH asserted a security interest in the Deposited Funds contained in the Accounts and advised the Debtor that it was prepared to seek appropriate court authority with respect to the Accounts to apply the Deposited Funds to the Debtor's outstanding obligations to BH; and

**WHEREAS**, BH had settlement discussions with the Debtor, the Chapter 11 trustee and the interim Chapter 7 trustee; and

**WHEREAS**, the Debtor believes that BH may be precluded from having a right of setoff with respect to the Deposited Funds, based on the Bankruptcy Code section 553(a)(3) exception to setoff, and also based on equitable grounds, and therefore, the BH Claim may be deemed wholly unsecured, which position is disputed by BH; and

**WHEREAS**, BH and the Debtor dispute the percentage of BH's Claim as against the total debts of Ampal Israel;

**NOW, THEREFORE**, the Trustee, Ampal Israel and BH, by their respective counsel, hereby agree, subject to Bankruptcy Court approval, as follows:

1.    This Stipulation shall not be enforceable against or binding upon any party hereto until it is approved and so ordered by the Bankruptcy Court.    In the event that the Bankruptcy Court declines to approve this Stipulation, all claims and rights of the parties hereto are reserved and nothing contained herein shall be deemed a waiver or admission by any party.    The Debtor, Ampal Israel and BH agree to use their best efforts to seek approval of this Stipulation.

2.    Upon entry of a final non-appealable order approving this Stipulation, BH's alleged security interest in Debtor's Deposited Funds shall be deemed resolved as follows:    (a) Three Hundred Thousand Dollars ($300,000.00) of the Deposited Funds

shall be immediately delivered by BH and paid to the Trustee, (b) BH shall have all right, title and interest in all but $300,000.00 of the Deposited Funds (the Deposited Funds less the $300,000.00 to be paid to the Debtor's estate is hereinafter referred to as the "Remaining Funds"), and (c) the Remaining Funds shall be applied by BH in reduction of the BH Claim, (d) the automatic stay shall be deemed modified pursuant to Bankruptcy Code section 362(d) solely to permit BH to deduct the Remaining Funds from the Accounts and apply them in reduction of the BH Claim, (e) BH's alleged lien shall be deemed released on each of the Accounts and the BH Claim shall be deemed wholly unsecured, and (f) the BH Claim shall be deemed amended to incorporate the terms agreed to in this Stipulation.

3.    The Debtor, Ampal Israel and BH agree that BH's percentage of Ampal Israel's debts will be fixed at 6.475% and further agree that BH will receive that percentage out of any distributions made subsequent to the date of the Stipulation to unsecured creditors of Ampal Israel up to the amount of BH Claim. "Distributions" will include any payments to unsecured creditors other than (i) those made in the ordinary course of business,(ii) payments for goods or services rendered prior to January 1st, 2013 and (iii) payments for employees and VAT claims. Such percentage will not be changed or amended as a result of the recovery stipulated in Sec. 2 above or any future recovery on the account of BH Claim. Also, such percentage will not be changed or amended (for better or worse) as a result of any findings, decisions or changes made in the claims of any creditor of Ampal Israel (including, but only, claims made by any of its affiliates) toward Ampal Israel.

4.    BH will not commence, or continue with, any legal or other proceedings against Ampal Israel, including but not only any collection proceedings with respect to BH Claim, as long as the Chapter 7 proceedings are taking place. However, in the event that: (i) no distribution is made by Ampal Israel to its creditors, including BH during a period of 36 months from the date of the approval of this stipulation, or (ii) a Triggering Event occurs, BH will be immediately entitled to commence any legal proceedings in order to enforce its rights (with no change in BH's percentage as aforementioned in Sec.3). A "Triggering Event" shall be (i) the appointment of a receiver, commencement of dissolution proceedings or other insolvency proceedings against Ampal Israel, or (ii) an attachment or voluntary or involuntary lien or encumbrance on assets of Ampal Israel of at least $150,000, provided however that such attachment or lien are not removed within 45 days.

5.    Notwithstanding anything contained in this Stipulation, the Trustee acknowledges that the Debtor and Ampal Israel are liable to BH in the principal amount of $3,500,000, less the AI Set Off and the Remaining Funds when applied ("Principal Balance"), plus continuing interest, attorney's fees and expenses to be agreed upon by the parties or determined by the Bankruptcy Court, all as set forth in the Loan Documents.

6.    The Trustee waives any right to challenge the Principal Balance of the BH POC, but reserves the right to challenge the remaining portion of the claim.

7.    This Stipulation constitutes the entire agreement and understanding of the parties hereto and supersedes any prior discussion or statement by and between the parties with respect to the subject matter hereof.

283488v2                                    7

8.    This Stipulation shall be binding on and inure to the benefit of the parties hereto and their respective successors, assigns, representatives, heirs, executors, administrators, trustees, receivers, members, managers, partners, employees and agents, as the case may be.

9.    This Stipulation may not be waived, amended or modified orally or in any other way or manner except by a writing signed by the party to be bound, and such approval and authorization of the Bankruptcy Court as may be necessary and appropriate under the circumstances.

10.    Each party represents and warrants to the other that its execution, delivery and performance of this Stipulation is within the power and authority of such party and has been duly authorized by such party.

11.    This Stipulation may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument.

12.    The Bankruptcy Court shall retain exclusive jurisdiction over the parties for the purpose of enforcing the terms and provisions of this Stipulation against any person or entity that may violate its terms or refuse to act in accordance with its terms.

13.    The Bankruptcy Court shall retain jurisdiction to interpret, enforce and resolve any disputes arising under or related to this Stipulation.

Dated: New York, New York
        December 24 , 2013

NACHAMIE SPIZZ COHEN
& SERCHUK, P.C.
Attorneys for Chapter 7 Trustee

By: _____
        Alex Spizz
        Janice B. Grubin
        Jill Makower
425 Park Avenue
New York, NY  10022
(212) 754-9400


Dated: Tel Aviv, Israel
        December_____, 2013

AMPAL ISRAEL LTD.


By: _____
        Shlomi Kelsi, Director



SO ORDERED

_____ __, 2013
New York, New York

Dated: New York, New York
        December 25 , 2013

HERRICK, FEINSTEIN LLP
Attorneys for Bank Hapoalim B.M.

By: _____
        Andrew C. Gold
2 Park Avenue
New York, NY 10016
(212) 592-1400

_____
STUART M. BERNSTEIN
United States Bankruptcy Judge

13.    The Bankruptcy Court shall retain jurisdiction to interpret, enforce and resolve any disputes arising under or related to this Stipulation.

Dated: New York, New York
       December 24, 2013

NACHAMIE SPIZZ COHEN
& SERCHUK, P.C.
Attorneys for Chapter 7 Trustee

By: _____
      Alex Spizz
      Janice B. Grubin
      Jill Makower
425 Park Avenue
New York, NY 10022
(212) 754-9400

Dated: Tel Aviv, Israel
       December 24, 2013

AMPAL ISRAEL LTD.

By: _____
    Shlomi Kelsi, Director

Dated: New York, New York
       December_____, 2013

HERRICK, FEINSTEIN LLP
Attorneys for Bank Hapoalim B.M.

By: _____
      Andrew C. Gold
2 Park Avenue
New York, NY 10016
(212) 592-1400

SO ORDERED

_____, 2013
New York, New York

                            _____
                            STUART M. BERNSTEIN
                            United States Bankruptcy Judge

**EXHIBIT "B"**

| UNITED STATES BANKRUPTCY COURT<br>FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Ampal-American Israel Corporation | Case Number<br>12-13689 (SMB) | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br><br>Bank Hapoalim B.M.<br><br>Name and address where notices should be sent:<br>Herrick, Feinstein LLP<br>2 Park Avenue<br>New York, New York 10016<br>Attn: Andrew C. Gold, Esq.<br><br>Telephone No.    (212) 592-1400 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check box if you have never received notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | Filed: USBC - Southern District of New York<br>AMPAL AMERICAN ISRAEL CORPORATION, Et Al.<br>12-13689 (SMB)      0000000008<br><br>‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖<br><br>This space is for Court Use Only |

| Account or other number by which creditor identifies debtor: | Check here<br>if this claim    ☐ replaces<br>                      ☐ amends    a previously filed claim, dated: __ |

| 1.  **Basis for Claim**<br>   ☐ Goods sold<br>   ☐ Services performed<br>   ☒ Money loaned<br>   ☐ Personal injury/wrongful death<br>   ☐ Taxes<br>   ☐ Other _____ | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (Fill out below)<br><br>   Your SS# _____ - _____ - _____<br><br>Unpaid compensation for services performed<br><br>from _____ to _____<br>           (date)                              (date) |

| 2.  Date debt was incurred:<br><br>     July 29, 2011 | 3.   If court judgment, date obtained: |

| 4.  **Total Amount of Claim at Time Case Filed:**         $ 3,523,488.56<br>   If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.<br>☒  Check this box if claim includes interest or other charges in addition to the principal amount of this claim. Attach itemized statement of all interest or additional charges. | | |

| 5.  **Secured Claim.**<br>☒  Check this box if your claim is secured by collateral (including a right of setoff).<br><br>Brief Description of Collateral:<br>   ☐ Real Estate       ☐ Motor Vehicle<br>   ☒ Other<br><br>Value of Collateral:  $767,888.00<br><br>Amount of arrearage and other charges <u>at time case filed</u> included in secured claim above, if any $ | 6.  **Unsecured Priority Claim.**<br>☐  Check this box if you have an unsecured priority claim<br>    Amount entitled to priority $ _____<br>    Specify the priority of the claim:<br>☐  Wages, salaries, or commissions (up to $4,300),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3)<br>☐  Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4)<br>☐  Up to $1,950* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(6)<br>☐  Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).<br>☐  Taxes or penalties of governmental units – 11 U.S.C. § 507(a)(8).<br>☐  Other–Specify applicable paragraph of 11 U.S.C. § 507(a-_____).<br>*Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

| 7.  CREDITS:  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br>8.  Supporting Documents:  *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br>9.  Date-Stamped Copy:  To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | This Space Is for Court Use Only<br><br>┌─────────────────────┐<br>│  **FILED / RECEIVED**  │<br>│                             │<br>│     FEB 22 2013      │<br>│                             │<br>└─────────────────────┘<br>EPIQ BANKRUPTCY SOLUTIONS, LLC |

| Date<br><br>February 20, 2013 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>*Elliot Winter, SVP*     *M Signorile AVP*<br>Elliot Winter, Senior Vice President     Mary Ellen Signorile, Assistant Vice President | |

| *Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 AND 3571. |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :    Chapter 11
                                              :
AMPAL-AMERICAN ISRAEL CORPORATION, :    Case No.: 12-13689 (SMB)
                                              :
                    Debtor.                   :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>RIDER TO PROOF OF CLAIM</u>

1.      Bank Hapoalim B.M. (the "Claimant") hereby asserts this Rider to supplement its attached proof of claim ("Proof of Claim") against the debtor Ampal-American Israel Corporation (the "Debtor").

2.      The undersigned is authorized to submit this proof of claim on the Claimant's behalf.

3.      Claimant hereby asserts a secured claim in the amount of $767,888.00 and a general unsecured claim in the amount of $2,755,600.56 (collectively, the "Claim") against the Debtor on account of monies owed by the Debtor to Claimant prior to August 29, 2012 (the "Petition Date").

4.      Claimant and the Debtor are parties to a letter agreement dated as of July, 29, 2011 (the "Letter Agreement"), whereby Claimant agreed to provide a term loan to the Debtor in the principal amount of $3,500,000, plus interest (the "Loan"). A true and correct copy of the Letter Agreement is annexed hereto as <u>Exhibit "A"</u>.

5.      The Loan was evidenced by a promissory note by and between Claimant and the Debtor, dated as of July 29, 2011 (the "Note"), whereby the Debtor, as borrower, promised to

pay to Claimant the principal amount of $3,500,000, plus interest at a rate to be calculated in accordance with the terms of the Note and certain riders thereto. A true and correct copy of the Note and riders thereto are annexed hereto as Exhibit "B".

6.    As of the Petition Date, $3,523,488.56 was due and owing to Claimant under the Note.

7.    The Debtor also maintains bank accounts with Claimant (the "AMPAL Accounts"). The AMPAL Accounts are governed by an account agreement between Claimant and the Debtor (the "Account Agreement"), pursuant to which the Debtor granted Claimant "a security interest in all deposits and in any and all other property belonging to [the Debtor] currently held or which will be held in the future by [Claimant]." A true and correct copy of the Account Agreement is annexed hereto as Exhibit "C".

8.    As of the Petition Date, the aggregate balance in the AMPAL Accounts was $767,888.00. Accordingly, the Claim is secured in the amount of $767,888.00.[1]

9.    The Claimant reserves the right to amend and/or supplement this Proof of Claim in any manner and/or to file additional or other proofs of claims for additional or other claims it may have against the Debtor including, but not limited to, an additional request of an administrative expense(s) pursuant to 11 U.S.C. §§ 503 and 507(a)(2) for any fees which have accrued since the Petition Date as well as for any damages which might accrue; and also interest, reasonable fees, costs and other expenses allowable under 11 U.S.C. §506(b).

---

[1] The amount of Claimant's secured claim continues to increase during the pendency of the Chapter 11 Case as a result of the accrual of interest on the Debtor's deposits in the AMPAL Accounts.

2

10.    The filing of this Proof of Claim is not:

(a)    a waiver or release of:  (1) any right to claim specific assets; (2) any right of setoff, recoupment or counterclaim; (3) any right arising by operation of law or in equity; or (4) the Claimant's rights against any person, entity or property;

(b)    a waiver or release of any right or claim of Claimant arising out of, or in respect of, any order entered in these cases, or of any other claim, of any nature whatsoever, which the Claimant has against the Debtor, its estate or any other person or entity;

(c)    a waiver of a right to move to withdraw the reference, or otherwise to challenge the jurisdiction of this Court, with respect to the subject matter of this Proof of Claim, and any objections or other proceeding commenced in this case against or otherwise involving the Claimant;

(d)    an election of any remedy to the exclusion, express or implied, or any other remedy;

(e)    a ratification or consent to any obligations or liability based upon or arising out of the indebtedness of the Debtor to the Claimant or the transactions evidenced thereby, all of which rights are expressly reserved.

