UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:                                               :
                                                     :
AMPAL-AMERICAN ISRAEL CORP.,       :                 Chapter 7
                                                     :          Case No. 12-13689 (SMB)
                    Debtor.              :
--------------------------------------------------------X


**FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING TRUSTEE'S
MOTION TO RETAIN TARTER KRINSKY & DROGIN LLP AS COUNSEL AND
DENYING CROSS-MOTION TO DISQUALIFY THE TRUSTEE**

**A P P E A R A N C E S :**

TARTER KRINSKY & DROGIN LLP
*Proposed Substitute Counsel to the Chapter 7 Trustee*
1350 Broadway
New York, NY 10018

>        Alex Spizz, Esq.
>        Arthur Goldstein, Esq.
>        Jill Makower, Esq.
>              Of Counsel


KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Counsel for Yosef A. Maiman and Merhav (M.N.F.) Limited*
1633 Broadway
New York, NY

>        David M. Friedman, Esq.
>        Daniel A. Fliman, Esq.
>        Nii-Amar Amamoo, Esq.
>              Of Counsel


COLE SCHOTZ, P.C.
*Attorneys for Irit Eluz*
900 Third Avenue, 16th Floor
New York, NY 10022
>        Michael D. Sirota, Esq.
>        Steven L. Klepper, Esq.
>              Of Counsel


**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Alex Spizz, the chapter 7 trustee (the "Trustee") of Ampal-American Israel Corporation ("Ampal"), has moved to retain the law firm of Tarter Krinsky & Drogin LLP ("Tarter") as substitute general bankruptcy counsel under 11 U.S.C. § 327(a). The Trustee recently joined Tarter as a partner together with four other lawyers and one paralegal after his previous firm, Spizz Cohen & Serchuk, P.C. ("Spizz Cohen"), which dissolved and closed. Yosef A. Maiman, the chairman and former chief executive officer and president of Ampal together with entities under his ownership or control (collectively, the "Controlling Shareholders") have objected to Tarter's retention based on its prior representation of certain parties-in-interest in other matters in this bankruptcy case. They have also cross-moved to disqualify the Trustee based primarily on his affiliation with Tarter. Irit Eluz, a former officer of Ampal, joined in the objection and the cross-motion. (*Joinder of Irit Eluz in Support of Yosef A. Maiman and the Controlling Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin LLP as Substitute Counsel to the Trustee an*d *(II) Motion to Disqualify Alex Spizz as Chapter 7 Trustee,* dated Apr. 29, 2015 (ECF Doc. # 577).)

The current battle again pits Ampal's former management against Ampal's bondholders, catching the Trustee and his new firm in the cross hairs. For the reasons that follow, the Controlling Shareholders' cross-motion is denied and the Trustee's motion to retain Tarter is granted.

## BACKGROUND

**A.    Commencement of Case and Conversion to Chapter 7 –** *Ampal I*

The background to this case is discussed at length in two previous decisions of the Court.

*See In re Ampal-American Israel Corp.*, No. 12-13689 (SMB), 2013 WL 1400346 (Bankr.

S.D.N.Y. Apr. 5, 2013) (*Ampal I*); *In re Ampal-American Israel Corp.*, 502 B.R. 361 (Bankr.

S.D.N.Y. 2013) (*Ampal II*).  I assume familiarity with these decisions and repeat only what is

necessary to this decision.

Ampal, a New York corporation, filed a chapter 11 petition in this Court on August 29,

2012.  Ampal was primarily engaged in the acquisition of interests in businesses located in the

State of Israel.  At all relevant times prior to the appointment of the chapter 11 trustee in this case,

Ampal was controlled by the Controlling Shareholders, and Maiman served as Ampal's

chairman, president and chief executive officer.  Ampal's assets consist mainly of interests in

non-debtor, foreign subsidiaries, and its principal non-affiliate debt consists of three series of

debentures, A, B and C,  in the approximate sum of $234 million.  The indenture trustees of the

Series A, B and C debentures are, respectively, Hermetic Trust (1975) Ltd. ("Hermetic"), Reznik

Paz Nevo R.P.N. Trusts 2007 Ltd. ("Reznik") and Mishmeret – Trusts Company Ltd.

("Mishmeret") (collectively, the "Indenture Trustees").  Following the commencement of the

chapter 11 case, the United States Trustee appointed the Indenture Trustees to the Official

Committee of Unsecured Creditors (the "Committee").  (*Appointment of Official Committee of*

*Unsecured Creditors*, dated Sept. 25, 2012 (ECF Doc. # 27).)[1]

---

[1]        "ECF Doc. # _____" refers to the docket in the bankruptcy case, and "ECF/Adv. Proc. __ Doc. # __" refers
to the docket of the adversary proceeding discussed in the text.  "TX" refers to the Trustee's exhibits received in
evidence at the hearing described later in this opinion.

Over two years ago, the Court observed that "[t]his case has been marked by strife between the Committee [*i.e.*, the bondholders] on the one hand and the Debtor and Maiman on the other." *Ampal I*, 2013 WL 1400346, at *1. As set out more fully in *Ampal I*, this discord ultimately led to the appointment of a chapter 11 trustee. *Id.* 2013 WL 1400346, at *7. After determining that the estate was administratively insolvent, the chapter 11 trustee moved to convert the case to chapter 7, and the Court granted the motion. (*Order Converting Chapter 11 Case to Chapter 7 and for Related Relief*, dated May 2, 2013 (ECF Doc. # 258).) Following conversion, the members of the Committee elected Spizz as the chapter 7 trustee. (*See United States Trustee's Report of Undisputed Election of Chapter 7 Trustee*, dated May 29, 2013, at 3-4 (ECF Doc. # 275).) Ofer Shapira, an Israeli attorney who represented Mishmeret and Hermetic at the election, voted his clients' proxies in favor of Spizz. Spizz thereafter retained Spizz Cohen as his counsel pursuant to Bankruptcy Code § 327(a).

Shortly after his appointment, the Trustee moved for authority to retain Shapira & Co. Advocates, Shapira's law firm, as special counsel to represent the estate's interests in Israel *nunc pro tunc* to the date of his election. (*See Chapter 7 Trustee's Application for Retention of Shapira & Co. Advocates as Special Counsel to Trustee Pursuant to 11 U.S.C. § 327(e), Effective as of May 20, 2013*, dated June 24, 2013 (ECF Doc. # 291).) The Controlling Shareholders objected to the application, arguing that Shapira's concurrent representation of Hermetic and Mishmeret was adverse to the estate. (*Objection of Yosef A. Maiman and the Controlling Shareholders to Chapter 7 Trustee's Application to Retain Shapira & Co. Advocates as Special Counsel to Trustee Pursuant to 11 U.S.C. § 327(e)*, dated July 1, 2013, at ¶¶ 6-9 (ECF Doc. # 303).) At the Court's suggestion, the Trustee withdrew the application, and instead, exercised Ampal's rights as direct or indirect sole shareholder of the non-debtor subsidiaries, the

4

parties that actually required the representation and would pay Shapira's bills, to hire Shapira on their behalf.