11.    All notices in respect of the Claimant's claim are to be sent to:

> Herrick, Feinstein LLP
> Attn.: Andrew C. Gold
> Attn: Justin B. Singer
> 2 Park Avenue
> New York, NY 10016
>
> -and-
>
> Bank Hapoalim B.M.
> 1177 Avenue of the Americas

New York, NY 10036-2790
Attn: Elliot Winter
Attn: Harold J. Weissler

12.    The request for copies of notices to be sent to counsel above shall not be deemed

authorization to accept service of process on behalf of Claimant.

13.    Nothing herein is intended to be, nor shall be deemed to be, a waiver of the

Claimant's rights and claims against any non-Debtor party.

Dated:   February 20, 2013

Bank Hapoalim B.M.

By:    _____
       Elliot Winter
       Senior Vice President

By:    _____
       Mary Ellen Signorile
       Assistant Vice President

HF 8080566 v.1  #99999/1000 02/07/2013 05:53 PM

**EXHIBIT "A"**

HF 8080566 v.1  #99999/1000 02/07/2013 05:53 PM



As of July 29, 2011

Ampal-American Israel Corporation
10 Abba Even Street
Ackerstein Tower C, 9th Fl
P.O. Box 12215
Herzliya, 46733
Israel

Ladies and Gentlemen:

We refer to the Committed Line of Credit Agreement dated as of June 5, 1992, between Bank Hapoalim B.M. (the "Bank") and Ampal-American Israel Corporation (the "Borrower"), as amended through June 30, 2011, (the "Agreement"), under which the Bank had provided the Borrower with a Committed Line of Credit (the "Facility").

We are pleased to advise that the Bank is prepared, subject to the conditions set forth below, to convert the Facility to a term loan in the principal amount of $3,500,000.00 (the "**Term Loan**"), subject to the terms set forth below. This letter agreement (the "**Letter Agreement**") shall then be deemed to be an amendment and restatement of the Agreement.

The Term Loan (1) shall be evidenced by a Promissory Note executed by the Borrower in favor of the Bank in the amount of US$3,500,000.00 (the Promissory Note together with any riders thereto [the "**Promissory Note**"]), which shall replace and supersede, but not extinguish, the debt evidenced by the Promissory Note dated as of June 27, 2008 currently in effect, (2) shall mature on June 30, 2018, and (3) shall be repaid by the Borrower in accordance with the terms and conditions of the Promissory Note.

The effectiveness of the conversion of the Facility and the amendment of the Agreement are subject to the Bank's receipt of such documentation as it may request, including without limitation, the following, each in form and substance satisfactory to the Bank in all respects: (i) this Letter Agreement duly executed by the Borrower, (ii) the Promissory Note duly executed by the Borrower in favor of the Bank, and (iii) any other documents as the Bank may require. The Borrower shall also pay the Bank a documentation fee in the amount of $1,000.00.

This Letter Agreement and the Promissory Note (the "**Loan Documents**") and the Borrower's rights and obligations hereunder and thereunder, and any claim or controversy directly or indirectly based upon or arising out of Loan Documents (whether based on contract, tort or any other theory), including all matters of construction, validity and performance, shall in all respects be governed by and interpreted, construed and

J:\ginaVl lagreements\11.111Ampal-American Israel Corporation Letter Agreement.doc (8/12/11)

*New York Branches*

---

1177 Avenue of the Americas  New York NY 10036-2790
T. 212 782 2000  F. 212 782 2222  www.hapoalimusa.com



determined in accordance with the internal laws of the State of New York without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction.

The Borrower hereby irrevocably and unconditionally accepts, consents and submits to the nonexclusive jurisdiction of the Federal and State courts located in the County of New York, State of New York. The Borrower irrevocably consents to the service of process in any action or proceeding of which the Loan Documents are the subject, by the mailing of copies thereof by certified or registered mail, postage prepaid, to the Borrower at the address set forth in this letter.

Please indicate your acknowledgment of and agreement to the foregoing by signing and returning the enclosed copy of this letter to the attention of Maxine Levy, First Vice President.

Very truly yours,

BANK HAPOALIM B.M.

By: _____
Title: _____

By: _____
Title: _____CVP_____

Acknowledged and Agreed to:

AMPAL-AMERICAN ISRAEL CORPORATION

By: X _____
Name & Title: Yosef A. Maiman, CEO

By: _____
Name & Title: Irit Eluz, SVP

AMPAL - AMERICAN

**EXHIBIT "B"**

6

HF 8080566 v.1  #99999/1000 02/07/2013 05:53 PM

**◆ bank hapoalim**

## PROMISSORY NOTE

U.S. $3,500,000.00

Dated: As of July 29, 2011, New York, New York

1. **Obligation and Repayment:** For value received, Borrower absolutely and unconditionally promises to pay to the order of the Bank, at the Office, without defense, setoff or counterclaim, the principal amount of **Three Million Five Hundred Thousand and 00/100 United States Dollars**, together with interest and any other sum(s) due and payable as specified below. The principal amount of this Note shall be due and payable as set forth below. Each date set forth below shall be a "Payment Date" hereunder.

| Payment Date | Amount |
|---|---|
| June 30, 2012 | USD 500,000.00 |
| June 30, 2013 | USD 500,000.00 |
| June 30, 2014 | USD 500,000.00 |
| June 30, 2015 | USD 500,000.00 |
| June 30, 2016 | USD 500,000.00 |
| June 30, 2017 | USD 500,000.00 |

The remaining principal balance shall be due and payable on June 30, 2018.

2. **Interest:** Subject to paragraph A(2) of the Terms and Conditions, interest shall accrue on the principal amount of this Note outstanding from time to time at the following rate described in the Rider referred to in Paragraph 3 below (the "Loan Rate"). Interest shall be payable in accordance with the attached Rider and at any Payment Date and at any time that any part of the principal or any installment of this Note is paid.

3. *Riders:* In the event of any inconsistency between this Note and any Rider(s) to which this Note is subject, the provisions of such Rider(s) shall prevail. This Note is subject to the following Rider, which is part of this Note:

Term or Installment Loan Rider to Promissory Note, Loan(s) Denominated in U.S. or Other Currency (Libor-Based Rate)

4. Address and Identification of Borrower:
Address:    10 Abba Even Street,
            Ackerstein Tower C, 9th Fl,
            P.O. Box 12215
            Herzliya, 46733 ISRAEL
Telephone:  972-9-952-6000
Fax No.:    972-9-952-6001
Taxpayer ID number: 13-0435685

5. *Agreement to All Terms and Conditions; Authorization to Complete Blanks:* This Note is subject to all of the Terms and Conditions set forth below. Each of the undersigned agrees to all of the provisions of this Note, including the Terms and Conditions and any Rider(s).

The Bank is authorized to complete any blank space in this Note. Such completion shall be conclusive, final and binding on Borrower in the absence of manifest error.

6. *No Representations or Agreements by the Bank:* Each of the undersigned acknowledges that the Bank has made no representation, covenant, commitment or agreement to Borrower except pursuant to any written document executed by the Bank.

7. *No Representation of Nonenforcement:* Each of the undersigned acknowledges that no representative or agent of the Bank has represented or indicated that the Bank will not enforce any provision of this Note, including the Terms and Conditions and any Rider(s), in the event of litigation or otherwise.

8. *Waiver of Jury Trial:* Borrower waives, and understands that the Bank waives, the right to a jury trial with respect to any dispute arising hereunder or relating to any of the Liabilities; any judicial proceeding with respect to any such dispute shall take place without a jury.

9. This Note supersedes and replaces the promissory note dated as of June 27, 2008, in the amount of $3,500,000.00, executed by the Borrower in favor of the Bank, but does not extinguish the indebtedness evidenced thereby.

10. **Execution of Promissory Note:** Borrower understands that by signing this Note the Borrower is agreeing to all of the terms as contained in this Note and all other Terms and Conditions and Rider(s).

Print name of Borrower:

AMPAL-AMERICAN ISRAEL CORPORATION

(Signature) By:
Print name: YOSEF A. MAIMAN
Title or capacity (if signing on behalf of Borrower):
CEO

(Signature) By:
Print name: IRIT ELUZ
Title or capacity (if signing on behalf of Borrower):
VP

AMPAL - AMERICAN

**◆ bank hapoalim**

## TERMS AND CONDITIONS

Definitions are set forth in paragraph N.

A. **Calculation and Accrual of Interest:** (1) **Generally.** Interest shall be calculated on a daily basis on outstanding balances at the Applicable Rate, divided by 360, on the actual days elapsed. During any time that the Applicable Rate would exceed the applicable maximum lawful rate of interest, the Applicable Rate shall automatically be reduced to such maximum rate. Any interest payment made in excess of such maximum rate shall be applied as, and deemed to be, in the Bank's sole discretion, (a) a payment of any of the Liabilities, in such manner as determined by the Bank, or (b) cash collateral to be retained by the Bank to secure repayment of this Note. (2) **Increased Rate.** Interest shall accrue at the Increased Rate upon and after (a) the occurrence of any Debtor Relief Action, (b) any demand of payment of this Note (if payable on demand) or (c) the occurrence of any Event of Default (if this Note is payable other than on demand). (3) **Accrual.** To the extent permitted by Law, interest shall accrue at the Applicable Rate on all unpaid Liabilities under this Note, including but not limited to any unpaid interest and any unpaid obligation owed pursuant to paragraph B (Indemnification).

B. **Indemnification:** To the extent permitted by Law: (1) **Taxes.** All payments under this Note shall be made free and clear of, and without deduction for, any Taxes. If Borrower shall be required to deduct any Taxes in respect of any sum payable under this Note, then (a) the sum payable shall be increased so that the Bank shall receive an amount equal to the sum the Bank would have received had no deductions been made, and (b) Borrower shall make such deductions and shall pay the amount deducted to the relevant Governmental Authority. Borrower shall pay to the Bank on demand, and shall indemnify and hold the Bank harmless from, any and all Taxes paid by the Bank and any and all liability (including penalties, interest and expenses) with respect thereto, whether or not such Taxes were correctly or legally asserted. Within 30 days after any Taxes are paid, Borrower shall furnish evidence thereof to the Bank. (2) **Regulatory Costs.** In the event that in connection with the transaction(s) contemplated by this Note and/or the Bank's funding of such transaction(s), the Bank is required to incur any Regulatory Costs in order to comply with any Law issued after the date of this Note, then Borrower shall pay to the Bank on demand, and shall indemnify and hold the Bank harmless from, any and all such Regulatory Costs. (3) **Costs and Expenses.** Borrower shall pay the Bank on demand, and shall indemnify and hold the Bank harmless from, any and all Costs and Expenses. (4) **Prepayment Costs.** If Borrower makes any payment of Prepaid Principal (voluntarily or not), and if the Applicable Rate with respect to such Prepaid Principal is not a Variable Prime-Based Rate, then Borrower shall pay to the Bank an amount sufficient to compensate the Bank for its Prepayment Costs. Borrower acknowledges that determining the actual amount of Prepayment Costs may be difficult or impossible in any specific instance. Accordingly, Borrower agrees that Prepayment Costs shall be deemed to be the excess, if any, of (i) the product of (A) the Prepaid Principal, times (B) the Applicable Rate divided by 360, times (C) the remaining number of days from the date of the payment to the applicable Payment Date, over (ii) that amount of interest which the Bank determines that the holder of a Treasury Obligation selected by the Bank in the amount (or as close to such amount as feasible) of the Prepaid Principal and having a maturity date on (or as soon after as feasible) the applicable Payment Date would earn if that Treasury Obligation were purchased in the secondary market on the date the Prepaid Principal is paid to the Bank and were held to maturity. Borrower agrees that the determination of Prepayment Costs shall be based on amounts which a holder of a Treasury Obligation could receive under these circumstances, whether or not the Bank actually invests the

Prepaid Principal in any Treasury Obligation. (5) **Bank Certificate.** The Bank's certificate as to any amounts owing under this paragraph shall be prima facie evidence of Borrower's obligation.

C. **Set Off:** Every Account of Borrower with the Bank shall be subject to a lien to being set off against the Liabilities. The Bank may at any time at its option and without notice, except as may be required by law, charge and/or appropriate and apply all or any part of any such Account toward the payment of any of the Liabilities.

D. **Events of Default:** The remainder of this paragraph D shall not apply if this Note is payable on demand. Each of the following shall be an Event of Default hereunder: (1) **Nonpayment.** (a) The nonpayment when due of any part of the Liabilities; (b) the prohibition by any Law of payment of any part of any of the Liabilities. (2) **Bankruptcy; Adverse Proceedings.** (a) The occurrence of any Debtor Relief Action; (b) the appointment of a receiver, trustee, committee, custodian, personal representative or similar official for any Party or for any Material part of any Party's property; (c) any action taken by any Party to authorize or consent to any action set forth in subparagraph D(2)(a) or (b); (d) the rendering against any Party of one or more judgments, orders, decrees and/or arbitration awards (whether for the payment of money or injunctive or other relief) which in the aggregate are Material to such Party, if they continue in effect for 30 days without being vacated, discharged, stayed, satisfied or performed; (e) the issuance or filing of any warrant, process, order of attachment, garnishment or other lien or levy against any Material part of any Party's property; (f) the commencement of any proceeding under, or the use of any of the provisions of, any Law against any Material part of any Party's property, including but not limited to any Law (i) relating to the enforcement of judgments or (ii) providing for forfeiture to, or condemnation, appropriation, seizure or taking possession by, or on order of, any Governmental Authority; (g) the forfeiture to, or the condemnation, appropriation, seizure, or taking possession by, or on order of, any Governmental Authority, of any Material part of any Party's property; (h) any Party being charged with a crime by indictment, information or the like. (3) **Noncompliance.** (a) Any Default with respect to any Agreement with or to the Bank; (b) the giving to the Bank by or on behalf of any Party at any time of any materially incorrect or incomplete representation, warranty, statement or information; (c) the failure of any Party to furnish to the Bank, copies of its financial statements and such other information respecting its business, properties, condition or operations, financial or otherwise, promptly when, and in such form as, reasonably required or requested by the Bank; (d) any Party's failure or refusal, upon reasonable notice from the Bank, to permit the Bank's representative(s) to visit such Party's premises during normal business hours and to examine and make photographs, copies and extracts of such Party's property and of its books and records; (e) any Party's concealing, removing or permitting to be concealed or removed, any part of its property with the intent to hinder or defraud any of its creditors; (f) any Party's making or suffering any Transfer of any of its property, which Transfer is deemed fraudulent under the law of any applicable jurisdiction; (g) the revocation or early termination of any Party's obligations under any Agreement with or to the Bank (including but not limited to any of the Liabilities), or the validity, binding effect or enforceability of any of such obligations being challenged or questioned, whether or not by the institution of proceedings. (h) the revocation, withdrawal, expiration, reduction or default of or under any related Letter of Undertaking or guarantee, or any agreement to which a Letter of Undertaking or guarantee was issued. (4) **Adverse Changes.** (a) The occurrence of a Material adverse change in any Party's financial condition; (b) the death or incompetence (if a person) or the dissolution or liquidation (if a corporation, partnership or other entity) of

J:\gina\11 agreements\11.109 Ampal-American Israel Corporation $3,500,000 Promissory Note.doc

AMER

any Party or such Party's failure to be and remain in good standing and qualified to do business in each jurisdiction Material to such Party; (c) any Material Default with respect to any Material Agreement other than with or to the Bank; (d) any Default pursuant to which any Person shall have the power to effect an Acceleration of any Material Debt; (e) any Acceleration or demand of payment with respect to any Material Debt; (f) any Party's becoming insolvent, as defined in the Uniform Commercial Code; (g) the Bank's believing in good faith that the prospect of payment of any of the Liabilities or of performance of any other obligation of any Party to the Bank is impaired; (h) the Material suspension of any Party's business; (i) any Party's Material failure to pay any tax when due; (j) the expulsion of any Party from any exchange or self-regulatory organization for any loss, suspension, nonrenewal or invalidity of any Party's Material license, permit, franchise, patent, copyright, trademark or the like; (k) the occurrence of any event which gives any Person the right to assert a lien, levy or right of forfeiture against any Material part of any Party's property; (l) Borrower's failure to give the Bank notice, within 10 Business Days after Borrower had notice or knowledge, of the occurrence of any event which, with the giving of notice and/or lapse of time, would constitute an Event of Default. (5) Business changes. (a) any change in Control of any Party; (b) any merger or consolidation involving any Party; (c) any Party's sale or other Transfer of substantially all of its property; (d) any bulk sale by any Party; (e) any Material change in the nature or structure of any Party's business. (6) Exchange Controls. (a) Any Party's failure to obtain any Exchange Control Permit deemed by the Bank to be necessary or appropriate; (b) the failure to obtain the renewal of any such Exchange Control Permit at least 30 days prior to its expiration.