**B.**      **The *Enforcement Motion - Ampal II***

The dispute between the Indenture Trustees and Maiman intensified on October 4, 2013, when Shapira wrote a letter in his capacity as attorney for Hermetic and Mishmeret to Maiman and certain of Ampal's officers and directors. The letter charged that Maiman and the officers and directors had breached their fiduciary duties, committed waste and mismanaged Ampal and its subsidiaries and demanded payment or security for payment.[2] An attorney representing several of the recipients sent an email to the Trustee in protest arguing that Shapira's letter asserted estate claims in violation of the automatic stay. The Trustee responded that he believed the letter had been sent in order to preserve claims under Ampal's D&O insurance policies and that he would not allow Hermetic and Mishmeret to prosecute claims belonging to the estate. (*Motion of Yosef A. Maiman, Irit Eluz, Yoram Firon, Amit Mantsur, Erez Meltzer, Leo Malamud, Sabih Saylan, Revital Degani, Daniel Vaknin, and Menachem Morag (I) to Enforce the Automatic Stay and, if Necessary, Confer Standing on the Movants Relating Thereto and (II) to Award Damages for Willful Stay Violations*, dated Oct. 22, 2013 ("*Enforcement Motion*"), Ex. C (email dated Oct. 14, 2013 1:38 p.m.) (ECF Doc. #352).)

Not satisfied with the Trustee's response, Maiman and the other recipients filed a motion to enforce the automatic stay, and damages from Mishmeret and Shapira and an order directing the Trustee to terminate Shapira's representation of the non-debtor subsidiaries. (*See*

---

[2]      Hermetic later withdrew its demand. (*Stipulation and Agreed Order*, dated Nov. 18, 2013, at ¶ 1 (ECF Doc. # 375).)

*Enforcement Motion* at 2.)  Tarter represented Mishmeret and Shapira in this matter.  Following

a hearing on the motion, the Court determined that any breach of fiduciary duty claims against

Maiman and the other officers and directors were property of the estate and ruled that Mishmeret

and Shapira had willfully violated the stay by seeking to collect on account of those claims.

*Ampal II*, 502 B.R. at 373.  The Court declined, however, to award damages.  *Id.* at 374.  The

Court also refused to direct the Trustee to terminate Shapira.  Although the Court noted a

potential conflict between the estate and Mishmeret regarding claims to the D&O insurance

proceeds, Shapira had not taken any steps to collect on behalf of Mishmeret and represented that

they would not do so.  Accordingly, the Court determined that no actual conflict existed that

warranted Shapira's termination.  *Id.* at 375.

## C.    The Litigation Financing Agreement

After the *Enforcement Motion* was resolved, the Trustee entered into a Litigation

Financing Agreement (the "LFA") with the Indenture Trustees.  (*See Chapter 7 Trustee's Motion*

*for Order (I) Authorizing Trustee to Enter into Litigation Financing Agreement Pursuant to 11*

*U.S.C. §§364(b) and 364(e), and (II) Modifying Automatic Stay Pursuant to 11 U.S.C. §362(d) to*

*Permit Trustee to Implement Terms of Litigation Loan*, dated May 21, 2014 ("*Litigation Finance*

*Motion*") (ECF Doc. # 407).) [3]  Tarter also represented Mishmeret in connection with the LFA.

Under the LFA, the Indenture Trustees agreed on behalf of their respective bondholders

to loan the Trustee $1.5 million to fund litigation against the Controlling Shareholders as well as

Ampal's former officers and directors (defined collectively in the LFA as the "Maiman

Litigation").  The principal focus of the Maiman Litigation was a $20 million note, executed in

---

[3]        A copy of the LFA, dated May 20, 2014, is attached as Exhibit B to the *Litigation Finance Motion*.

favor of Ampal by Merhav (M.N.F.) Limited ("MNF"), an entity controlled by Maiman and one

of the Controlling Shareholders, and personally guaranteed by Maiman.  Ampal subsequently

assigned the note to Merhav Ampal Group Ltd. ("MAG"), a non-debtor subsidiary.  The Trustee

and MAG were required to use reasonable efforts to commence the Maiman Litigation as soon as

practicable.  (*Id.* at ¶ 15.)

The Court approved the LFA by order dated June 24, 2014.  (*Order Granting Chapter 7*

*Trustee's Motion for Order (I) Authorizing Trustee to Enter into Litigation Financing Agreement*

*Pursuant to 11 U.S.C. §§364(b) and 364(e), and (II) Modifying Automatic Stay Pursuant to 11*

*U.S.C. §362(d) to Permit Trustee to Implement Terms of Litigation Loan*, dated June 24, 2014

(ECF Doc. # 429).)  The order provided that the Indenture Trustees could assign their rights and

obligations under the LFA to Klirmark Opportunity Fund L.P. and Meitav Gemel & Pension Ltd.,

which were identified as underwriters in Annex A of the LFA.  (*Id.* at ¶ 8.) Klirmark and Meitav,

entities that Tarter never represented, subsequently funded the loan.    (*Affidavit of Alex Spizz, as*

*Trustee, in Response to the (1) Objection Filed by Yosef A. Maiman and the Controlling*

*Shareholders to the Retention of Tarter Krinsky & Drogin LLP in Place of Spizz Cohen &*

*Serchuk, P.C. as Substitute Counsel to the Trustee; and (2) Cross-Motion to Disqualify Alex*

*Spizz as Chapter 7 Trustee*, sworn to May 14, 2015, at ¶ 16 ("*Spizz Affidavit*") (ECF Doc. # 587).)

**D.**    **Discovery Dispute and the *Discovery Order***

On October 7, 2013, the Trustee filed a motion to compel Ampal, through Maiman, to

turn over servers and computers containing information pertaining to the business operations and

financial affairs of Ampal and its subsidiaries.  (*Chapter 7 Trustee's Motion for Order*

*Compelling the Debtor (Through Yosef A. Maiman, Debtor's Court-Designated Representative)*

*to Deliver Property of the Estate to the Trustee, Pursuant to 11 U.S.C. §§521(a)(3), 521(a)(4),*

*542(a) and 542(e)*, dated Oct. 7, 2013 ("*Turnover Motion*") (ECF Doc. # 348).)  The parties

entered into a stipulation providing a procedure for identifying and segregating private, personal

information of former employees of Ampal from other relevant information, (*Stipulation and*

*Agreed Order Concerning Trustee's Access to Debtor's Files, Books and Records*, dated Feb. 6,

2014 (ECF Doc. # 395)), but then feuded over performance under the stipulation.  The Court

entered a supplemental order on December 5, 2014 that required the Trustee to keep private

information confidential and prohibited him from disclosing the information to Shapira, Shapira

& Co. or any of its employees, representatives or agents.  (*Supplemental Order Concerning*

*Trustee's Access to Debtor's Files, Books and Records*, dated Dec. 5, 2014 ("*Discovery Order*"),

at ¶¶ 3-4 (ECF Doc. # 532).)


**E.      The Maiman Litigation and the Interference Claim**

As contemplated by the LFA, MAG commenced the action against MNF and Maiman on

the note and guaranty (the "Note and Guaranty Action") in New York state court.

(*Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of*

*Complaint*, dated Sept. 3, 2014, at p. 10 of 132.)[4]  Prior to answering MAG's motion for

summary judgment in lieu of complaint, *see* N.Y.C.P.L.R. 3213, Maiman filed a proof of claim[5]

against the estate.  The proof of claim attached a statement asserting that Ampal, MAG and

representatives of the Indenture Trustees had impeded MNF from obtaining financing for an

ethanol production project in Colombia (the "Interference Claim").

---

[4]      A copy of the *Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint* is attached as Exhibit A to the *Notice of Removal*, dated Sept. 24, 2014 ("*Notice*").  (ECF/Adv. Proc. 14-02385 Doc. # 1.)

[5]      The proof of claim is attached as Exhibit C to the *Spizz Affidavit*.

The defendants subsequently removed the Note and Guaranty Action to this Court,

(*Notice* at 1), the Trustee filed a complaint, (*Amended Complaint*, dated Oct. 23, 2014 (ECF/Adv.