E. *Remedies:* (1) *Acceleration at Bank's Option.* Upon any failure to pay this Note in full on demand (if payable on demand) or (if this Note is payable other than on demand) upon the occurrence of any Event of Default other than any Debtor Relief Action, then any and all Liabilities, not then due, shall, at the Bank's option, become immediately due and payable without notice, which Borrower waives. (2) *Automatic Acceleration.* Upon the occurrence of any Debtor Relief Action, then, whether or not any of the Liabilities are payable upon demand and notwithstanding paragraph F, any and all Liabilities not then due, shall automatically become immediately due and payable without notice or demand, which Borrower waives. (3) *Additional Remedies.* Bank shall have all rights and remedies available to it under any applicable Agreement or Law.

F. *Waiver of Protest, etc.:* Notice, presentment, protest, notice of dishonor and (except for such of the Liabilities as are payable on demand, but subject to subparagraph E(2)) demand for payment are hereby waived as to all of the Liabilities.

G. Payment: (1) Manner. Any payment by other than immediately available funds shall be subject to collection. Interest shall continue to accrue until the funds by which payment is made are available to the Bank. If and to the extent any payment of any of the Liabilities is not made when due, the Bank is authorized in its discretion to effect payment by charging any amount so due against any Account of Borrower with the Bank without notice, except as may be required by law, whether or not such charge creates an overdraft. (2) Application. Any payment received by the Bank (including a deemed payment under paragraph A, a set-off under paragraph C or a charge against an Account under this paragraph G) shall be applied to pay any obligation of indemnification (including but not limited to under paragraph B) and to pay any other Liabilities (including interest thereon and the principal thereof) in such order as the Bank shall elect in its discretion. Borrower will continue to be liable for any deficiency. (3) Prepayment. Borrower shall be entitled to pay any outstanding principal amount or installment under this Note on any Business Day prior to the applicable Payment Date without the prior

consent of the Bank, provided that (a) any such payment shall be together with payment of all Liabilities then due and all interest accrued on the Prepaid Principal to the date of such payment, and (b) if the Applicable Rate with respect to such Prepaid Principal is not a Variable Prime-Based Rate, any such payment shall be on not less than 5 Business Days' notice to the Bank and shall be accompanied by any amount required pursuant to subparagraph B(4). Any such payment shall, unless otherwise consented to by the Bank, be applied pro rata to the last outstanding principal amount(s) to become due under this Note in inverse order of maturity. (4) Non-Business Days. If any payment of any of the Liabilities is due on any day that is not a Business Day, it shall be payable on the next Business Day. The additional day(s) shall be included in the computation of interest. (5) Extension at Bank's Option. The Bank shall have the option, which may be exercised one or more times by notice(s) to Borrower, to extend the date on which any amount is payable hereunder to one or more subsequent date(s) set forth in such notice(s). (6) Late Payment. Without limiting or waiving any rights or remedies of the Bank contained in the Note or under applicable law, and without implying that the Bank has any obligation to declare or to notify the Borrower of the occurrence of any Event of Default, if the Bank has neither declared nor notified the Borrower of the occurrence of an Event of Default, and if any amount of any required payment of principal, interest fees and/or Late Charge (as defined below) under the Note is not paid in full within (7) seven days after the same is due, then in addition to all interest, penalty interest or other fees due to the Bank pursuant to the Note, any rider to the Note or any agreement or document related to this credit facility, the Borrower shall pay the Bank a late fee equal to $14.30 for each day thereafter. Any amount due under this paragraph shall be referred to herein as a "Late Charge". The Borrower shall pay any and all such Late Charges in addition to all payments of principal, interest and fees (if any) under the Note, provided, however, that during any time that any of the above Late Charges would cause the total interest payable under the Note to exceed the applicable maximum lawful rate of interest, then the sum of (a) all such Late Charges and (b) the amount of interest payable at the Applicable Rate shall automatically be reduced to an amount that shall not exceed the amount of interest payable at such maximum rate.

H. Parties; Counterparts; No Transfer by Borrower: If Borrower is more than one Person, all of them shall be jointly and severally liable under this Note. This Note and any Rider hereto may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single instrument. The obligations under this Note shall continue in force and shall apply notwithstanding any change in the membership of any partnership executing this Note, whether arising from the death or retirement of one or more partners or the accession of one or more new partners. Without the Bank's written consent, Borrower shall have no right to make any Transfer of any of the Liabilities; any such purported Transfer shall be void. Subject to the foregoing, the provisions of this Note shall be binding on Borrower's executors, administrators, successors and assigns.

I. Bank Transfers: (1) Transferability. Without limiting the Bank's rights hereunder, the Bank may make a Transfer of all or any part of (a) any obligation of Borrower to the Bank (including but not limited to any of the Liabilities), (b) any obligation of any other Party in connection with any of the Liabilities, (c) any Agreement of any Party in connection with any of the Liabilities, (d) any collateral, mortgage, lien or security interest, however denominated, securing any of the Liabilities, and/or (e) the Bank's rights and, if any, obligations with respect to any of the foregoing. (2) Extent of Transfer. In the event the Bank shall make any Transfer of any of the foregoing items ("Transferred Items"), then — to the extent provided by the Bank with respect to such Transfer — the Transferee shall have the rights, powers, privileges and remedies of the Bank. The Bank shall

3

AMPAL - AMERICAN
ISRAEL CORPORATION

thereafter, to the extent of such Transfer, be forever relieved and fully discharged from all liability or responsibility, if any, that it may have to any Person with respect thereto, except for claims, if any, arising prior to or upon such Transfer. The Bank shall retain all its rights and powers with respect to any Transferred Items to the extent that it has not made a Transfer thereof. Without limiting the foregoing, to the extent of any such Transfer, paragraph B (Indemnification) shall apply to any Taxes, Regulatory Costs, Costs and Expenses, and Prepayment Costs of, or incurred by, any Transferee, and paragraphs C (Set-Off) and G(1) (Payment-Manner) shall apply to any Account of Borrower with any Transferee. (3) Disclosures. The Bank is authorized to disclose to any prospective or actual Transferee any information that the Bank may have or acquire about Borrower and any information about any other Person submitted to the Bank by or on behalf of Borrower. (4) *Negotiability Defenses Waived.* If this Note is not a negotiable instrument, Borrower waives all defenses (except such defenses as may be asserted against a holder in due course of a negotiable instrument) which Borrower may have or acquire against any Transferee who takes this Note, or any complete or partial interest in it, for value, in good faith and without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any Person.

J. **No Oral Changes; No Waiver by the Bank; Partial Unenforceability:** This Note may not be changed orally. Neither a waiver by the Bank of any of its options, powers or rights in one or more instances, nor any delay on the part of the Bank in exercising any of them, nor any partial or single exercise thereof, shall constitute a waiver thereof in any other instance. Any provision of this Note which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or nonauthorization, without invalidating the remaining provisions of this Note in that or any other jurisdiction and without affecting the validity, enforceability or legality of such provision in any other jurisdiction.

K. **Disputes and Litigation:** (1) Governing Law. This Note and the rights and obligations of the Bank and Borrower hereunder shall be governed by the internal laws of the State of New York without giving effect to conflict of laws principles. (2) *Jurisdiction, Venue, and Service of Process.* Borrower submits to the nonexclusive jurisdiction of the federal and state courts in the State of New York in New York County with respect to any dispute arising hereunder or relating to any of the Liabilities. Service of process may be made on Borrower by personal delivery at, or by mail addressed to, any address to which the Bank is authorized to address notices to Borrower. (3) *Waiver of Defenses, Setoffs, Counterclaims and Certain Damages.* Borrower waives the right to assert any defense, setoff or counterclaim in any proceeding relating in any way to this Note or any transaction contemplated hereby. The Bank shall not have any liability for negligence, except solely to the extent required by law and not disclaimable, and except for its own gross negligence or willful misconduct. In any event, the Bank shall not have any liability for any special, consequential or punitive damages. (4) *Sovereign Immunity.* Borrower irrevocably waives, with respect to itself and its property, any sovereign immunity that it may have or hereafter acquire, including but not limited to immunity from the jurisdiction of any court, from any legal process, from attachment prior to judgment, from attachment in aid of execution, from execution or otherwise.

L. **OFAC and Patriot Act:** Borrower shall: Comply with all Anti-Terrorism Laws; immediately to notify the Bank if it obtains knowledge that it or any of its Affiliates has become or been listed as a Restricted Party or has been charged with or has engaged in any violation of any Anti-Terrorism Law; not to receive any funds from a Restricted Party and, in any case,

to exclude any funds derived from any Restricted Party or from any person or entity involved in the violation of any Anti-Terrorism Law from being used to pay debt service or any other amounts owing under the Note; not to transfer or permit the transfer of any legal or beneficial ownership interest of any kind in Borrower to a Restricted Party or any person or entity involved in the violation of any Anti-Terrorism Law; not to acquire, directly or indirectly, ownership interest of any kind in any Restricted Party or any person or entity involved in the violation of any Anti-Terrorism Law, not to form any partnership or joint venture or conduct any business with any Restricted Party or any person or entity involved in the violation of any Anti-Terrorism Law, and not to act, directly or indirectly, as the agent or representative of any Restricted Party or any person or entity involved in the violation of any Anti-Terrorism Law; and to indemnify the Bank for any costs incurred by any of them as a result of any violation of an Anti-Terrorism Law by Borrower.

M. **Notice:** Any notice in connection with any of the Liabilities shall be in writing and may be delivered personally or by cable, telex, telecopy or other electronic means of communication, or by certified mail, return receipt requested, addressed (a) to Borrower as set forth herein or to any other address that the Bank believes to be Borrower's address, and (b) to the Bank at Bank Hapoalim B.M., 1177 Avenue of the Americas, New York, New York 10036, Attention: Legal Department. Any such notice shall be addressed to such other address (es) as may be designated in writing hereafter. All such notices shall be deemed given when delivered personally or electronically or when mailed, except notice of change of address, which shall be deemed to have been given when received.

N. **Definitions:** The following definitions apply in this Note: **(1) Acceleration:** any acceleration of payment or requirement of prepayment of any Debt, or any Debts becoming due and payable prior to stated maturity. **(2) Account:** (a) the balance of any account of Borrower with any Person, and/or (b) any property in the possession or custody of, or in transit to, any Person, whether for safekeeping, collection, pledge or otherwise, as to which Borrower has any right, power or interest — in each case whether existing now or hereafter, in any jurisdiction worldwide, and whether or not denominated in the same currency as any of the Liabilities. **(3) Agreement:** any agreement or instrument (including but not limited to this Note), no matter when made, under which any Party is obligated to any Person. **(4) Applicable Rate:** whichever of the Loan Rate or Increased Rate is the applicable interest rate at any time. **(5) Anti-Terrorism Law:** any U.S. State or Federal law relating to terrorism, money laundering or any related seizure, forfeiture or confiscation of assets, including: (a) Executive Order No. 13224 of September 23, 2001 - Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism; (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the USA PATRIOT Act), Public Law 107-56; and (c) the Money Laundering Control Act of 1986, Public Law 99-570 **(6) Bank:** Bank Hapoalim B.M. **(7) Borrower:** the Person(s) executing this Note at paragraph 10 or any one or more of them. "Borrower" may refer to one or more Persons. **(8) Business Day:** any day on which both (a) banks are regularly open for business in New York City and (b) the Office is open for ordinary business. In the Bank's discretion, the Office may be closed on any Saturday, Sunday, legal holiday or other day on which it is lawfully permitted to close. **(9) Control:** the power, alone or in conjunction with others, directly or indirectly, through voting securities, by contract or otherwise, to direct or cause the direction of a Person's management and policies. **(10) Costs and Expenses:** any and all reasonable costs and expenses (including but not limited to attorneys' fees and disbursements) incurred in connection with the Borrower and/or the Liabilities, including but not limited to those for (a) any action taken, whether or not by litigation, to collect,