Proc. 14-02385 Doc. # 4)), and the defendants filed an answer.  The answer asserted the

Interference Claim as an affirmative defense alleging that the Indenture Trustees and their

representatives had tortiously interfered with MNF's and Maiman's performance of the note and

guaranty.  (*Answer*, dated Nov. 24, 2014, at 6 (ECF/Adv. Proc. 14-02385 Doc. # 7).)  The Fifth

Affirmative Defense amplified the estate's connection to the Interference Claim:

> The Bondholder Parties, whose asserted claims comprise nearly all of the
> Debtor's debts, are essentially the sole beneficiaries of this action and also exert
> extensive control and influence over the Trustee and the Plaintiff.  Indeed, the
> Bondholder Parties elected the Trustee as Chapter 7 trustee, thereby hand-
> selecting him.  And, the Bondholder Parties are financing this litigation by
> loaning funds to Plaintiff in exchange for liens on any recoveries.  *For these
> reasons, the conduct of the Bondholder Parties should be imputed to the Trustee
> and to Plaintiff.*  Otherwise, the very parties that blocked the Columbia ethanol
> project will receive a windfall.

Emphasis added.

Maiman and MNF expanded on the Interference Claim in the third party complaint they

filed against the Indenture Trustees, Shapira and two bondholders of Ampal (collectively, the

"Third Party Defendants"). (*Third Party Complaint*, dated Nov. 24, 2014, at ¶¶ 49, 54 (ECF/Adv.

Proc. 14-02385 Doc. # 8).)  According to the third party complaint, MNF and Ampal were

making great progress negotiating for the land, permits and financing needed to build an ethanol

project in Colombia.  (*Id.* at ¶ 27.)  At the same time, Ampal was facing financial problems,

including the prospect of defaulting on its bond obligations, and had commenced negotiations

with the bondholders for alternative payment terms.  (*Id.* at ¶¶ 29-30.)  The third party complaint

charged that the Indenture Trustees and Shapira had made "inflammatory" reports to the Israeli

press as part of a "very public smear campaign" charging the directors' with corporate

9

wrongdoing, an inability to lead Ampal, and even responsibility for the political uprisings and

terrorist attacks that had occurred in Egypt.  (*Id.* at ¶¶ 32-33.)  As a result, the financing for the

ethanol project fell through, (*id.* at 38), and Ampal was forced into bankruptcy.  (*Id.* at ¶ 40.)

MAG moved for summary judgment, and the Third Party Defendants moved to dismiss

the third-party claims.  (*See Third Party Defendants' Notice of Motion to Dismiss the Third

Party Complaint*, dated Feb. 26, 2015 (ECF/Adv. Proc. 14-02385 Doc. # 28).)  Both motions are

*sub judice*.

## F.    The *Retention Application*

While the Maiman Litigation was proceeding, Spizz Cohen dissolved and ceased

operations.  (*Declaration of Arthur Goldstein Pursuant to Bankruptcy Rule 2014 on Behalf of

Tarter Krinsky & Drogin LLP as Proposed Substitute Counsel to Trustee and Disclosure

Pursuant to Bankruptcy Code Sections 327 and 329 and Bankruptcy Rule 2014*, dated Apr. 16,

2015 ("*Goldstein Declaration*"), at ¶ 1.)[6]  The Trustee joined Tarter as a partner, Arthur

Goldstein, another former Spizz Cohen attorney, joined as counsel, (*id.* at ¶ 2),[7] and the Trustee

moved to retain Tarter as substitute counsel.  (*Application for Order Pursuant to 11 U.S.C. § 327

and Federal Rule of Bankruptcy Procedure 2014 Authorizing Retention of Tarter Krinsky &

Drogin LLP as Substitute Counsel to the Trustee*, dated Apr. 16, 2015 ("*Retention

---

[6]       A copy of the *Goldstein Declaration* is attached as Exhibit 2 to the *Notice of Presentment of Order
Authorizing Retention of Tarter Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute
Counsel to the Trustee Pursuant to 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014*, dated Apr. 17,
2015 ("*Notice of Presentment*") (ECF Doc. # 573).)

[7]       The Trustee and Goldstein were joined by Jill Makower, Esq., Perry Cohen, Esq. and Paul Karan, Esq., and
Sheree Nobles, a paralegal.  (Transcript of Evidentiary Hearing held on June 9, 2015 ("Tr."), at 35:19-25, 38:1-3
(ECF Doc. # 602).)  Cohen and Karan were not involved in the representation of the Trustee.  (*Id.* at 37:23-38:3.)

*Application*").)[8]   The *Retention Application* disclosed Tarter's prior representation of Mishmeret

and Shapira and asserted that Tarter no longer represented either of the parties.  (*Id.* at ¶ 17.)

        The Controlling Shareholders objected to the *Retention Application* and cross-moved to

disqualify the Trustee on several grounds that centered on Tarter's conflicts.  (*Yosef A. Maiman*

*and the Controlling Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin*

*LLP as Substitute Counsel to the Trustee and (II) Motion to Disqualify Alex Spizz as Chapter 7*

*Trustee*, dated Apr. 28, 2015 ("*Maiman Objection*") (ECF Doc. # 576).)  They argued that the

Tarter's prior representation of Shapira and Mishmeret presented an actual conflict, but even a

potential conflict was disabling.  (*Reply in Further Support of Yosef A. Maiman and the*

*Controlling Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin LLP as*

*Substitute Counsel to the Trustee and (II) Motion to Disqualify Alex Spizz as Chapter 7 Trustee*,

dated May 18, 2015 ("*Maiman Reply*") (citing *In re Project Orange Assocs. LLC*, 431 B.R. 363,

373 (Bankr. S.D.N.Y. 2010) (ECF Doc. # 594).)    Specifically, Tarter represented Mishmeret

and Shapira in connection with the *Enforcement Motion* during which the Court ruled that

Mishmeret and Shapira had violated the automatic stay, (*Maiman Objection* at ¶¶ 17-20, 31),

Tarter also represented Mishmeret as a lender under the LFA, (*id.* at ¶¶ 21-22), and the estate

held valuable causes of action against Mishmeret and Shapira that Tarter was unable to pursue.

These claims related to their tortious interference with the Colombian ethanol project (*i.e.* the

Interference Claim), and Shapira's statements to the Israeli press in late 2013 regarding the

bondholders' intention to force a sale of Gadot Chemical Tankers & Terminals Ltd. ("Gadot"),

an Ampal non-debtor subsidiary, which caused Israel Discount Bank ("IDB") to seek the

---

[8]        A copy of the *Retention Application* is attached as Exhibit 1 to the *Notice of Presentment*.

appointment of a receiver of the Gadot shares the next day (the "Gadot Claim.")  (*Id.* at ¶¶ 23-26, 36-38.)

Finally, the Controlling Shareholders contended through their cross-motion that Tarter's disqualifying conflicts tainted the Trustee as well and constituted cause for his removal.  (*Id.* at ¶¶ 41-42.)  In addition, the Trustee had failed to pursue the Interference and Gadot Claims.  (*Id.* at ¶ 43.)  Lastly, Trustee and Tarter would necessarily violate the terms of the *Discovery Order* because it prohibited Shapira or his agents from reviewing the confidential information in the hands of the Trustee and his former Spizz Cohen (now Tarter) attorneys.  They argued that Tarter, and hence the Trustee, were agents of Shapira based on Tarter's prior representation.  (*Id.* at ¶¶ 14-66, 44.)