4

AMPAL - AME
CORPORA

or to protect rights or interests with respect to, or to preserve any collateral securing, any of the Liabilities, (b) compliance with any legal process or any order or directive of any Governmental Authority with respect to any Party, (c) any litigation or administrative proceeding relating to any Party, and/or (d) any amendment, modification, extension or waiver with respect to any of the Liabilities. **(11) Debt:** any Party's obligation of any sort (in whole or in part) for the payment of money to any Person, whether (a) absolute or contingent, (b) secured or unsecured, (c) joint, several or independent, (d) now or hereafter existing, or (e) due or to become due. **(12) Debtor Relief Action:** the commencement by any Party or (unless dismissed or terminated within 60 days) against any Party of any proceeding under any law of any jurisdiction (domestic or foreign) relating to bankruptcy, reorganization, insolvency, arrangement, composition, receivership, liquidation, dissolution, moratorium or other relief of financially distressed debtors, or the making by any Party of an assignment for the benefit of creditors. **(13) Default:** any breach, default or event of default under, or any failure to comply with, any provision of any Agreement after giving effect to any applicable notice, grace or cure period. **(14) Event of Default:** any event set forth in paragraph D. **(15) Exchange Control Permit:** any permit or license issued by a Governmental Authority outside the United States under which any Party is permitted (a) to incur and pay any of the Liabilities in the United States in any currency(ies) in which denominated or (b) to enter into, incur and/or perform any other obligation or Agreement. **(15A) Executive Order:** Executive Order No. 13224 of September 23, 2001 - Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism; **(16) Governmental Authority:** any domestic or foreign, national or local, (a) government, (b) governmental, quasi-governmental or regulatory agency or authority, (c) court or (d) central bank or other monetary authority. **(17) Increased Rate:** (a) If the Loan Rate is a Variable Prime-Based Rate, the Increased Rate with respect to the entire outstanding principal balance shall be the Loan Rate plus 2% per year. (b) If the Loan Rate is not a Variable Prime-Based Rate, the Increased Rate with respect to any amount of principal or installment shall be (i) the Loan Rate plus 2% per year prior to the applicable Payment Date and (ii) the Prime Rate plus 4% per year on or subsequent to the applicable Payment Date. **(18) Law:** any treaty, law, regulation, rule, judgment, order, decree, guideline, interpretation or request (whether or not having the force of law) issued by any Governmental Authority. **(19) Liabilities:** (a) any and all of the Debt evidenced by this Note, and any and all other Debt of Borrower to, or held or to be held by, the Bank in any jurisdiction worldwide for its own account or as agent for another or others, whether created directly or acquired by Transfer or otherwise, and (b) any and all obligations of any other Party with respect to any of such Debt. **(20) Loan Rate:** the interest rate determined under paragraph 2. **(21) Material:** material to the business or financial condition of any Party on a consolidated or consolidating basis. **(22) Office:** the Bank's office at 1177 Avenue of the Americas, New York, New York 10036, or such other place as the Bank may specify by notice. **(23) Party:** (a) Borrower; (b) any maker, co-maker or endorser of any Agreement evidencing-, or any guarantor, surety, accommodation party or indemnitor with respect to-, or any Person that provides any collateral as security for-, or any Person that issues a subordination, comfort letter, standby letter of credit, repurchase agreement, put agreement, option, other Agreement or other credit support with respect to-, any of the Liabilities; (c) if any Party is a partnership or joint venture, any general partner or joint venturer in such Party; and (d) any Person (i) that is under the Control of any Party and (ii) whose business or financial condition is Material to such Party. **(24) Payment Date:** any Business Day on which any part of the principal or any installment of this Note becomes due and payable under paragraph 1 (and not on

account of an Acceleration). **(25) Person:** any person, partnership, joint venture, company, corporation, unincorporated organization or association, trust, estate, Governmental Authority, or any other entity. **(26) Prepaid Principal:** any amount of principal or any installment of this Note which Borrower pays prior to the applicable Payment Date for such amount. **(27) Prepayment Costs:** all losses, costs and expenses incurred as a result of receiving Prepaid Principal and of reinvesting it at rate(s) which may be less than the Applicable Rate for such Prepaid Principal. **(28) Prime Rate:** the Bank's New York Branches' stated Prime Rate as reflected in its books and records as such Prime Rate may change from time to time. The Bank's determination of its Prime Rate shall be conclusive and final. The Prime Rate is a reference rate and not necessarily the lowest interest rate charged by the Bank. **(29) Regulatory Costs:** any and all costs and expenses of complying with any Law, including but not limited to with respect to (a) any reserves or special deposits maintained for or with, or pledges to, or assessments, insurance premiums or special charges paid to, any Governmental Authority, or (b) any capital, capital equivalency ledger account, ratio of assets to liabilities, risk-based capital assessment or any other capital substitute, risk-based or otherwise. **(30) Restricted Party:** (a) any individual or entity: listed in the Annex to the Executive Order or is otherwise subject to the provisions of the Executive Order; (b) listed on the "Specially Designated Nationals and Blocked Persons" list maintained by the Office of Foreign Assets Control (OFAC) of the United States Department of the Treasury, as updated or amended from time to time, or any similar list issued by OFAC; or (c) whose property has been blocked, or is subject to seizure, forfeiture or confiscation, by any order relating to terrorism or money laundering issued by the President, Attorney General, Secretary of State, Secretary of Defense, Secretary of the Treasury or any other U.S. State or Federal governmental official or entity. **(31) Taxes:** any and all present and future taxes, levies, imposts, deductions, charges and withholdings in any jurisdiction worldwide, and all liabilities with respect thereto, which are imposed with respect to this Note or to any amount payable under this Note, excluding taxes determined on the basis of the net income of a Person or of any of its offices. **(32) Transfer:** any negotiation, assignment, participation, conveyance, grant of a security interest, lease, delegation, or any other direct or indirect transfer of a complete or partial, legal, beneficial, economic or other interest or obligation. **(33) Transferee:** any Person to whom a Transfer is made. **(34) Transferred Items:** items defined in paragraph I. **(35) Treasury Obligation:** a note, bill or bond issued by the United States Treasury Department as a full faith and credit general obligation of the United States. **(36) Variable Prime-Based Rate:** any Applicable Rate which is determined based on the Prime Rate. Any such rate shall change automatically when and as the Prime Rate changes.

5

AMPAL - AMERICAN ISRAEL CORPORATION



### TERM OR INSTALLMENT LOAN RIDER TO PROMISSORY NOTE
### LOAN(S) DENOMINATED IN U.S. OR OTHER CURRENCY
### LIBOR-BASED RATE

This Rider is referred to in paragraph 3 of, and constitutes a part of, a note in the amount of **$3,500,000** from Borrower to the Bank dated as of **July 29, 2011.**

Specific Terms

(a) Margin: **3.5% per year**

(b) Interest Period: **Quarterly**

Borrower agrees to the above Specific Terms and to all of the Terms and Conditions set forth below.

Print Borrower's Name: **AMPAL-AMERICAN ISRAEL CORPORATION**

(Signature) By: _____ (Signature) By: _____
Print Name: _YOSEF A. MAIMAN_ Print Name: _IRIT ELUZ_
Print Title: _CEO_ Print Title: _SVP_

Terms and Conditions

Certain capitalized terms are defined in paragraph 3.

1. Payment of Principal and Interest. Subject to the other provisions of the Note:

    (a) Obligation, Time and Manner of Payment. Subject to the other provisions of the Note and this Rider, the Outstanding Principal Amount shall be due and payable at the applicable Payment Date. Unless specified otherwise in the Note or in a Rider thereto, every payment to be made by or on behalf of the Borrower under the Note shall be made in U.S. Dollars, and the designation of U.S. Dollars as the currency of payment is of the essence. Every payment or delivery under the Note by or on behalf of Borrower of any money denominated in any Currency shall be made at the Office and/or to such account or accounts as the Bank may designate from time to time by notice to Borrower, in immediately available and freely transferable funds in the Currency in which the applicable obligation is denominated and in Currency that is unrestricted, unblocked and free of exchange controls, without set off, counterclaim, withholding or deduction of any kind whatsoever. Except as otherwise provided herein, any payment due under the Note on a day that is not a Business Day shall be payable on the next succeeding Business Day.

    (b) Loan Rate. Interest on any Outstanding Principal Amount shall accrue at the LIBOR-Based Rate; provided, however, that if the Bank determines (i) that by the Determination Time (A) by reason of circumstances affecting the London Interbank Market generally, adequate and fair means do not exist for ascertaining an applicable LIBOR rate or it is impractical for the Bank to fund or continue to fund the Outstanding Principal Amount during the applicable Interest Period, or (B) quotes for funds in the relevant Currency in sufficient amounts comparable to the relevant Outstanding Principal Amount and for the duration of the applicable Interest Period would not be available to the Bank in the London Interbank Market, or (C) quotes for funds in the relevant Currency in the London Interbank Market will not accurately reflect the cost to the Bank of making a Loan or of funding the relevant Outstanding Principal Amount during the applicable Interest Period, or (ii) that at any time the making or funding of loans, or charging of interest at rates, based on LIBOR shall be unlawful or unenforceable for any reason, then as long as such circumstance(s) shall continue, interest on the relevant Outstanding Principal Amount shall accrue at the Alternate Rate.

(c) Payment and Calculation of Interest. Interest shall be payable (i) at each Payment Date or (whenever the Applicable Rate is a Variable Prime-Based Rate) monthly, (ii) at the Due Date and (iii) at any time that any Outstanding Principal Amount or part thereof is paid. Interest shall be calculated as set forth in the Note.

(d) Currency of Payment. Upon any failure of Borrower to pay or deliver any amount of Currency when due, the Bank may, at its option in its sole discretion, require Borrower to pay the equivalent of such amount in any other Currency, computed at the Bank's selling rate for such Currency at the place where such amount is due. The receipt by the Bank of any amount in respect of any obligation under the Note in a Currency other than that in which such amount was originally due, whether pursuant to a judgment or arbitration award or pursuant to the provisions of the Note or any agreement or otherwise, shall not discharge Borrower with respect to any such obligation except to the extent that on the first day on which the Bank is open for business immediately following such receipt, the Bank shall be able, in accordance with normal banking practice, to purchase the Currency in which such amount was due with the Currency received. If the amount so purchasable shall be less than the original amount of the Currency in which such amount was due, Borrower shall, notwithstanding any judgment or arbitration award, indemnify and hold the Bank harmless against any loss sustained by it. Borrower shall in any event indemnify the Bank against any and all costs incurred by it in making any such purchase of Currency.

2.  Bank's Conclusive Determinations and Schedule. The Bank's determination with respect to any matter hereunder shall be conclusive, final and binding on Borrower, absent manifest error. The Bank shall from time to time record the date and amount of each Loan, the Applicable Rate, each date on which any part of principal, interest or any other amount shall be due and payable, and the amount and date of each payment of principal, interest or any other amount, on a schedule, which in the Bank's discretion may be computer-generated and/or may be taken from the Bank's general books and records, and which schedule is incorporated in, and is a part of, the Note and this Rider (the "Schedule"). The Schedule shall be conclusive, final and binding upon Borrower, absent manifest error, provided, however, that the failure of the Bank to record any of the foregoing shall not limit or otherwise affect the obligation of Borrower to pay all amounts owed to the Bank under the Note. Without limiting the foregoing, Borrower acknowledges that the Interest Period and the Applicable Rate with respect to any Outstanding Principal Amount are subject to the Bank's consent ordinarily negotiated between Borrower and the Bank by telephone, and Borrower agrees that in the event of any dispute as to any of the terms of any Loan, the determination of the Bank and its respective entry with respect thereto on its books and records and/or on the Schedule shall be conclusive, final and binding on Borrower, absent manifest error.

3.  Definitions. Each capitalized term not defined herein shall have the meaning ascribed thereto in the Note. The following definitions apply in this Rider and in the Note, and shall prevail over any different definitions in the Note.

(a) Alternate Rate: an annual Variable Prime-Based Rate equal to the Prime Rate plus the Margin.

(b) Applicable Rate: whichever of the Loan Rate or Increased Rate is the applicable interest rate at any time with respect to any Outstanding Principal Amount.

(c) Currency: money denominated in the lawful currency of any country (including but not limited to the lawful currency of the United States) or any unit of account or single or unified currency of the European Community.

(d) Determination Time: 12:00 noon (or any later time determined by the Bank in its sole discretion), New York City time, of a Working Day that is three Working Days prior to the date of the Loan.

(e) Due Date: the date set forth in paragraph 1(b) of the Note or, if the Bank has extended such date pursuant to paragraph G(5) of the Note or by an agreement with Borrower, such extended date.

(f) Interest Period: any term of 1 day, 1 week, 1 to 6, 9 or 12 months, or such other term as may be acceptable to the Bank in its discretion, as set forth above under Specific Terms or if not so set forth, as selected or agreed to by the Bank in its discretion. A term shall not be considered an "Interest Period" during any period that the Applicable Rate is a Variable Prime-Based Rate. Each Interest Period shall commence

AMPAL - AMERIC
ISRAEL CORPORATIC

immediately at the end of the preceding Interest Period, if any. If there had been no immediately preceding Interest Period with respect to any Outstanding Principal Amount, the Interest Period shall commence on the first Business Day on which (i) such amount shall be outstanding and (ii) the Applicable Rate is not a Variable Prime-Based Rate. If any Interest Period would otherwise come to an end on a day that is not a Working Day, its termination shall be postponed to the next day that is a Working Day unless it would thereby terminate in the next calendar month. In such case, such Interest Period shall terminate on the immediately preceding Working Day.

(g)  LIBOR for each Interest Period: the rate per annum (carried out to the fifth decimal) equal to the rate determined by the Bank to be the offered rate on a page or service (whether provided by Bridge Telerate, Reuters, Bloomberg or any other service) that displays an average British Bankers Association Interest Settlement Rate for deposits in the applicable Currency (for delivery on the first Working Day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Working Days prior to the first Working Day of such Interest Period. At the Borrower's request, the Bank will provide the Borrower with identifying information with respect to the page or service so used by the Bank. If the Bank determines that the rate referenced in the first sentence of this paragraph is not available, then "LIBOR" will mean, as applicable to any Interest Period, the rate determined (i) on the basis of the offered rates for deposits in the applicable Currency with a term equivalent to such Interest Period, which are offered by four major banks selected by the Bank in the London interbank market at approximately 11:00 a.m. London time, on the Working Day that is two (2) Working Days prior to the first Working Day of such Interest Period; or (ii) by applying such other recognized source of London Eurocurrency deposit rates as the Bank may determine from time to time. If the Bank determines in its sole discretion that LIBOR cannot be determined or does not represent its effective cost of maintaining a Loan, then interest shall accrue at the effective cost to the Bank to maintain the Loan (as determined by the Bank in its sole discretion).

(h)  LIBOR-Based Rate: an annual rate equal to LIBOR plus the Margin, as determined by the Bank.