The Trustee filed an affidavit in response to the *Maiman Objection*.  The Trustee argued that he did not violate the *Discovery Order* by joining Tarter because Tarter was not currently Shapira's agent, (*id.* at ¶ 11), an ethical wall had been created that prevented the Trustee and the former Spizz Cohen (now Tarter) professionals and the other Tarter attorneys from sharing confidential information, (*id.* at ¶ 12), and no confidential information had been disclosed or was alleged by the Controlling Shareholders to have been disclosed to Shapira.  (*Id.* at ¶ 13.)  The Trustee also disputed the Controlling Shareholders' contention that Mishmeret was a post-petition lender under the LFA.  (*Id.* at ¶ 16.)

The Trustee also explained his skepticism regarding the Interference Claim.  As discussed in more detail below, it was never disclosed by Maiman when he ran Ampal and, when disclosed, was asserted by Maiman as a claim against the estate and as a defense in the Note and Guaranty Action.  (*Id.* at ¶¶ 18-24.)  The Trustee concluded that Maiman and MNF raised the

Interference Claim to undermine his own case in the Note and Guaranty Action and avoid liability. (*Id.* at ¶ 26.) Nevertheless, the Trustee had no reservations about pursuing estate claims against Mishmeret and the other Indenture Trustees. If the Court later determined in the Note and Guaranty Action that the Interference Claim had merit, the Trustee would appoint conflicts counsel to investigate and prosecute the claim. (*Id.* at ¶¶ 31, 36.)

The Trustee also determined that the Gadot Claim lacked factual support. He found no evidence that IDB was influenced by any statement by Shapira prior to moving to appoint a receiver; IDB's application was filed a year before Shapira was alleged to have made the damaging statements, and IDB did not reference any statement by Ampal's bondholders or Shapira in its application to the Israeli court. (*Id.* at ¶ 34.)

Tarter also filed a response to the *Maiman Objection*. (*Tarter Krinksy & Drogin LLP's Reply to: (1) Objection of Yosef A. Maiman and the Maiman to the Retention of Tarter Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute Counsel to the Trustee; and (2) Cross-Motion to Disqualify Alex Spizz as Chapter 7 Trustee*, dated May 14, 2015 ("*Tarter Response*") (ECF Doc. # 589).[9] Tarter reiterated the Trustee's position that the *Discovery Order* had not been violated, no confidential information had been disclosed, and the protections in place would prevent any future disclosure. (*Id.* at ¶¶ 4, 7, 39.) Tarter denied that its representation of Mishmeret and Shapira in defending against the *Enforcement Motion* resulted in a conflict. (*Id.* at ¶ 12.) Tarter also restated the Trustee's argument against pursuing the Interference and Gadot Claims, (*id.* at ¶¶ 15-28, 32-36), and endorsed the Trustee's intention to

---

[9]     Tarter filed its response twice on the case docket. (*Compare* ECF Doc. # 586 and ECF Doc. # 589.) The document filed as ECF Doc. # 586 appears to be missing a page. Therefore, the Court considers ECF Doc. # 589 a corrective filing.

employ conflicts counsel if he decided to prosecute claims against Mishmeret and Shapira.  (*Id.* at ¶ 38.)  Finally, Tarter noted the creation of the ethical wall as a precautionary measure.  (*Id.* at ¶ 39.)   In addition, the Trustee and Tarter jointly filed a memorandum of law that argued the factual and legal bases of their positions.  (*Chapter 7 Trustee's and Tarter Krinsky & Drogin LLP's Memorandum of Law in Response to Yosef A. Maiman and the Controlling Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin LLP as Substitute Counsel to the Trustee and (II) Motion to Disqualify Alex Spizz as Chapter 7 Trustee*, dated May 14, 2015 ("*Trustee Memorandum*")  (ECF Doc. # 588).)

The Controlling Shareholders filed a reply.  They restated that Tarter's prior representation created ongoing conflicts, questioned the efficacy of conflicts counsel due to the Trustee's own bias and contended that the ethical wall was meaningless because it was not put into place until nearly a month after the Trustee joined Tarter.  (*Maiman Reply* at ¶¶ 16, 23, 29.)

## G.    Evidentiary Hearing

The Court conducted an evidentiary hearing on June 9, 2015.   Scott Markowitz, Esq., a partner and co-chair of Tarter's bankruptcy practice group, testified about the scope and duration of Tarter's representation of Mishmeret and Shapira.  (Tr. at 8:8-10.)  Mishmeret first retained Tarter in either June or July of 2013 when it moved for relief from the automatic stay in order to proceed in an Israeli court to enforce its rights as Indenture Trustee of a sinking fund on deposit in certain Israeli banks.  (*Id.* at 8:20-9:12; TX 1 (retainer agreement dated July 1, 2013 (the "July 2013 Retainer Agreement") at ¶ 1; *see also Motion of Mishmeret-Trust Company Services Ltd for Clarification that the Automatic Stay is Inapplicable or, in the Alternative, Relief from the Automatic Stay Pursuant to § 362(d) of the Bankruptcy Code, to the Extent Necessary*, dated Oct. 31, 2013 (ECF Doc. # 357).)  The Trustee and Mishmeret eventually settled the dispute, and

14

Markowitz appeared before the Court as attorney for Mishmeret in June 2014 in connection with the motion to approve the settlement agreement.  (Tr. at 10:23-25; *see also Order Granting Chapter 7 Trustee's Motion Pursuant to 11 U.S.C. §§105(a) and 362(d) and Fed. R. Bankr. P. 4001(d) and 9019(a), for Approval of Agreement Concerning Sinking Funds and Alleged Preferential Transfer*, dated June 18, 2014 (ECF Doc. # 424).)  This engagement terminated after the entry of the order approving the settlement.  (Tr. at 11:18-12:1.)

Mishmeret and Shapira also retained Tarter to oppose the *Enforcement Motion*.  (*Id.* at 12:2-18.)  They executed a retainer agreement with Tarter in October 2013, (TX 2), that required Tarter to prepare a response and appear at hearings before the Court in opposition to the *Enforcement Motion*.  (*Id.* at ¶ 1; Tr. at 14:3-7.)  Tarter's engagement ended after the entry of an order denying the *Enforcement Motion* in January 2014.  (Tr. at 15:7-15.)

Finally, Tarter represented Mishmeret with respect to the LFA matter although no formal retainer agreement was signed.  Tarter reviewed the LFA, and Markowitz signed the agreement on behalf of Mishmeret.  (Tr. at 16:15-17.)  The engagement terminated after the Court approved the LFA in June 2014.  (*Id.* at 17:10-21.)  As noted, Mishmeret assigned its rights and did not fund the loan.

Tarter's invoices confirmed the beginning and end of its representation of Mishmeret and Shapira.  The first invoice was dated July 1, 2013, (TX 3 at 0000038), and the final invoice was dated August 1, 2014.  (*Id.* at 0000071).  The final invoice showed time entries for services

provided on July 10 and July 15, 2014. (*Id.*)[10] Markowitz testified that Tarter did not perform any work for Mishmeret or Shapira after July 15, 2014, (Tr. at 18:17-20, 21:13-15), and Tarter never represented Mishmeret or Shapira outside of the Ampal case. (*Id.* at 22:6-11.) Beyond reviewing the *Maiman Objection* and providing the Trustee with background information regarding Tarter's representation of Mishmeret and Shapira, Markowitz testified that he had not performed any services for the Trustee. (*Id.* at 22:23-23:7.) In addition, no other Tarter attorneys who had provided services to Mishmeret and Shapira had performed work for the Trustee, (*see id.* 23:8-17), and they would not provide services for the Trustee in the future. (*Id.* at 25:11-20.) Finally, Markowitz testified that he was aware of the ethical wall in place, (*id.* at 24:19-21), and that physical case files of Mishmeret and Shapira were put into off-site storage. (*Id.* at 25:10-12.)