(i)  Loan: (i) any loan advanced by the Bank to Borrower under the Note, (ii) any rollover by the Bank of any such loan that is otherwise due and payable, or (iii) any conversion of the Applicable Rate for any Outstanding Principal Amount from a rate that is a Variable Prime-Based Rate to one that is not, or vice versa.

(j)  Loan Rate: the interest rate determined under subparagraph 1(b).

(k)  Margin: as set forth under Specific Terms or, if not so set forth, 2% per year.

(l)  Note: the note of which this Rider is a part (including any and all riders and amendments to the Note).

(m)  Outstanding Principal Amount: the outstanding principal amount of each Loan.

(n)  Payment Date: the last Business Day of the applicable Interest Period or, if the applicable Loan Rate is a Variable Prime-Based Rate, the Due Date.

(o)  Working Day: a Business Day on which banks are regularly open for business in London.

AMPAL - AMERICAN
ISRAEL CORPORATION

**<u>EXHIBIT "C"</u>**

HF 8080566 v.1  #99999/1000 02/07/2013 05:53 PM



### ♦ bank hapoalim
*new york branches*

## ACCOUNT AGREEMENT

### RULES AND REGULATIONS FOR U.S. DOMESTIC ACCOUNTS

**This is an AGREEMENT** between you and Bank Hapoalim B.M. regarding your deposit(s) and account(s) with the New York Branches of the Bank. In these Rules and Regulations, "the Bank", "we" or "us" means Bank Hapoalim B.M., and the "New York Branches" mean those branches of the Bank located in the State of New York, "insured New York Branch" means that branch of the Bank located in the State of New York which is insured by the Federal Deposit Insurance Corporation. Please read these Rules and Regulations carefully. When you sign the signature card or authorization and/or make your opening deposit into an account or time deposit and/or draw a check, you have agreed to all the terms and conditions written below, as may be amended from time to time.

1.  APPLICABLE LAWS, RULES AND REGULATIONS

    All deposit(s) and account(s) with the Bank are governed by: (1) this Account Agreement; (2) applicable state and United States federal laws and regulations; (3) Federal Reserve Bank operating circulars, procedures and agreements; (4) local clearing house rules; (5) any special agreement you may have with the Bank regarding your deposit(s)/ account(s) or any services provided to you by the Bank; (6) the Bank's operating policies and procedures.

2.  ADDRESS; HOLD MAIL INSTRUCTIONS

    (a)  All required documentation for your account must be complete, accurate and current, meeting the Bank's requirements to its satisfaction. If you are notified by the Bank that certain of your account documentation does not meet its requirements, you must arrange to provide satisfactory documentation within 30 days of the date of the Bank's notice to you or the Bank may place a "freeze" on your account, thereby preventing any transactions from taking place until the documentation requirements are satisfied or your account is closed.

    (b)  You must notify the Bank promptly and in writing of any change in your address. The Bank will send mail to you at the address last recorded by the Bank.

    (c)  The Bank does not customarily offer "hold mail" services to non-Private Banking customers, however, if for any special reason or arrangement, "hold mail" is indicated for your deposit(s)/account(s), or the Bank is designated as your mailing address pursuant to a lockbox or other service arrangement, the Bank may hold all mail, statements and notices at its offices, in the form and for the length of time indicated by the Bank's operating policies and procedures. By requesting the Bank to "hold mail", you give up and waive all rights to notices, statements, and returned items from the Bank, including any notices required by law or regulation, and you agree to indemnify the Bank and hold the Bank harmless from any damages which we might incur, or which you might incur, resulting from or occasioned by the Bank's acceding to the "hold mail" request. If you instruct the Bank to hold the mail related to your deposit/account, you further agree:

    (i)  That the Bank will hold on your behalf all statements, supporting items, vouchers, certain paid and unpaid returned items, advices, notices, correspondence and documents relating to said deposit(s)/account(s) (all of which are referred to as "account records").

    (ii)  That your instructions to hold mail are subject to these Rules and Regulations and that said instructions will remain in effect until (i) the Bank has received written instructions, satisfactory to us, to the contrary, or (ii) until the mail is retrieved at the Bank by you in person, or iii) retrieved at the Bank by your duly authorized agent.

    (iii)  That all such account records shall be deemed to have been made immediately available to you without any liability or responsibility on the part of the Bank.

    (iv)  That all time periods provided by agreement, law or regulation in which you may take any action, assert any claim, or commence any legal action against the Bank in respect of any matter relating to the deposit(s)/account(s) subject to the hold mail instructions (including, but not limited to any notices, statements, returned items, discrepancies, forgeries, or alterations which would be revealed by or become apparent from an examination of the said account records) shall be counted from the time said account records are placed in the Bank's hold mail file.

    (d)  With respect to mail from third parties received by the Bank in connection with a lockbox or other service agreement, the Bank has no responsibility other than that specifically set forth in such service agreement.

3.  BANK HOURS

    The Bank will open its New York Branches during the hours, and on such days, as are set forth on notices displayed at each office; the Bank's business days and cutoff hours are subject to change from time to time in the Bank's discretion.

## OPERATION OF DEPOSITS/ACCOUNTS

4.  MINIMUM OPENING DEPOSITS AND BALANCES

The Bank requires opening deposits for new customers and minimum balances thereafter of:

$2,500.00 for Money Market accounts (or, for accounts to be held in foreign currency, an amount in that currency equal to $2,500.00 at the Bank's exchange rate).

$100,000.00 for Time Deposits (or, for accounts to be held in foreign currency, an amount in that currency equal to $100,000.00 at the Bank's exchange rate).

$1,000.00 for Demand Deposit/Checking accounts (or, for accounts to be held in foreign currency, an amount in that currency equal to $1,000.00 at the Bank's exchange rate).

These minimum opening deposit and balance requirements may change from time to time; you will be notified of such changes in the manner required by applicable law or regulation. Failure to maintain a minimum balance will result in charges as specified from time to time in the Bank's Schedule of Charges.

From time to time, the Bank may waive minimum opening balance requirements or balance maintenance charges in conjunction with a customer's total account relationship with the Bank.

5.  DEPOSITS

(a)  You may make deposits in your account(s), or establish your deposit(s), in cash, or by depositing checks payable to you or to cash which you endorse for deposit, or by transfers acceptable to the Bank which may not exceed any limitations on such transfers which may be imposed by law, regulation or the Bank. The Bank reserves the right, in its absolute discretion, to refuse any item or deposit.

If you fail to endorse an item which you submit for deposit, the Bank has the right, but is not obligated, to supply the missing endorsement. The Bank may require that certain government checks, insurance company items or other special types of checks be personally endorsed by each of the payees. You agree to reimburse the Bank for any loss or expense it incurs because you fail to endorse an item exactly as it is drawn.

(b)  Pursuant to applicable law and regulation, availability of the proceeds of deposited items is set forth in a schedule (the "Funds Availability Schedule") accompanying this agreement. (Additional copies are available upon request.) The Funds Availability Schedule may be changed from time to time by notice, and is a part of the Bank's operating procedures, and therefore, of this agreement. The Funds Availability Schedule applies only to deposits of non-cash items such as checks and money orders drawn upon institutions located in the United States. Proceeds of items drawn on institutions located outside of the United States may be used only after the Bank has been deemed to have received final

payment. Therefore, with respect to deposited checks drawn on institutions outside the United States you are entitled to draw checks or to withdraw money from your account(s) against the amount of the item only after the Bank has had a reasonable time to know that the item has been paid, which is when actually paid by the payor (usually the person who wrote the check), even though the amount of the deposited item may appear on your statement before that time.

Availability of the proceeds of an item accepted for deposit on a collection basis (including all items drawn on financial institutions outside the United States,) is after the item has been finally paid by the payor and the Bank is in receipt of the proceeds. (See paragraph 7 below.)

Availability of proceeds of Automated Clearing House ("ACH") credits is discussed in paragraph 8 below.

(c)  With the exception of specifically designated foreign currency accounts, all deposits will be in U.S. Dollars. Each account will be for a single type of currency only.

(d)  (i) You may make a deposit personally at the New York branches, or someone else can make it for you. Deposits may also be made by mail; however, do not include currency of any kind in a mailed deposit. Please include all parts of the Bank's printed form of deposit ticket, properly completed. All mail deposits are at your own risk until received and verified by the Bank.

(ii) All deposits that the Bank receives on Saturdays, Sundays, holidays, on days when the Bank is authorized to close, or on weekdays after 3:00 P.M. local time (the time at the relevant Bank office), will be treated as received by us at the opening of the Bank's next business day.

(e)  You agree that the Bank will not be liable to you because an item you deposit in your account is returned after the time set by applicable law if the delay in returning the item is caused by markings made by you or a prior endorser on the item, in the space reserved for the depositary bank's endorsement. (Similarly, you will be liable to the Bank for any loss or expense including, without limitation, reasonable attorneys' fees, which it incurs because it is unable properly to return an item drawn on your account within the time set by applicable law, where the delay in returning the item is caused by markings on the item in the space reserved for the depositary bank's endorsement, which markings existed at the time you issued the item.)

(f)  With respect to Time Deposits, the following additional Rules and Regulations apply:

(i)  Minimum Balance and Duration

Your funds must remain with the Bank for a fixed period to be agreed upon between you and

the Bank when you establish your deposit. Your deposit is subject to the Bank's schedule of minimum amounts and durations, which the Bank may change from time to time. This schedule, including any changes made in it from time to time, is part of these Rules and Regulations and, therefore, of your agreement with the Bank. The schedule in effect at the time you open your account is included as an addendum to these Rules and Regulations. Notice of any changes in the schedule will be provided to you in accordance with applicable law and regulation, by mail (or, if you have requested and the Bank has agreed to hold your mail, in accordance with paragraph 2 herein), or upon your request.

(ii) Additional Deposits

You may not add to your Time Deposit after its Issue Date.

(iii) Confirmation

Your Time Deposit will be duly noted on the Bank's records and you will be provided with a confirmation describing your deposit. The confirmation is your record of the deposit. If you believe the confirmation contains an error you must notify the Bank immediately. The Bank's books and records will govern as to any discrepancies. It is not the Bank's practice to provide its customers with actual certificates of deposit ("CDs"). Upon your request, the Bank may, at its option, provide you with a non-transferable CD. If a CD is issued, it must be surrendered, duly endorsed, prior to renewal or payment of the deposit. (The Bank has special procedures for replacement of lost or stolen CDS, and may require you to provide an indemnity agreement or bond.)

6.   WITHDRAWALS AND TRANSFERS

(a) Unless allowed by the Bank you may not draw checks or withdraw funds against any deposit(s) made by you until the Bank receives:

(i) satisfactory documents requested from you in connection with opening your account(s)/deposit(s); and

(ii) satisfactory confirmation(s) of your signature and identity and/or authority and capacity to do business, from a source the Bank considers acceptable.

You will not be provided with checks before that time.

(b) With respect to Time Deposits, the following additional Rules and Regulations regarding withdrawals and transfers apply:

(i) Payment Maturity Date

Your deposit is payable on its maturity date with interest to maturity at the interest rate specified

for the deposit, except as may be otherwise provided in these Rules and Regulations. If the maturity date of any original or renewed Time Deposit falls on a day which is not a day on which the Bank is open for the ordinary transaction of business, the deposit's maturity will be extended to the Bank's first business day thereafter. Interest will continue to be paid at the rate specified for the deposit until that day.

The Bank has agreed to pay you a specified interest rate based upon your agreement to make your funds available to the Bank for the number of days specified for your deposit. Therefore if the Issue Date assigned to your deposit proves to be a date prior to when your funds became available to the Bank, the Bank may not make payment to you in immediately available funds.

(ii) Payment Prior to Maturity

You have contracted to leave funds in your Time Deposit until the maturity of the initial or renewal term of your Deposit. The Bank has no obligation to permit any early withdrawal.

Unless otherwise required by law, your Time Deposit may not be withdrawn in whole or in part prior to the date it matures without the Bank's consent, which may be given only at the time the early withdrawal is sought. If such consent is given, there will be a penalty for early withdrawal assessed on the amount withdrawn, which you agree to pay as liquidated damages.

If the law requires the Bank to assess a penalty, then the penalty will be at least as great as the amount required by law. The amount of the penalty will be described in the Bank's schedule of early withdrawal penalties provided to you with this agreement. The Bank may change this schedule by notice from time to time. The schedule, including any changes from time to time made in it, is a part of these Rules and Regulations and, therefore, of your agreement with the Bank. The schedule and any changes therein will be made available to you in accordance with the requirements of law and regulation.

If the amount of the penalty exceeds the amount of interest earned on the deposit, the principal amount of the deposit will be reduced to pay the penalty and you will receive less than you deposited.

If you need to make a premature withdrawal which would bring the amount of your deposit below the Bank's minimum amount for such a Time Deposit (see paragraphs 4, 5), the Bank may require you to withdraw all of your deposit.

(iii) Automatic Renewal of Time Deposits

The Bank is under no obligation to advise you of the impending maturity of your Time Deposit if it is for a period of one month or less. For Time

Deposits of more than one month's duration, notice will be given in accordance with applicable law and regulation. If your Time Deposit matures and the Bank has received no instructions on or before the maturity date regarding the disposition of the funds, the Time Deposit (including interest) will be automatically renewed at the close of business on the date of maturity for the same term as the original deposit, with interest at the rate then being offered by the Bank for Time Deposits of similar amount and duration. In the event the Bank is no longer offering deposits for the same term, we may place your funds in a Time Deposit of a shorter duration or in a Money Market Deposit account.

If you timely notify the Bank that your Time Deposit should not be renewed, but fail to give further instructions regarding your deposit, your funds will be placed in a Money Market Deposit account.

(iv) Transfer of Time Deposits

Your Time Deposit is not transferable except as collateral for a loan or as otherwise permitted by the Bank in accordance with regulations of the Federal Reserve Board, unless your Certificate of Deposit (if one is provided to you) specifies in writing to the contrary.

(c) Money can be withdrawn from your demand deposit, or Money Market Deposit account(s) in different ways:

(i) You can write a check and sign it;

(ii) At our discretion, and in accordance with the terms of any rules and procedures we may establish regarding telephone and wire transfers, you can instruct us by telephone or wire to transfer money from your account; or

(iii) By other written instructions satisfactory to the Bank;

(iv) Accounts denominated in foreign currency may have withdrawals made only by methods (ii) and (iii) above.