The Trustee also called Goldstein to testify regarding the ethical wall created by Tarter. A bilateral ethical wall was established on May 8, 2015 that prevented Tarter attorneys who had represented Mishmeret and Shapira from accessing Ampal's client files and former Spizz Cohen attorneys from accessing Mishmeret's and Shapira's client files. (*Id.* at 37:4-18; TX 6 (email dated May 8, 2015); TX 8 (email dated May 14, 2015).)[11] Furthermore, all Tarter attorneys who had represented Mishmeret and Shapira were barred from accessing non-computer files of Ampal that were not a matter of public record, all physical case files pertaining to Mishmeret and

---

[10]    The final entry reflected a deduction of $330.00 on November 20, 2014. Markowitz testified that he was contacted by Tarter's accounting department around that date regarding an unpaid receivable and instructed the accounting department to write it off. (Tr. at 21:20-22:5.)

[11]    Goldstein had previously testified at a deposition on May 14, 2015, that he was not aware of any ethical walls in place preventing former Spizz Cohen attorneys from accessing the client files of Mishmeret and Shapira. (Tr. at 40:2-23.) Goldstein testified at the evidentiary hearing that he became aware subsequently that he had been mistaken and that the ethical wall had been put in place on May 8, 2015. (*Id.* at 43:15-18.)

Shapira were moved off-site, and only the Trustee, Goldstein and Makower had access to the

portable hard drive containing the confidential information covered by the *Discovery Order*. (Tr.

at 38:8-20; TX 5 (memorandum dated May 18, 2015).)

It came to light during the hearing that although Shapira had been served with the

*Retention Application* (and did not object), the Trustee had never served Mishmeret. Following

the conclusion of the hearing, the Court directed the Trustee to serve notice of the *Retention*

*Application* and the *Maiman Objection* on Mishmeret. (*Order Directing Service of the Trustee's*

*Application and Cross-Motion to Disqualify the Trustee*, dated June 9, 2015 (ECF Doc. # 600).)

The order granted Mishmeret 21 days to respond and directed the Trustee to file a certificate of

no objection if Mishmeret failed to respond within that period. The Trustee filed a certificate of

no objection on July 2, 2015. (*Certificate of No Objection Regarding Trustee's Application to*

*Retain Tarter Krinsky & Drogin LLP as Proposed Substitute Counsel to the Trustee*, dated July 2,

2015 (ECF Doc. # 607).)

## DISCUSSION

A.    **The *Retention Application***

Because the objection and cross-motion turn mainly on Tarter's alleged conflicts, I begin

there. The Code permits a trustee to employ professional persons "that do not hold or represent

an interest adverse to the estate, and that are disinterested persons." 11 U.S.C. § 327(a). A

professional person is disinterested, *inter alia*, if he "does not have an interest materially adverse

to the interest of the estate or of any class of creditors or equity security holders, by reason of any

direct or indirect relationship to, connection with, or interest in, the debtor, or for any other

reason." 11 U.S.C. § 101(14)(C). A professional person is not disqualified from employment

"solely because of such person's employment by or representation of a creditor, unless there is

objection by another creditor or the United States trustee, in which case the court shall

disapprove such employment if there is an actual conflict of interest."  Bankruptcy Code § 327(c)

"prevents disqualification based *solely* on the professional's prior representation of or

employment by a creditor—it 'does not preempt the more basic requirements of subsection (a).'"

*Bank Brussels Lambert v. Coan* (*In re AroChem Corp.*), 176 F.3d 610, 621 (2d Cir. 1999)

(quoting *In re Interwest Business Equip.,* 23 F.3d 311, 316 (10th Cir.1994).)

> The Bankruptcy Code does not define the phrase "hold or represent an interest adverse to

the estate," but many courts have adopted the following definition:

> (1) to possess or assert any economic interest that would tend to lessen the value
> of the bankruptcy estate or that would create either an actual or potential dispute
> in which the estate is a rival claimant; or (2) to possess a predisposition under
> circumstances that render such a bias against the estate.

*AroChem*, 176 F.3d at 623 (quoting *In re Roberts,* 46 B.R. 815, 827 (Bankr. D. Utah 1985), *aff'd*

*in relevant part and rev'd and remanded in part on other grounds,* 75 B.R. 402 (D. Utah 1987);

*accord In re Angelika Films 57th, Inc.*, 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998); *In re Granite*

*Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998).  The Court must make the

determination whether a proposed professional holds or represents an adverse interest on a case-

by-case basis giving due consideration to the totality of the circumstances.  *AroChem*, 176 F.3d

at 622; *In re Belmonte*, 524 B.R. 17, 27 (Bankr. E.D.N.Y. 2015); *Project Orange*, 431 B.R. at

370.

> The adverse interest test under Bankruptcy Code § 327(a) speaks in the present tense and

only examines present interests.  *AroChem*, 176 F.3d at 623-24; *In re M.F. Global Inc.*, 464 B.R.

594, 600 (Bankr. S.D.N.Y. 2011); *Project Orange*, 431 B.R. at 370.  Tarter does not presently

possess any claims or interests contrary to the estate, and consequently, does not hold an adverse

interest within the meaning of § 327(a). *AroChem*, 176 F.3d at 623. In particular, there is no

basis to conclude that Tarter has a predisposition in favor of Shapira, Mishmeret or anyone else

that renders it biased against the estate. For the same reason, Tarter does not "have" a personal

interest materially adverse to the estate or anyone else within the meaning of Bankruptcy Code §

101(14)(C). *See AroChem*, 176 F.3d at 629. Nor does Tarter represent an "adverse interest."

While Mishmeret is a creditor and holds an adverse interest, the evidence produced at the

evidentiary hearing showed that Tarter has not represented Mishmeret (or Shapira) since July

2014. *See AroChem*, 176 F.3d at 623.

The remaining question is whether Tarter's prior representation of Mishmeret and

Shapira create an actual conflict within the meaning of Bankruptcy Code § 327(c). An actual

conflict of interest is "an active competition between two interests, in which one interest can only

be served at the expense of the other." *In re Diva Jewelry Design, Inc.*, 367 B.R. 463, 472

(Bankr. S.D.N.Y. 2007) (quoting *In re Mercury*, 280 B.R. 35, 54 (Bankr. S.D.N.Y. 2002)); *see In

re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) ("An actual conflict involves

the representation of 'two presently competing and adverse interests,' while a potential conflict

occurs where the competition 'may become active if certain contingencies arise.'") (quoting In re

American Printers & Lithographers, Inc., 148 B.R. 862, 866 (Bankr. N.D. Ill. 1992).) Although

the distinction between actual and potential conflicts has been has been criticized, *e.g., Project

Orange*, 431 B.R. at 373; *Angelika Films*, 227 B.R. at 39; *Granite Partners,* 219 B.R. at 33,

Congress made it in § 327(c) and so must the Court when applying that provision.

The more limited the prior representation, even in the same bankruptcy case, the less

likely the actual conflict. *In re Diva Jewelry Design, Inc.*, 367 B.R. 463 (Bankr. S.D.N.Y. 2007)

illustrates this point. There, the debtor filed a chapter 7 petition, but several creditors became

19

dissatisfied with the interim trustee's investigation of the debtor's alleged misconduct. Cindy Molloy, Esq., the litigation attorney representing a group of creditors (the "Group") hired Leo Fox, Esq. to press their interests. Fox conducted an examination pursuant to Federal Bankruptcy Rule 2004, attended the section 341 meeting, requested an election for a permanent chapter 7 trustee and consulted with Molloy regarding the election process. *Id.* at 465. Fox also introduced the creditors to Matthew Harrison, Jr., who was then elected as permanent trustee. Fox moved to certify the election, the Court appointed Harrison as trustee, and Harrison thereafter sought to retain Fox as his bankruptcy counsel. *Id.* at 466.