(v) For demand deposit accounts only, corporations and other entities may establish electronic Automated Clearing House ("ACH") payment services, or check drawing services, with the Bank's Payment Services group. Each of these services is subject to the terms and conditions of a specific agreement in addition to this Account Agreement.

(d) With respect to Money Market Deposit accounts, the following additional Rules and Regulations apply:

(i) Money can be withdrawn or transferred from your Money Market Deposit account in different ways:

(A) You can make unlimited in person withdrawals on forms we provide.

(B) You can make payments to other parties with some limitations. You can give other-party payment instructions, in a form satisfactory to the Bank, or draw checks payable to other parties, subject to the limitation that a total of only six other party payments may reach the Bank within a monthly statement cycle.
These limitations are based on the number of other party instructions and/or checks which are presented to the Bank during the statement cycle. In enforcing these limitations the Bank will pay no attention to the date of your check or payment instruction or the date on which such check or payment instruction was written.

A penalty charge (see paragraph 32) will be imposed against your account in the event you exceed the limitations described above regarding the number of checks you may write and transfers you may make during a statement cycle. If you continue to exceed those limitations, your account may be closed by the Bank (see paragraph 30).

(C) Although at the present time the Bank does not plan to exercise the right, the Bank is required by law to reserve the right to require you to give seven days written notice of your intention to have money paid out of your Money Market Deposit account.

(ii) The Money Market Deposit account is transferable only with permission of the Bank.

7.    COLLECTION OF CHECKS

The Bank will act as your agent in the collection of all deposited items, but will assume no responsibility beyond the exercise of due care in accordance with customary banking practice. The Bank will use any method it chooses to obtain payment of deposited items and may select correspondents to aid in this process. The Bank is not responsible for actions taken by other banks nor for the loss or destruction of any items in the possession of correspondents, clearing houses, or in transit; each correspondent will only be liable for its own negligence. The Bank is not responsible for any act or failure to act (or the consequences therefrom) which is reasonable under the circumstances or which is in accordance with the agreements, laws, rules, regulations or practices referred to in paragraph 1 of these Rules and Regulations. Special instructions for handling an item are effective only if made in writing and given to the Bank (along with the item in question) and accepted by it.

8.    CLAIMS AND CHARGEBACKS

Your account may be debited on the day an item is presented to the Bank or at such earlier time as notification is received by us by electronic or other means that an item drawn on your account has been deposited for

collection in another financial institution. A determination of your account balance for purposes of making a decision to dishonor an item for insufficiency of available funds may be made at any time between the receipt of such presentment or notice and the time of return of the item, and no more than one such determination need be made.

If the Bank makes payment to you or credits you for a check which you have deposited, or cashes a check for you, and a claim is then made on the Bank to recover all or part of the amount of that check on the basis that the check (or any endorsement) was forged or altered or if the check was bounced or returned for any reason or was otherwise not properly payable, or paid, the Bank may withhold the amount of the claim from your account (or ask you to repay it) until the claim is finally determined. The Bank is authorized to pursue the collection of previously dishonored items, and in so doing it may permit the payor bank to hold an item beyond the midnight deadline.

Unless you challenge the correctness of a third-party claim within 60 days after you receive notice of the claim from us, we may pay over to the claimant the amount we have withheld from your account. If amounts in your account are insufficient to cover the amount of the claim, you will be liable for any shortfall.

If a check you deposited or cashed is not paid, and we have previously given you credit for it, we will charge your account with the amount of the check. This is called "chargeback".

If, for any reason, the Bank is required to reimburse the Federal Government for all or any portion of any benefit payments deposited into your account through a direct deposit plan, you agree that the Bank may, without prior notice to you, deduct the amount returned to the Federal Government from your account or from any other account you have with the Bank worldwide, unless the deduction is prohibited by law. This right is in addition to any other rights the Bank has under this Agreement, including its right of set off and its security interest in your account.

### Preauthorized Drafts

From time to time, the Bank may receive items generated by third parties for payment against your account that do not bear your signature. Typically such items (known as "preauthorized drafts") are used to pay for merchandise or other debts owed by you to the third party. This Agreement authorizes the Bank to pay such items if presented for payment against your account. In addition, the Bank's charging of this type of item to your account, without timely objection by you pursuant to paragraph 8 of this Agreement, shall constitute authorization by you to charge against your account any subsequent item generated by the same third party, whether or not you state to the Bank that such subsequent item was not authorized by you, unless you have notified the Bank in writing a reasonable time before any such subsequent items are presented to the Bank for payment that the Bank should no longer charge to your account items generated by that third party.

### Receipt of Automated Clearing House Entries

All ACH credits and debits received for your account will be received by the Bank subject to the rules of the National Clearing House Association and any other applicable ACH rules. You agree to be bound by the ACH rules. Any credit given by the Bank to you for an ACH credit shall be provisional until the Bank receives final payment. If the Bank does not get paid, the Bank may revoke the provisional credit and charge the amount to your account or obtain a refund from you, in which case the original of the credit entry shall not be deemed to have paid you the amount of such entry. Unless the Bank otherwise agrees in writing, the Bank shall not notify you of its receipt of ACH transactions other than as recorded in your regular account statement.

### Payment Services Debits

All ACH payments originated by you through the Bank's Payment Services group, and all checks drawn by the Bank through its Payment Services group at your request, are subject to the claims and chargeback provisions of the specific agreement with the Bank related to the service.

## 9.  SUFFICIENT BALANCES

You must maintain a sufficient balance in your account to cover the checks you write and all withdrawals, wire transfers and other debits you authorize.

### Order of Payment

When items you have written and electronic debits that you have initiated are presented to the Bank for payment on the same day and there are insufficient available funds in your account to pay all of these transactions, it is the Bank's policy to pay all electronic debits, such as electronic transfers and ACH debits, first. If you have a payment services agreement with the Bank, the ACH entries or checks to be sent will be debited from your account at the time we accept your electronic instruction. If available funds remain after these transactions have been completed, the Bank will pay items generally starting with the item for the largest amount. If your balance is insufficient to pay the largest item, the Bank will pay the next largest item until the Bank finds an item that can be paid by your available balance. This order of payment will continue for the remaining items presented that day.

Notwithstanding the foregoing, the Bank reserves the right to pay checks or other items or payments drawn upon your account in any order determined by the Bank, even if paying a particular check or item results in a balance in your account insufficient to pay one or more other items that otherwise could have been paid out of your account.

### Overdrafts

If your balance is too small for us to pay a check you have written, we may at our discretion either pay the check or refuse payment and return it unpaid ("bounce" the check). An insufficient balance may result, among other things, from:

(a)  the payment of other checks you have written;

(b)  other payments which you have authorized;

(c)  the return, unpaid, of any checks you have deposited or cashed;

(d)  funds not yet deemed available (see paragraph 5 above);

(e)  service charges and other amounts properly debited to, withheld from or offset against your account;

(f)  if you have other accounts/deposits with us, any charges in connection with these accounts/deposits.

An insufficient balance in your account, which has not been covered by an overdraft protection agreement, is subject to a service fee charged against your account according to the Bank's then current schedule of charges. (Overdraft protection is not available for accounts denominated in foreign currency.) Checks or other items drawn against insufficient funds in your account may also be subject to the service fee set forth in that schedule. The Bank may determine whether or not your account contains sufficient funds to pay a check or other item at any time between the time the check or other item is received by the Bank and the Bank's return deadline, and only one determination of the account balance is required. If that determination reveals insufficient funds to pay the check or other item the Bank will not be required to honor the check or other item and may return it, as stated above. Alternatively. the Bank may honor the check or other item and create an overdraft. However, the honoring of one or more overdrafts does not obligate the Bank to honor any future overdrafts, and you should not rely on the Bank to honor an overdraft. Moreover, the Bank is not required to send you prior notice on checks returned for insufficient funds. You agree to deposit sufficient funds to cover the overdrafts, interest, and any service fees upon notice of the overdraft, and to reimburse the Bank for any costs it incurs in collecting the overdraft from you including, without limitation, reasonable attorneys' fees and the costs of litigation to the extent permitted by law. Notices of changes in the schedule of charges will be provided in accordance with applicable law and regulation. The Bank may reimburse itself from any of your other account(s)/deposit(s) (see paragraphs 27, 32).

10.  CHECK FORMS/OTHER WITHDRAWALS

Any check you write must be on a form obtained from (or specifically approved in writing by) the Bank and must be drawn on the branch of the Bank where your account is maintained, or the Bank may return the check unpaid. The preprinted checks you receive from the Bank meet this requirement; a blank form or other person's check does not.

The Bank also reserves the right to refuse any check or other item drawn against your account or used to withdraw funds from your account if made in a manner not specifically authorized for your account, if made more frequently or in a greater number than specifically permitted for your account, or if made in an amount less than the minimum withdrawal or transfer specifically permitted for your account.

11.  DATE OF CHECKS

The Bank may honor or refuse to honor any check presented more than six months after its date without being responsible in either case. All checks issued through the Bank's Payment Services are void 90 days from the date of drawing.

You agree not to date a check later than the date on which you write it ("post-dated check"). If you do, and the check is presented to us for payment before the date written on it, we may return the check unpaid, but we will not be responsible if we pay or certify it. You agree that the Bank will not be liable to you for charging your account before the indicated date on a properly payable but post-dated check. If the Bank does re-credit your account after paying a Post-Dated Check, you agree to transfer to the Bank all of your rights against the payee or other holder of the check, and to assist the Bank in any legal action necessary.

### INTEREST

12.  INTEREST ON MONEY MARKET DEPOSIT ACCOUNT BALANCES

(a)  The Bank pays interest on your Money Market Deposit Account at the rates determined by the Bank from time to time.

(b)  Interest will begin accruing on your deposit balances in accordance with the following schedule, or as mandated by law or regulation, as changed from time to time:

   (i)    For the portion of a deposit consisting of cash or other immediately available funds received by 3:00 p.m. local time of a banking day - on the day of deposit;

   (ii)   For the portion of a deposit consisting of checks or money orders drawn on banks located in the United States in accordance with the Funds Availability Schedule (see Paragraph 5 above);

   (iii)  For the portion of a deposit consisting of checks or money orders drawn on banks located outside the United States, only after the Bank has been deemed to have received final payment from the drawer of the item;

   (iv)   In all other cases, ask your account officer;

   (v)    Any changes in this schedule will be made available to you in accordance with applicable law and regulation.

(c)  With respect to Money Market Deposit accounts, we will pay no interest on the first five thousand dollars ($5,000.00) on deposit in your account at any time.

(d)  For the purpose of calculating interest on accounts subject to state or Federal Reserve requirements. the balance in such accounts will be reduced by the appropriate reserve percentage, if any. Your account

officer can provide you with additional information on this subject.

(e) Interest is credited to your account on the last day of each monthly account cycle

## 13. INTEREST ON TIME DEPOSITS

The Bank will pay interest on your time deposit from the Issue Date, at the rate specified for the deposit. Interest is calculated on a daily basis by multiplying the original principal amount by the annual interest rate and dividing by 365 (or 366 in leap years). Interest is not compounded during the maturity period of your deposit. Except as provided in paragraph 6, no interest will be paid on a deposit after maturity unless the deposit is renewed.

### OWNERSHIP/ACCOUNT TYPES

## 14. JOINT ACCOUNTS

Unless the Bank agrees otherwise in writing, when an account is opened in the name of more than one person, the account shall belong to all of them as joint owners with rights of survivorship. Unless the signature card indicates that more than one signature is required, each of the persons acting alone can make withdrawals or transfers from or draw checks from the joint deposit/account, execute powers of attorney and give instructions and receipts. If the signature card indicates that more than one signature is required, then although any of the owners may make deposits to the account, subject to paragraph 20, the specified number of signatures will be required to make withdrawals, transfers, draw checks, execute powers of attorney and give instructions and receipts. In either case, if a joint owner dies, his or her interest in the account will be automatically owned by the remaining joint owner(s), subject to requirements and processes of law and regulation.

All of the joint owners will be liable to the Bank, both together and separately, for any liability arising in connection with the deposit/account regardless of whose action caused the liability. In addition, if any one or more of the joint owners owes the Bank money that is due, for any reason, the Bank may use the funds in the joint account to pay the debt in accordance with Paragraph 27 of these Rules and Regulations, regardless of whose funds make up the deposit/account. Joint accounts are subject to claims and legal proceedings by third parties (including governmental authorities) who are creditors of, or have other claims or legal proceedings against, against any of the joint account holders, and to the terms of paragraph 29 below in relation to such claims and legal proceedings against any of the joint account holders, regardless of whose funds make up the deposit/account.

## 15. MINORS

The Bank does not open accounts for or accept deposits from minors. However, if a deposit is made by or in the name of a minor, or a minor is the beneficiary of or heir to an account, the Bank will allow withdrawals only by the minor (together with his/her legal guardian, as may be required by law).

## 16. CORPORATE ACCOUNTS, PARTNERSHIP, FIDUCIARY, GOVERNMENTAL, CONVENIENCE AND SPECIAL ACCOUNTS

Convenience deposits/accounts, special deposits/accounts and deposits/accounts held by corporations, partnerships, fiduciaries, governmental entities and by other non-individual account holders will be governed, in addition to these Rules and Regulations, by the applicable deposit/account documents and agreements and, where applicable, resolutions on file with the Bank. Any change in any such resolutions or deposit/account documents will not be effective until new resolutions and deposit/account documents satisfactory to the Bank are received by the Bank.

## 17. "TOTTEN TRUST" ACCOUNTS

When an account/deposit is opened in the name(s) of one or more persons/depositors "in trust for" ("I/T/F") another person or other persons (beneficiaries), the amount in the account shall be payable in accordance with the directions of the depositors as long as any of them shall live. The funds in the account shall be payable in equal portions to any beneficiaries who outlive all the deposit/account holders, and in accordance with local law.

All balances in Totten Trust Accounts and any additions or accruals thereto, are the property of the deposit/account holder(s) and, as such, during their lifetime(s), only the deposit/account holder(s) may operate the account or request that the account be closed;

## 18. CONVENIENCE ACCOUNTS

As an individual you may establish Convenience Account(s) with the Bank's branches located in New York State. The Convenience Account(s) are in your name as the deposit/account holder and with instructions that the balances therein may be paid or delivered to, or at the instruction of, another person or persons "for the convenience" ("FCO") of the deposit/account holder. The balances remain your property and there exists no right of survivorship in the account in favor of the other person(s) so named.