The United States Trustee objected to the retention, and the Court conducted an evidentiary hearing. It found that Fox did not have a "one-on-one" relationship with any creditor and did not meet any creditors until about the time of the section 341 meeting. In addition, while Fox discussed the concept of preference recoveries with members of the Group, he did not discuss any member's personal exposure or advise any member regarding its preference liability. *Id.* at 467. Furthermore, Molloy did not share confidential information with Fox and did not discuss any claims that might be brought against any members of the Group other than the general concept that trustees bring such actions as they deem necessary. Fox, Molloy, and possibly members of the Group discussed the concept of reclamation claims, but did not discuss any potential reclamation claims that members of the Group might have. *Id.* Finally, Fox did not receive any confidential information regarding claims the estate might bring against the members of the Group. *Id.* at 468.

Based on these findings, the Court approved the retention application. After noting that the adverse interest test focused on the present and Fox no longer represented the Group or its members, the Court turned to Bankruptcy Code § 327(c) and the issue of an actual conflict. *Id.*

20

at 472.  It observed that Fox was not conflicted in prosecuting avoidance actions against creditors he did not formally represent, and in the "most technical sense," was not conflicted in prosecuting avoidance claims against his former clients, the members of the Group.  He no longer represented them, he did no work with respect to those claims and he did not receive any confidential information regarding those claims.[12]  *Id.*  The Court concluded that Fox's prior representation of the Group's members did not lessen the value of the estate, create an actual or potential dispute now or, in all likelihood, in the future, or display a predisposition against the estate.  *Id.* at 472-73.

As *Diva* illustrates, the issue of actual conflict focuses on the relationship between the prior representation of the creditors and the proposed representation of the estate and, as part of that inquiry, whether confidential communications passed between proposed counsel and his former clients that would prevent him from representing the best interest of the estate.  *Cf.* NEW YORK RULES OF PROFESSIONAL CONDUCT 1.9 (a) ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the *same or a substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.") (emphasis added).  As *Diva* illustrates, the mere prior representation of creditors, even in the same bankruptcy case, does not automatically create an actual conflict or mandate disqualification under Bankruptcy Code § 327(c).

---

[12]    The Court did express its belief that before Fox investigated or prosecuted avoidance claims against his former clients, it should consider whether the claims should be investigated or prosecuted by someone else.  *Diva*, 367 B.R. at 472.

Here, Tarter's representation of Mishmeret and Shapira was limited and does not support a finding of an actual conflict. Initially, although Mishmeret is a creditor, there is no evidence that Tarter counseled Mishmeret regarding the merits of its claim or received any confidential communications relating to the claim. According to the Final Claims Register prepared by the former claims agent, Mishmeret filed a proof of claim as Indenture Trustee on February 28, 2013, in the approximate sum of $44 million. This occurred prior to Tarter's initial retention, and the claim was prepared on Mishmeret's behalf by Brown Rudnick, LLP, another law firm. Furthermore, the Controlling Shareholders have not argued that Mishmeret's claim should be disallowed. It is based on the amount of the Series C bonds.

The Controlling Shareholders contend that Tarter's role representing Mishmeret in connection with the LFA creates an actual conflict. The argument is based on the incorrect assumption that Mishmeret was the lender under the LFA. Mishmeret assigned its rights, and the loan was funded by other entities. To the extent any dispute arises in connection with the LFA or the post-petition financing, it will not involve Mishmeret.

Next, the Controlling Shareholders point to Tarter's defense of Shapira and Mishmeret during the *Enforcement Motion*. The Court previously concluded that Tarter's clients violated the automatic stay but that violation did not damage the estate. *Ampal II*, 502 B.R. at 373-74. The Court did express a concern that Shapira and Mishmeret faced a *potential* conflict with the estate over the division of the D&O insurance proceeds, but there was no actual conflict, *id.* at 375, and none has been brought to the Court's attention in the approximate eighteen months that have elapsed since that decision. The matters relating to the *Enforcement Motion* are completed, and the Court does not foresee any further proceedings.

22

In addition, and although not directly related to the subject matter of the prior representations, the *Discovery Order* does not create a conflict. The *Discovery Order* prohibits the Trustee from disclosing confidential information to Shapira, the Shapira firm or any of their agents. (*Discovery Order* at ¶ 4.)   The Controlling Shareholders assert that Tarter is still Shapira's agent and the Trustee is also an agent based on his association with Tarter. (*Maiman Objection* at ¶¶ 16, 44.)  However, Shapira retained Tarter for the limited purpose of defending against the *Enforcement Motion*, (TX 2 at ¶ 1), and that representation was completed when the Court entered an order denying the *Enforcement Motion* in January 2014.   Consequently, Tarter is no longer Shapira's agent. *Vigna v. Galeano*, 856 N.Y.S. 2d 503, 2008 WL 203757, at *7 (N.Y. Civ. Ct. 2011) (agency limited to particular purpose terminates when that purpose is completed); *see also* RESTATEMENT (SECOND) OF AGENCY § 106 (authority of agent to accomplish specified act terminates when the act is done).

Furthermore, there is no danger of the disclosure of confidential information.  The Trustee produced uncontroverted evidence of the creation of a bilateral ethical wall on May 8, 2015 that effectively seals off the use of any such confidential information that may exist.  The Mishmeret files were moved off-site, and the Trustee's confidential information is under the exclusive control of the Trustee and the former Spizz Cohen attorneys.  Goldstein also testified in this regard that the confidential information covered by the *Discovery Order* was physically located in a portable hard drive in his possession.  (Tr. at 38:17-19; *accord* TX 5 at 2.)  Moreover, neither group has computer access to the other group's files.  Finally, the Tarter attorneys who

worked on the Mishmeret and Shapira matters have not and will not perform any services for the Trustee. (Tr. at 22:19-24:18.)[13]

Although associated attorneys are presumed to share client confidences, *In re MF Global Inc.*, 464 B.R. 594, 605 n.10 (Bankr. S.D.N.Y. 2011) (explaining the presumption that associated attorneys share client confidences)), that presumption is rebutted through evidence that an ethical wall prevents information sharing. *Hempstead Video, Inc. v. Village of Valley Stream*, 409 F.3d 127, 138 (2d Cir. 2005) ("We see no reason why, in appropriate cases and on convincing facts, isolation-whether it results from the intentional construction of a "Chinese Wall," or from *de facto* separation that effectively protects against any sharing of confidential information-cannot adequately protect against taint."); *Maricultura Del Norte, S. de R.L. de C.V. v. WorldBusiness Capital, Inc.*, No. 14 Civ. 10143, 2015 WL 1062167, at *15 (S.D.N.Y. Mar. 9, 2015) ("In every other *post-Hempstead* case I have located within this circuit, the district court, after considering whether an ethical screen was sufficient, has found the presumption rebutted and denied a motion to disqualify."); *Am. Int'l Grp. v. Bank of Am. Corp.*, 827 F. Supp. 2d 341, 346 (S.D.N.Y. 2011) ("One method of rebutting the presumption [of sharing confidential information] is by demonstrating a timely and effective ethical screen that fences the disqualified attorney from the other attorneys in the firm in connection with the case for which the conflict is alleged.") (internal quotation marks omitted); *see MF Global*, 464 B.R. at 605 n.10. The Trustee's evidence rebuts the presumption that he will share confidential information with Tarter attorneys

---

[13]    The Controlling Shareholders take issue with the delay between the Trustee's employment by Tarter and the creation of the ethical wall, (*Maiman Reply* at ¶ 29), but there is no evidence that any confidential information was actually exchanged prior to the creation of the ethical wall.