(a) All balances in Convenience Accounts and any additions or accruals thereto, are the property of the deposit/account holder individually and, as such, during his or her lifetime, only the deposit/account holder may request that the account be closed;

(b) The Bank may honor checks or withdrawal requests from you as the deposit/account holder, or the other person or persons named as convenience signatories, during your lifetime, even if the said checks or withdrawal requests reduce the deposit/account balance to zero;

(c) The Bank may be required by service of legal process to turn over balances held in a Convenience Account to pay your debts. However, except as may otherwise be ordered by a court, the Convenience Account is not subject to the debts of the other person(s) named as convenience signatories authorized to draw against the deposit/account;

(d) Until the Bank has received written notice of the death of a deposit/account holder, and for ten days thereafter, the Bank may honor checks or withdrawal requests from the other person(s) named as convenience signatories authorized to draw against the account;

(e) Upon the death of a deposit/account holder, and prior to receipt by the Bank of a restraining order, injunction or other legal process prohibiting payment (and for a reasonable period thereafter, giving us time to comply), the Bank may make payment to the executor, administrator or voluntary administrator of the deposit/account holder's estate, or to any other person designated under the laws of the State of New York;

(f) Until ten days after the Bank receives from you written notice not to pay or deliver any monies in the account to, or at the instruction of, the named authorized person(s), we are not liable for continuing to honor checks or withdrawal requests from the other named authorized person(s);

(g) The Bank may require, after you have exercised the provisions in subparagraph (f) above to change or remove a named authorized person, that all further payments or deliveries be authorized by you in writing.

## AUTHORIZATION

19. AUTHORIZED SIGNATURE

Your signature on the Signature Card is your authorized signature. For the payment of funds and for other purposes relating to any account you have with the Bank, the Bank is authorized to recognize your signature, but it will not be liable to you for refusing to honor your checks or other signed instructions if it believes in good faith that the signature appearing on such checks or instructions is not genuine. Additionally, you may authorize the use of a facsimile signature device by designation on the Signature Card or in a separate resolution. If you have authorized the use of a facsimile signature device, the Bank may honor any check or other signed instruction which bears or appears to bear your facsimile signature even if it was made by an unauthorized person or with a counterfeit facsimile device. Therefor, you should maintain close control over your facsimile signature device and promptly review your statement and cancelled checks for unauthorized use of the device. When your account is established, you may, subject to the provisions of paragraph 20, require more than one authorized signature on a check or other item drawn against the account by designating a specific number of required signatures on the Signature Card. In the absence of a designation on the Signature Card, the Bank may honor any check or other item drawn against the account so long as it contains at least one authorized signature.

20. SPECIAL INSTRUCTIONS

With respect to any type of account/deposit or transaction, if you ask us to accept special instructions which we believe would expose us to legal problems, we may refuse to follow them. Or, we may require a surety bond, indemnification, or other protection satisfactory to us before we follow such instructions.

21. AUTOMATED PROCESSING OF ITEMS (CHECKS)

You recognize that the Bank has adopted automated collection and payment procedures so that it can process the greatest volume of items at the lowest possible cost to all customers. These automated procedures rely primarily on information encoded onto each item in magnetic ink. In recognition of this fact, you agree that in paying or taking an item for collection, the Bank may disregard all information on the item other than the drawer's signature, the identity of the drawee bank, the amount of the item, and any other information encoded onto the item in magnetic ink according to general banking standards, whether or not that information is consistent with other information on the item. You agree to reimburse the Bank for any loss or expense it incurs because you issue or deposit an item containing such extra information. Furthermore, you agree that it is not failure to exercise ordinary care on the part of the Bank, to pay an item solely because the Bank's procedures do not provide for the sight examination of items with a face amount below an amount specified from time to time.

22. FAXED, TELECOPIED INSTRUCTIONS; DEPOSIT/ ACCOUNT RECORDS

You agree that the Bank may act upon faxed, telecopied or photocopied instructions or correspondence regarding your deposit/account, if the original of said instructions is not transmitted by you directly to the Bank's offices where your deposit/account is maintained. Further, you agree that the Bank need not maintain hard copy records of instructions, correspondence, checks, or account records, regarding your deposit/account, and may rely upon film or electronic image records of said instructions, correspondence, checks, or account records, and that such film or electronic image records shall be deemed to be original documents in the event of any dispute between us.

## CLAIMS OF ERROR IN ACCOUNT

23. STATEMENTS; CLAIMS OF ERROR

(a) The Bank will send to you, at the last address you have given in writing, or hold for you (please refer to Paragraph 2 above), a periodic statement of your account. You should carefully examine the statement and the cancelled checks (or substitute checks as defined in the Check Clearing for the 21st Century Act ("Check 21")) we have returned to you in your statements. If your problem is related to a substitute check we will, at your request, take the steps necessary to obtain for you either the original check (if still available from the party which truncated the item), or a better, more readable/functional copy of the substitute check. If you feel there is an error on the statement, or that some unauthorized person has withdrawn funds from the account, the Bank should be notified immediately. The statement is considered correct unless you notify the Bank promptly after any error is discovered.

(b) Because you are in the best position to discover an unauthorized withdrawal or payment, an

unauthorized signature, an unauthorized endorsement or a material alteration of an item, you agree that the Bank will not be liable for paying such items if (i) you did not exercise reasonable care in examining the statement and cancelled checks and substitute checks or you have not reported unauthorized withdrawal or payments, any unauthorized signatures or any alterations to the Bank within 30 days of the mailing date of the earliest statement containing these items, or (ii) these items were drawn without authority or altered so cleverly (as by unauthorized use of a facsimile machine or otherwise) that the lack of authorization or alteration could not be detected by exercise of reasonable precautions standard in the banking industry.

(c) Unless you  notify the Bank (in writing within 30 days of the  mailing of any statement of account) of any claimed errors in such statement, or that there are unauthorized transactions or the account holder's signature upon any returned item was forged, or that any withdrawal, payment or item was made or drawn without authority of the account holder or not in accordance with the signature arrangement set forth in the account holder's agreements with the Bank, or that the amount of the item was raised or the item otherwise altered, or unless the you  notify the Bank (in writing within one year after the  mailing of any such item) that any endorsement was forged, improper, made without the authority of the endorser, or missing, said statement of account shall be considered correct for all purposes and the Bank shall not be liable for any payments made and charged to the account holder or for any other errors in the statement of account as rendered.  You agree that no legal proceeding or action shall be brought by the account holder against the Bank to recover payment of any payment or withdrawal or of an item upon which any signature or endorsement has been forged or was improper, or which was drawn, made, accepted or endorsed without the authority of the account holder or the endorser or not in accordance with the signature arrangement set forth in the account holder's agreements with the Bank, or which item was raised or altered, or on which endorsement was missing unless (i) the account holder shall have given the written notice as provided hereinabove, and (ii) such legal proceeding shall be commenced within one year after the date when such statement and/or cancelled items were  mailed to the account holder in the case of an unauthorized payment or withdrawal, or signature or any alteration on the face or back of a check, or one and one-half years in the case of an unauthorized endorsement of a check.

Check 21 – Special Terms for Consumers

(d) If you have elected not to receive copies of cancelled checks with your statements, the cancelled checks or legible copies will be provided to you within a reasonable time after you have submitted a written request that sufficiently identifies the checks requested.  You agree to pay the applicable service charge for retrieval and copying of the requested checks.

(e) If yours is a personal account eligible under the Check Clearing in the 21st Century Act to be treated as a consumer account, and you have received a substitute check as a returned item in your statement, and you have a problem with the substitute check (for example, difficulty determining whether there has been an unauthorized endorsement or a material alteration because of the condition of the substitute check), you must notify us of the problem, in writing, within 40 days of your receipt of the earliest statement containing the item, and we will take the steps necessary to obtain for you either the original check (if still available from the party which truncated the item), or a better, more readable/functional copy of the substitute check.

(f) If yours is a personal checking account eligible under the Check Clearing for the 21st Century Act to be treated as a consumer account, and you have notified us of your problem with a substitute check, in writing and within the 40 day period referred to in subparagraph (d) above, you may receive up to $2,500 of your refund (plus interest if your Personal Checking Account earns interest) within 10 business days after we receive your claim and the remainder of your refund (plus interest if your personal checking account earns interest) not later than 45 calendar days after we receive your written claim.  We may reverse the refund to your account (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

**STOP PAYMENT/LOST CHECKBOOKS**

24. OFFICIAL CHECKS/STOP PAYMENT OF OFFICIAL CHECKS

The Bank at the present time does not offer the service of certifying checks.  Official checks ("Bank Checks") may be issued if you ask us to do so, for a service charge specified in the Bank's schedule of fees.

However, please note that, prior to 90 days after issuance, a Bank check may be stopped/replaced only in the Banks discretion, because the check has been lost, stolen, or destroyed; you will be required to provide a bond and/or satisfactory indemnity agreement, plus any other documents the Bank deems appropriate.  Otherwise, you may not "stop" a Bank check.  All requests to "stop" Bank checks must be made in writing, including an affidavit and indemnification agreement.  The Bank will first determine whether the check has been paid, and, if it has not, will consider your request.  Before reimbursing you, or issuing a new check, the Bank may require a waiting period.  Stop payment orders for Bank Checks may also be subject to a fee for each stop payment order or renewal thereof.

Checks drawn by the Bank under a Payment Services agreement are not Official Checks or Bank Checks.  Depending upon the circumstances of any specific stop payment request pertaining to a Payment Services Check, the above procedures may also apply.

25. STOP PAYMENT

(a) Specific Checks

At your request, the Bank will stop payment on a check written on your account, unless we are unable to do so because your request to us was too late, or the information you supplied to us was wrong or incomplete. You or your authorized representative (designated by you in writing and accepted by us) should notify us as quickly and as accurately as possible, by telephone, in person or by mail, because unless we have sufficient information and a reasonable opportunity to stop the check, we will not be responsible if it is paid. We will accept an oral stop payment order, but such an order will be effective for only 14 days unless you or your authorized representative confirm it in writing. Written stop payment orders will stay in effect for six months, unless you or your authorized representative asks us in writing to terminate it or renew it. We will charge your account a fee for each stop payment order and for each termination or renewal of a stop payment order.

In the case of a joint account, any one of the joint owners may stop payment of a check. For corporate, partnership, fiduciary, governmental and special accounts, payment of a check may be stopped by any person or persons so authorized in the account documents, agreements and, where applicable, corporate resolutions governing the account. If the applicable document, agreement or resolution does not specify the person or persons authorized to effect a stop payment, then any one of the authorized signatories, acting alone, may issue a stop payment order.

Any stop payment order placed by you or your authorized representative must specify the exact amount, account number, payee, number and date of the check to be stopped. The Bank is not responsible if the information you give is incorrect or incomplete and the Bank is entitled to a reasonable period of time after you have issued the order, to notify employees. If the Bank re-credits your account after paying a check over a valid and timely stop order, you agree to transfer to the Bank all of your rights against the payee or other holder of the check, and to assist the Bank in any legal action necessary.

(b) Lost or Stolen Checkbooks

The same procedure for stop payment will apply in the case of lost or stolen checkbooks. In addition, your account will be closed and a new account will be opened using a new account number.

**WIRE TRANSFER PAYMENTS**

26. FUNDS TRANSFER BY WIRE

(a) DEFINITIONS

A "funds transfer" means a series of transactions, beginning when an originator issues a payment order for the purpose of paying to the beneficiary of such order (the "beneficiary") but does not include payments made by check or credit card, a debit transfer made through the Automated Clearing House System ("ACH") or transfers governed by the federal Electronic Funds Transfer Act. The term "payment order" means an instruction to a receiving bank transmitted orally, electronically, or in writing to pay a fixed or determinable amount to a beneficiary. Your issuance to us of a payment order or our acceptance of a payment order for your account will evidence your acceptance of these terms and procedures. You will be charged a service charge for any funds transfer.

You may debit your account and instruct the Bank to pay those funds to another party or account via a wired funds transfer payment order. Instructions to the Bank to make such a payment on your behalf must be made in writing, on the Bank's special form for such instructions. Unless the instructions are signed before a duly authorized representative of the Bank, they will be subject to a security procedure by the Bank, to confirm the authorization and content of the instructions. No instructions transmitted by telephonic, telefacsimile or other telecommunications means will be accepted by the Bank unless you have entered into, and complied with, a specific separate agreement with the Bank establishing telephonic and/or test key security procedures.

(b) No transfer will be made:

(i) To a designated recipient or payee subject to sanctions issued by the U.S. Department of Commerce or,

(ii) To a designated recipient or payee to whom payment is prohibited by the Foreign Asset Control Regulations of the U.S. Department of the Treasury, or

(iii) Which is otherwise in contravention of U.S. law or regulation.

(c) The following are the basic terms governing, and conditions upon which the Bank is willing to conduct, wired funds transfers:

(i) SYSTEMS/CORRESPONDENTS

The Bank may use, at its discretion, the Federal Reserve Bank System FEDWIRE and/or the Clearing House Interbank Payment System ("CHIPS") and/or SWIFT to execute any portion of any funds transfer. The Bank may use any correspondent, agent or instrumentality, without being responsible for any of their acts or defaults. Neither the Bank nor any of its correspondents, agents or other instrumentalities shall be liable for: any loss or damage due to their own negligence except for failure to exercise ordinary care or to act in good faith (ordinary care on the part of the Bank shall be determined in accordance with the reasonable commercial standards of the banking industry); any errors, delays or defaults of any kind in the transmission or delivery of any messages or

instructions by mail, telegraph, wireless or cable, inducing any error, delay or default arising out of use of codes; any act or decree, legal or illegal, of any government or governmental agency or of any authority actually in control of the place of payment or of any place where the Bank or any such correspondent, agent or instrumentality shall be located or shall act; any change in currency exchange rates; the failure of any correspondent, agent or instrumentality to locate, or any error in identifying the named beneficiary or payee; failure to effect payment; or any other cause which is beyond the control of the Bank or any correspondent, agent or instrumentality.    In addition, the Bank shall not be liable for any other act or omission of any agent, correspondent or instrumentality. The Bank, its agents, correspondents or instrumentalities, and any receiving bank or financial institution, may rely solely on identification numbers as proper identification of accounts, receiving banks, or . intermediary or beneficiary's banks.

The Bank shall not be liable for any special, indirect or consequential damages, even if it has been advised of the possibility of such damages.