(other than the former Spizz Cohen attorneys) or that Tarter will share confidential information relating to Mishmeret or Shapira with the Trustee and his group.

The Controlling Shareholders' final area of "actual" conflict relates to the Interference Claim and the Gadot Claim. They maintain that both Tarter and the Trustee will not investigate or prosecute these claims against Mishmeret and Shapira based on Tarter's prior representation. Initially, the Controlling Shareholders do not argue that Tarter ever represented Mishmeret or Shapira in connection with the transactions that gave rise to these claims, or that Tarter is in possession of confidential information bearing on these claims. Furthermore, as discussed in the next section, the Trustee has considered these claims and concluded that they are unsubstantiated, speculative and their prosecution at this time is contrary to the best interests of the estate.

Finally, the case law that the Controlling Shareholders cite in support of their actual conflict claim is distinguishable. In *In re Quality Beverage Co., Inc.*, 216 B.R. 592 (Bankr. S.D. Tex. 1995), the debtor sought to retain Coopers & Lybrand to assist him in the prosecution of turnover and preference litigation. The accounting firm had formerly represented the Official Committee of Unsecured Creditors, and some of its members were targets of the trustee's proposed actions. The bankruptcy court denied the retention application finding that the "dual representation" created an actual conflict. *Id.* at 595. For reasons discussed in the next section, neither Mishmeret nor Shapira are targets of any proposed lawsuits to be brought by the Trustee.

In *Gosser v. Arkison* (*In re Hammer*), WW-06-1373-MODJ, 04-22244, 2007 WL 7540945 (B.A.P. 9th Cir. Aug. 17, 2007), the debtor's counsel failed to disclose its representation of one of the major creditors of the estate (the "City"). When it sought compensation, a group of creditors objected. The bankruptcy court initially ruled that there was

no conflict of interest and that the law firm was disinterested.  The bankruptcy appellate panel reversed primarily because the law firm had represented the debtor and the City at the same time. *Id.*, 2007 WL 7540945, at *7.   Even if the law firm did not presently represent the City, it still held an adverse interest because there was substantial evidence that the law firm had an ongoing relationship with the City and had an incentive not to jeopardize its relationship with an institutional creditor that had paid the law firm $180,000 in recent years.  *Id*.  Finally, the law firm had also represented the City in relation to its claim against the estate, and the law firm would be exposed to liability if it identified any defects in the claim.  Consequently, the law firm had an incentive not to challenge the City's claim.  *Id.*

Here, there is no failure to disclose on Tarter's part, Tarter has no ongoing relationship with Shapira or Mishmeret, and it is unlikely that the subject matter of its prior representations will become the subject matter of a dispute between the estate and the former clients.  Hence, there is no meaningful incentive on the part of Tarter to act contrary to the estate's interests *vis-à-vis* its former clients.

In *Buckley v. TransAmerica Investment Corp.* (*In re Southern Kitchens*), 216 B.R. 819 (Bankr. D. Minn. 1998), the trustee retained the law firm as special counsel to sue the debtor's prior chapter 11 plan funder and its management, arguing that their actions drove the debtor into a second bankruptcy.  The defendants responded that the activities of Gunberg, a former director who had sought to usurp control of the debtor, caused the debtor's downfall.  The law firm had represented Gunberg in her personal bankruptcy case at the same time as the activities at issue in

the adversary proceeding.[14]  The defendants sought to disqualify the law firm contending that it never should have been retained as special counsel.  *Id.* at 821-25.

The bankruptcy court expressed its wariness of strategic disqualification motions but concluded that "the sequence of uncontroverted facts is enough to lay that concern to rest."  *Id.* at 828.  The record reflected a "meritorious dispute" over the reasons for the reorganized Debtor's failure arising from the struggle for control that pitted Gunberg against the defendants in the adversary proceeding.  *Id.* at 828-29.  The Court concluded that because of the possibility that the law firm's former client was liable for the damages attributed to the defendants, the law firm was deemed to have represented an interest adverse to the estate on the subject matter of the suit brought on behalf of the estate.  *Id,* at 829.

Here, the Controlling Shareholders' opposition and cross-motion, like their assertion of the Interference and Gadot Claims, are strategic.  Furthermore, Tarter did not represent Mishmeret or Shapira at the time they allegedly committed the bad acts underlying the Interference Claim.  As discussed in more detail below, the Interference and Gadot Claims lack any ostensible merit, and the Trustee's decision not to prosecute the claims is due to his reasonable exercise of business judgment, not the inability of his counsel to assess the liability of its former clients.

Lastly, in *In re Vebeliunas*, 231 B.R. 181, 193 (Bankr. S.D.N.Y. 1999), the court disqualified trustee's counsel after finding that there was "direct evidence of actual bias and prejudice" against the debtor, stemming from the attorney's comments regarding the debtor's

---

[14]    The law firm had defended an objection to Gunberg's general discharge.  The bankruptcy court denied the discharge and had made findings that Gunberg was not credible and had committed acts of personal dishonesty.  *Southern Kitchens*, 216 B.R. at 823 n. 7.

trustworthiness.  The bankruptcy court reasoned that the attorney's personal conduct exhibited an

inability to act impartially.  Here, the Controlling Shareholders have not pointed to any acts of

bias by Tarter.

### B.    Cross-Motion to Remove the Trustee for Cause

A court may remove a trustee for "cause."  11 U.S.C. § 324(a).  The Bankruptcy Code

does not define "cause," but decisional law "generally requires a showing of actual fraud or

injury to a debtor's interests. *Dieffenbach v. Haworth* (*In re Haworth*), 356 Fed. Appx. 529, 530

(2d Cir. 2009) (quoting *In re Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2d Cir. 1965));

*Surabian v. Picard*, Case No. 13 Civ. 935 (JGK), 2014 WL 917091, at *2 (S.D.N.Y. Mar. 7,

2014); *In re Belmonte*, 524 B.R. at 28; *Pereira v. Foong* (*In re Ngan Gung Restaurant*), 254 B.R.

566, 574-75 (Bankr. S.D.N.Y. 2000).  The party seeking removal must make a "strong showing

because the effect of removal is deleterious to the continuity of the administration of the estate."

*In re Carla Leather, Inc.,* 44 B.R. 457, 473 (Bankr.S.D.N.Y.1984), *aff'd* 50 B.R. 764 (S.D.N.Y.

1985).

The Controlling Shareholders do not allege that the Trustee engaged in fraudulent

conduct or caused injury to the estate but argue that such a showing is not required to establish

cause.  (*Maiman Reply* at ¶ 30; *see In re Lundborg*, 110 B.R. 106, 108 (Bankr. D. Conn. 1990)

(observing that some courts have found cause where trustee was not disinterested).)  Instead,

they contend that the Trustee should be removed based on his connection with Tarter, (*Maiman

Objection* at ¶¶ 41-42), his refusal to pursue the Interference Claim and the Gadot Claim, (*id.* at ¶

43), and his violation of the *Discovery Order*.  (*Id.* at ¶ 44.)  The Court has already concluded

that there is no conflict to impute to the Trustee because Tarter is not conflicted and there is no

violation of the *Discovery Order* because neither Tarter nor the Trustee are Shapira's agents.