(ii)  CURRENCY OF PAYMENT

If the transfer is requested to be made in U.S. Dollars, the amount of the payment will be placed at the disposal of the Bank's correspondent or agent.  (For those accounts denominated in another currency, the Bank will first exchange that currency for dollars at the Bank's New York City buying rate for such currency on the date of sending the transfer.) The correspondent or agent may, in its discretion, make payment in U.S. Dollars or in currency of the place of payment at the correspondent's or agent's buying rate for New York City exchange on the date of payment. However, unless payment in local currency is legally required at the place of payment, payment will be made in U.S. Dollars if the purchaser expressly requests in writing that this be done. If the transfer is requested to be made in foreign currency it will be at the Bank's New York City selling rate for such foreign currency on the date of sending the transfer.

(iii) REFUND IF PAYMENT IS NOT MADE

If payment is not effected, refund will be made only after the Bank has received notice that its order for the transfer has been fully cancelled and after (and solely to the extent that) it is in possession (free of all claims of others) of collected funds debited or earmarked in connection with the transfer request.  If the transfer is payable in foreign currency, the Bank will not be liable for any amount above the Bank's buying rate for the transfer amount in New York City at the time the refund is made. (For those accounts denominated in non-U.S. currency, the refund will be made only in the

currency of the account, which may require that the Bank purchase such currency at the Bank's selling rate for such currency on the date of making the refund.)  The Bank may deduct all its expenses (including all amounts paid to correspondents,    agents    and    other instrumentalities) from any refund.

(iv) EXECUTION

The Bank will initiate the execution of each accepted payment order on the execution date, provided there is a withdrawable credit balance in the account sufficient to cover the amount of the payment order.  Nothing herein constitutes an agreement or commitment of the Bank to extend any credit to the Customer with respect to funds transfer, nor shall any course of dealing between the Bank and the Customer be deemed to be, or constitute any such commitment or obligation.  Each payment order is subject to the terms and conditions on which the Bank makes account services available to the Customer and to applicable other agreements and law.

(v)  FUNDS TRANSFER NOTICES

In any funds transfer where you are the recipient or beneficiary of the transfer, the Bank shall not be obligated to notify you of any such payment to your account, other than to record such payment in your next regular statement of account. In the event that the Bank sends you an additional notice of the receipt of such a funds transfer for your account, you may not withdraw such funds until the Bank has received payment from the sender of such transfer.

**GENERAL PROVISIONS**

27. LIEN OR SET-OFF

If you owe money to the New York Branches, or any other office of the Bank anywhere in the world, the law allows us, in some circumstances, to use funds in your deposit/account to pay that debt.  This is called a lien or banker's set-off on your deposit/account.

In addition, by agreeing to these Rules and Regulations, you agree that, to pay any debt you may ever owe to the Bank anywhere worldwide, you are giving to the Bank a security interest in any money or property of yours anywhere in the world that may come into the Bank's possession or custody or in transit to or through the Bank (including for purposes of safekeeping, collection or pledge).  You also agree that the balance of every account of yours with the Bank anywhere worldwide, or any other claim you may have against the Bank anywhere worldwide, in any currency, may be set off against any debt you may ever owe or guarantee you may have issued, to the Bank anywhere worldwide in any currency.

You hereby grant to the Bank a security interest in all deposits and in any and all other property belonging to you currently held or which will be held in the future by the Bank.  Pursuant to this security interest, the Bank may place a hold on such deposits or property until your

obligations or liabilities have been repaid in full. You will, at the Bank's request at any time, execute and deliver to the Bank such security agreements, assignments and other documents and instruments, in form and substance satisfactory to the Bank, as shall be deemed necessary or desirable by the Bank to evidence the Bank's security interest in such deposits and property. These Rules and Regulations do not require the Bank to give you notice of any set off.

## 28. LEGAL PROCESS AGAINST ACCOUNT

(a) If legal action such as tax levy, attachment, garnishment, etc. is brought against your account, the Bank may refuse to pay out any money from your account until the dispute is resolved. If your account is attached, garnished or otherwise subject to levy by lawful legal action, the Bank will not be liable to you for any sums it may be required to pay because of such attachment, garnishment or other levy, even if paying the money from your account leaves insufficient funds to pay a check you have written. The Bank may charge you a service fee, and if the Bank incurs any expenses, including without limitation, reasonable attorneys' fees, in responding to an attachment, garnishment or other levy which are not otherwise reimbursed it may charge such expenses to your account without prior notice to you. Any garnishment or other levy against your account is subject to the Bank's right of set off and security interest.

(b) Other Adverse Claims: If the Bank receives notice of an actual or potential adverse claim to your account or the funds in your account, it may in its discretion refuse to pay out any money from your account for a reasonable period of time after receipt of notice of the actual or potential claim. Although the Bank reserves the right to refuse to pay out any money from your account if it has received notice of an actual or potential claim, the Bank is not required to recognize any adverse claim unless (i) the claimant provides the Bank with an acceptable bond indemnifying the Bank against any and all liabilities, losses, damages, costs and expenses that might be incurred by the Bank in connection with payment of the adverse claim and any resulting dishonored checks or other items, or (ii) the claimant has obtained an order from a court of competent jurisdiction in a case in which you are made a party and served with a summons, or (iii) you act as a fiduciary for the claimant and the claimant gives the Bank an affidavit setting forth the nature of your fiduciary relationship and the facts upon which the claimant has reasonable cause to believe that you are about to misappropriate the funds.

## 29. DEATH AND INCOMPETENCY

In the event of death, judicially declared incompetency or other disability of any deposit/account holder, the Bank may delay making any payment until all requirements of law are met and all documents required by us are provided. Nevertheless, the Bank may honor checks drawn on an account, or honor withdrawals, until it knows of the fact of death or incompetency. Even after it obtains knowledge of death, the Bank may honor checks drawn on or prior to the date of death for ten days after death unless

a person claiming an interest in the account stops payment of such checks (see Paragraphs 14, 16, 17, 18, 19, 20).

## 30. CLOSING THE DEPOSIT/ACCOUNT/TRANSFER OF OWNERSHIP

Subject to these Rules and Regulations, and applicable law, you or the Bank may close your deposit/account at any time. We will try to notify you in advance when we close your deposit/account, but we are not obligated to do so. When your deposit/account is closed, we will, if it is a checking account, return unpaid any checks subsequently received by us. After the deposit/account is closed we will transfer to you by (at the Bank's discretion) wire, electronic transfer, or by a check mailed to the last address for you on the Bank's records, any balance remaining in the deposit/account after deducting any applicable charges, fees or legal obligations, and any applicable withholding taxes. At the Bank's option, in consideration of security issues, the Bank may hold such remaining balances in a non interest bearing suspense account awaiting your secure claim of the funds.

Although checks drawn on your account are negotiable, the account itself is not. Accounts are non transferable except on the Bank's books and records. In order to transfer title or pledge the account as collateral for a loan from someone other than the Bank, a written request must be provided on a form approved by the Bank. If ownership is to be transferred, the Bank may require that the account be closed and a new account opened. Any pledge of the account to a third party remains subject to the Bank's right of set off and security interest.

## 31. DORMANT DEPOSITS/ ACCOUNTS AND ESCHEAT LAWS

### Inactive account(s)/deposit(s)

(a) A Time Deposit will be classified as "Dormant" if it is (i) automatically renewed because the Bank has not heard from you, and (ii) we do not receive any written communication from you regarding your Time Deposit for another year after such automatic renewal;

(b) A Money Market Deposit, or checking account will be classified as "Dormant" if (i) there has been no activity in such account for one year, and (ii) we have not heard from you in writing during that time;

(c) Any type of account/deposit will be classified as "Dormant" if (i) you have died without leaving a will, have no surviving heirs, and no legal claim to your account/deposit is otherwise made, and (ii) two years have passed after your death.

### Dormant Status

Under the law in the State of New York, the Bank is required to turn over to the State the funds in your account or deposit if, under state law the Dormant account or deposit (as defined above) has become "Abandoned". The Bank must re-classify Dormant account or deposit as "Abandoned" if the account or deposit has remained in Dormant status for a total of five years from the date of

the last activity or written communication from the
Account Holder.

(a) After an account/deposit has been classified as
Dormant, it may be classified as "Abandoned" and
the funds therein may be turned over ("escheat") to
the State of New York under applicable law. If the
funds have been turned over ("escheated") to the
applicable state government agency, then you (or
your heirs or administrator of your estate) will have
to make application to that state agency to obtain
your funds.

(b) Prior to the Bank's turn over of the funds to the
applicable state agency, at any time during the
Dormant period described above you can re-activate
your account/deposit by either (i) conducting a
transaction in the account/deposit (such as writing a
check, or making a deposit, or directing the renewal
or withdrawal of a time deposit), or (ii) writing to the
Bank and acknowledging the existence of the
account/deposit.

32. CHARGES/SERVICE FEES

You agree to pay, and the Bank may charge against your
deposit/account, the service fees and charges described on
the Bank's schedule of charges in its operating policies and
procedures. (For example, there is a monthly maintenance
charge for Money Market accounts having an average
balance below a specified minimum during the monthly
cycle and there are charges for excessive transactions in
such accounts; there are also check charges, chargeback
charges, penalties for early withdrawal, etc., depending on
the type of deposit/account and the circumstances.) The
Bank will not be liable for dishonoring checks or other
withdrawal orders because of insufficient funds resulting
from deduction of these charges/fees. From time to time,
the Bank may change the amount of any charge and add
any new charges. The schedule of charges, including any
changes from time to time made in it, is a part of the
Bank's operating policies and procedures and, therefore, of
your agreement with the Bank. The schedule has been
made available to you as an addendum to this agreement
and is available upon request. Notices of changes in the
schedule will be made available to you in accordance with
applicable law and regulation. All charges/fees are
payable in U.S. Dollars. (Amounts deducted from
accounts denominated in foreign currency will first be
exchanged for U.S. Dollars at the Bank's selling rate on
the date of payment and then applied to the charges/fees.)

33. INTERNET INFORMATION SERVICE

(a) The Bank offers access to its domestic internet
account information service, subject to (i) the terms
and conditions for internet account information
service, attached as the "Hapoalim Online
Addendum" to these Rules and Regulations and
which are an integral part hereof, and (ii) to any
separate agreements between the account holder and
the Bank, and (iii) the Bank's policies and procedures
for internet account information services, each of the
aforementioned as amended from time to time.

(b) A separate application and agreement is necessary for
each account holder to sign up for the internet
information service

34. WAIVERS

No waiver or modification of any of these Rules and
Regulations or any provisions of this agreement shall be
effective unless the Bank has consented to it in writing.
The Bank may exercise its rights under this agreement at
any time even if it has failed to exercise those rights
before.

35. DISPUTES

(a) We hope no disputes arise between us under this
agreement or about your deposit/account. However,
if they do, they will be governed by the internal law
of New York State without reference to conflicts of
law principles, and you and the Bank agree that if the
dispute goes to court, the decision will be made by a
judge, without a jury. You also agree not to assert
any setoffs or counterclaims of any nature. In
connection with any dispute, you submit to the non-
exclusive jurisdiction of Federal and State Courts
located in the State of New York, and any trial shall
take place in New York County. The Bank can serve
any legal process on you by mailing it to your last
address recorded by the Bank.

(b) You agree and acknowledge that the Bank will have
no responsibility or liability for, and you hereby
indemnify and hold the Bank harmless from and
against, any claims, damages, judgments, liabilities,
costs and expenses (including, without limitation,
attorneys' fees) which the Bank sustains or incurs in
connection with this agreement, the deposit/account
or any other account, including but not limited to
those sustained or incurred by the Bank: (i) as a
result of the Bank's creation or its refusal to create (in
its sole and absolute discretion) any overdraft in the
account; (ii) in connection with the collection or
enforcement of any of your obligations or liabilities
hereunder (including, without limitation, the Bank's
refusal to honor any check or other draft or request
for payment due to insufficient funds in any account
resulting from the Bank having previously debited
such account for the amount of one or more unpaid
overdrafts and/or interest accrued thereon); and (iii)
in connection with any action or legal proceeding
brought by a third party to attach, or execute or levy
upon, the deposit/account or any other account, or to
enjoin or restrain the Bank from making any
payments with respect to the account or any other
account.

You agree that the Bank is authorized to deduct any
such loss, costs, or expenses from your account
without prior notice to you.

36. DISCLOSURE OF ACCOUNT INFORMATION TO
THIRD PARTIES

The Bank may disclose information to third parties about
the Account Holder's account or the transactions the
Account Holder orders:

(a) as necessary to complete transactions;

(b) in connection with the investigation of any claim Account Holder or a third party initiates;

(c) to comply with government agency or court orders;

(d) in accordance with Account Holder's written permission, or with other agreements between the Account Holder and the Bank;

(e) as otherwise permitted by the terms of the Bank's privacy policy, as may be applicable to the Account Holder.

37. CHANGE IN THESE RULES AND REGULATIONS

We may change these Rules and Regulations from time to time, and any change will become effective after the length of time required by applicable law or regulation, or, if there is no such law or regulation ten days after we either (i) post a notice of the change in the branch of the Bank in which you maintain your account or (ii) mail a written notice of the change to you, or (iii) (if you are, or become, a recipient of the Bank's online account information service) post notice of the change on the online information site, or email the notice of change to you at the last known email address the Bank has for you.

38. SEVERABILITY

If a court finds one or more provisions of these Rules and Regulations to be invalid, the remainder will stay in effect.

# HERRICK

NEW YORK
NEWARK
PRINCETON

**JUSTIN B. SINGER**
Direct Tel:   212.592.5928
Direct Fax:   212.545.2346

Email:  jsinger@herrick.com

February 21, 2013

VIA FEDERAL EXPRESS

Ampal American Israel Corporation Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, New York 10017

Re:    Ampal-American Israel Corp., Case No. 12-13689 (SMB)

Dear Sir/Madam:

Enclosed for filing in the above bankruptcy case is the Proof of Claim on behalf of Bank Hapoalim B.M.

Please cause the Proof of Claim to be filed on the official claim register for debtor Ampal-American Israel Corp. (Case No. 12-13689). Also enclosed is a self-addressed stamped envelope along with a copy of the above Proof of Claim. Please file stamp the copy and enclose it in the self-addressed stamped envelope which is enclosed for that use. Thank you for your courtesies.

Very truly yours,

*/s/ Justin B. Singer*

Justin B. Singer

Enclosures

HERRICK, FEINSTEIN LLP

A New York limited
liability partnership
including New York
professional corporations

2 PARK AVENUE, NEW YORK, NY 10016 • TEL 212.592.1400 • FAX 212.592.1500 • www.herrick.com
HF 8115278v.1 #99999/1000

PS|Ship - FedEx Label



1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.