28

This leaves the Interference Claim and the Gadot Claim.  A trustee is not required to prosecute every cause of action belonging to the estate.  *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1346-47 (7th Cir. 1987); *In re V. Savino Oil & Heating Co.*, 91 B.R. 655, 656 (Bankr. E.D.N.Y. 1988) ("a trustee or debtor-in-possession has a substantial degree of prosecutorial discretion to sue or not to sue.").  He has broad discretion and his actions are reviewed under the business judgment standard.  *In re Smith*, 400 B.R. 370, 378 (Bankr. E.D.N.Y. 2009); *In re Consolidated Industries Corp.*, 330 B.R. 712, 715 (N.D. Ind. 2005).

The Trustee has explained why he does not intend, at least at present, to prosecute these claims.  First, the Interference Claim is suspect.  As the Trustee argues, (*see Spizz Affidavit* at ¶¶ 18-23), the events underlying the Interference Claim occurred pre-petition.  Yet when Ampal filed its chapter 11 petition, and Maiman controlled Ampal as its chairman, president and chief executive officer, Ampal failed to disclose the Interference Claim in its schedules or in the *Declaration of Irit Eluz Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtor's Chapter 11 Petition and First-Day Motions*, dated Aug. 29, 2012.  (ECF Doc. # 2.) Furthermore, it did not blame the bondholders for pushing it into bankruptcy.  Instead, Ampal attributed its default primarily to the "Arab Spring" and the interruption that caused to the cash flow from another Ampal project in Egypt.  (*Id.* at ¶¶ 21-24.)  In addition, the Rule 1007-2 Declaration runs on for twenty-three pages without mentioning the ethanol project or the tortious conduct of the bondholders or Shapira.  Finally, Ampal never pursued the Interference Claim while Maiman ran Ampal, including during the eight months after the chapter 11 case was commenced.

The Trustee first learned of the Interference Claim two years later in September 2014 when Maiman filed his proof of claim after he had been ousted from management.  (*Spizz*

*Affidavit* at ¶ 21.)  Maiman asserted the claim in his proof of claim only after the Trustee

commenced the Note and Guaranty Action, and his (and MNF's) answer filed a short time later

asserted it as an affirmative defense in the Note and Guaranty Action.  The circumstances

suggest that the Interference Claim was interposed as a litigation tactic to defeat their liability to

MAG.  Furthermore, the Controlling Shareholders have still not identified the defamatory

statements or the publications on which the Interference Claim is based.  (*Id.* at ¶¶ 20, 28.)

Finally, according to Maiman and MNF, the Interference Claim is an Ampal liability

rather than an Ampal asset.  Maiman has asserted the Interference Claim as a claim against the

Ampal estate, and Maiman and MNF have asserted the Interference Claim as a defense to their

liability in the Note and Guaranty Action.  The Trustee conferred with his special counsel,

Troutman Sanders, concluded that the Note and Guaranty claim was strong and the pursuit of the

Interference Claim, though weak, could potentially undermine MAG's claims.  "Simply put,

Maiman seeks to have the Trustee pursue these uncertain and speculative claims against others at

the expense of the Trustee's claims against him and Merhav."  (*Id.* at ¶ 26.)

The Trustee also investigated the Gadot Claim and concluded that it lacked merit.  The

Controlling Shareholders claimed that Shapira had made inflammatory statements to the Israeli

press in late 2013 that induced IDB to seek the appointment of a receiver in Israel of the Gadot

shares the very next day.  (*Maiman Objection* at 25.)  The Trustee discovered that IDB had

applied for the appointment of a receiver in December 2012.  (*Spizz Affidavit* at ¶ 34 & Ex. G.)

Thus, the Gadot Claim is factually unsupportable.

The Trustee suggests that if the Interference Claim or the Gadot Claim subsequently

appears to have merit, or a need arises to contest Mishmeret's claim, he will retain conflicts

counsel to investigate and, if appropriate, prosecute those claims or objections.  (*Id.* at ¶¶ 31, 36.)
Tarter agrees.  (*Tarter Response* at ¶ 38.).  This would not resolve an actual conflict arising from
Tarter's prior representation of Mishmeret or Shapira because that conflict would be imputed to
the Trustee.  The Court has concluded, however, that Tarter would not suffer an actual conflict in
those circumstances.  Although Tarter would not be disqualified, the Trustee may nevertheless
retain special conflicts counsel in the exercise of his business judgment even though the
Bankruptcy Code does not require it.

## CONCLUSION

In evaluating a proposed retention, a bankruptcy court must exercise its discretion "in a
manner which takes into account the particular facts and circumstances surrounding each case
and the proposed retention before making a decision." *AroChem*, 176 F.3d at 621 (quoting 3
COLLIER ON BANKRUPTCY ¶ 327.04[1][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.);
*accord In re Harold & Williams Dev. Co.,* 977 F.2d 906, 910 (4th Cir.1992) (in exercising its
discretion, the ultimate considerations "must be the protection of the interests of the bankruptcy
estate and its creditors, and the efficient, expeditious, and economical resolution of the
bankruptcy proceeding."); *Diva*, 367 B.R. at 471.  This does not mean that the Court may
approve a retention where the application of Bankruptcy Code mandates denial.  It does suggest,
however, that in the absence of the mandated rejection of a retention application, the bankruptcy
court still has discretion whether to approve that application.  While it may be easy to err on the
side of disqualification in what may appear to some to be a close case, the bankruptcy court
presiding over the case is in the best position to assess the surrounding circumstances and
consider the interests of the estate and the creditors and the expeditious resolution of the case.

31

I have presided over this case for three years and conclude that the disqualification of Tarter and the removal of the Trustee would have a deleterious effect.  The Trustee has overseen the administration of the Ampal case and the operations of its Israeli subsidiaries for over two years.  He has managed Ampal's affairs in connection with international arbitrations involving its most valuable claim and the liquidation of its interests in the assets of its foreign subsidiaries.  He has done his job faithfully and competently and has served the best interests of all stakeholders.  Disqualification of Tarter and removal of the Trustee would disserve the estate and cause unnecessary delay.

My discretion is also informed by the history of the case and the nature of the opposition.  As mentioned earlier, there is a long history of enmity between Ampal's former management, including Maiman, and its bondholders, which has spilled over into this Court.  Invariably, the Trustee elected by the bondholders has been viewed, expressly or impliedly, as their shill.  Were that a basis for disqualification, every trustee elected by creditors pursuant to 11 U.S.C. § 702 would immediately be disqualified.[15]  In an effort to oust the Trustee, the Controlling Shareholders have asserted claims for the Trustee to investigate that are of doubtful validity or valuable to the estate.  In fact, at least as alleged by Maiman and MNF, they are estate liabilities and defenses to MAG's valuable claim asserted in the Note and Guaranty Action.  Furthermore, according to the third party complaint, they belong to Maiman and MNF, not the estate.  Under the circumstances, rejection of Tarter's retention with the consequent removal of the Trustee would be an improper exercise of discretion.

---

[15]      I have criticized the Trustee in the past for taking the bondholders' and Shapira's side in a dispute that did not directly concern the estate.  *Ampal II*, 502 B.R. at 375.  However, the Trustee had also threatened to sue the Indenture Trustees, including Mishmeret, in connection with a dispute regarding the turnover of sinking funds.  (*Spizz Affidavit* at ¶ 27 & Ex. F.)  The Court is confident that his connection with Tarter will not lessen his zealous representation of the estate.

Accordingly, the *Retention Application* is granted and the Controlling Shareholders'

cross-motion to remove the Trustee is denied.

Submit order.

Dated: New York, New York
July 27, 2015

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Court