**Hearing Date and Time:**
**March 1, 2016 at 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**Objection Deadline Date and Time:**
**February 23, 2016 at 4:00 p.m.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                    :
In re                                                               :    Chapter 7
                                                                    :
AMPAL-AMERICAN ISRAEL CORPORATION,                                  :    Case No. 12-13689 (SMB)
                                                                    :
                                                                    :
                    Debtor.                                         :
                                                                    :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF HEARING ON CHAPTER 7 TRUSTEE'S MOTION FOR AN
ORDER APPROVING CERTAIN DISTRIBUTION AGREEMENT
PURSUANT TO SECTIONS 105 AND 362
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019**

**PLEASE TAKE NOTICE** that a hearing (the "Hearing") will be held before the

Honorable Stuart M. Bernstein, United States Bankruptcy Judge, on **March 1, 2016 at 10:00**

**a.m.**, or as soon thereafter as counsel may be heard, at the United States Bankruptcy Court for

the Southern District of New York, One Bowling Green, New York, NY 10004-1408,

Courtroom 723, to consider the *Chapter 7 Trustee's Motion for an Order Approving Certain*

*Distribution Agreement Pursuant to Sections 105 and 362 of the Bankruptcy Code and*

*Bankruptcy Rule 9019* (the "Motion").

      **PLEASE TAKE FURTHER NOTICE** that you do not need to appear at the Hearing if

you do not object to the relief requested in the Motion.

      **PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned

from time to time without further notice other than an announcement of the adjourned date or

dates at the Hearing or at a later hearing.

      **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion must be

made in writing, state with particularity the grounds therefore, shall conform to the United States

Bankruptcy Rules and the Local Rules of the Bankruptcy Court, include in the upper right hand corner of the caption, the ECF docket number to which the filing relates, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (with a courtesy copy delivered directly to the Chambers of Stuart M. Bernstein, United States Bankruptcy Judge, United States Bankruptcy Court, The Alexander Hamilton Custom House, One Bowling Green, Room 723, New York, NY 10004), and served upon (i) the Office of the United States Trustee, 201 Varick Street, Ste. 1006, New York, New York 10014 (Attention: Andrew Velez-Rivera, Esq.); and (ii) upon Troutman Sanders, LLP, Special Counsel for the Trustee, 875 Third Avenue, New York, New York, 10022 (Attention: John P. Campo, Esq.) and (iii) Tarter Krinsky & Drogin LLP, Counsel for the Trustee, 1350 Broadway, New York, New York 10018 (Attention: Arthur Goldstein, Esq.) together with proof of service thereof, so as to be received no later than **4:00 p.m. Eastern Time on February 23, 2016**.

PLEASE TAKE FURTHER NOTICE that unless responses are received by that time, the relief may be granted as requested in the Application.

Dated: New York, New York
      February 2, 2016

TROUTMAN SANDERS LLP

By: */s/ John P. Campo*
    John P. Campo
    J. David Dantzler, Jr.
    Brett D. Goodman
    875 Third Avenue
    New York, NY 10022
    Tel.: (212) 704-6075

*Special Counsel for the Trustee*

2

**Hearing Date and Time:**
**March 1, 2016 at 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**Objection Deadline Date and Time:**
**February 23, 2016 at 4:00 p.m.**

------------------------------------------------------------ x

| | |
|---|---|
| In re: | : Chapter 7 |
| | : |
| AMPAL-AMERICAN ISRAEL CORPORATION, | : Case No. 12-13689 (SMB) |
| | : |
| Debtor. | : |

------------------------------------------------------------ x

### CHAPTER 7 TRUSTEE'S MOTION FOR AN ORDER APPROVING CERTAIN DISTRIBUTION AGREEMENT PURSUANT TO SECTIONS 105 AND 362 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019

**TO THE HONORABLE STUART M. BERNSTEIN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Alex Spizz (the "Trustee"), as the duly qualified chapter 7 trustee for the estate of Ampal-American Israel Corporation (the "Debtor"), by and through his undersigned special counsel, hereby moves (the "Motion") this Court for entry of an Order pursuant to sections 105(a) and 362(d) of title 11 of the United States Code, 11 U.S.C. § 101, et. seq. (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving that certain Distribution Agreement dated as of January 19, 2016 (the "Distribution Agreement")[1] entered into between the Trustee and Forest Value Fund II (the "Bondholder Representative"). A copy of the Distribution Agreement is annexed hereto as Exhibit A. In support of this Motion, the Trustee incorporates by reference herein the Declaration of Alex Spizz (the "Spizz Declaration") which has been filed contemporaneously herewith, and represents as follows:

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Distribution Agreement.

27744556v10

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) in that it is a matter concerning the administration of the Debtor's estate.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 362 of the Bankruptcy Code and Bankruptcy Rule 9019(a).

## BACKGROUND

***General Background***

3.      On August 29, 2012 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").

4.      The Debtor operated as a debtor-in-possession until April 8, 2013, when Michael Luskin was appointed as chapter 11 trustee for the Debtor's estate.

5.      On or about May 2, 2013, the Debtor's case was converted to a case under chapter 7 of the Bankruptcy Code, and on May 20, 2013, the Trustee was elected as chapter 7 trustee of the Debtor's estate and was duly qualified thereafter.

***Relevant Background***

6.      On August 27, 2014, the Trustee commenced an adversary proceeding in this chapter 7 case styled *Spizz v. Eluz, et al.*, Adv. Proc. No. 14-02110-smb (the "Trustee Litigation") against certain former directors and officers of the Debtor, alleging causes of action for, *inter alia,* breach of fiduciary duty.

2

7.      In October 2014, the Bondholder Representative, through counsel, contacted the Trustee and his counsel and advised that the Bondholder Representative and his counsel were investigating various potential claims that could be asserted in Israel by the bondholders against former directors and officers, as well as the controlling shareholder, of the Debtor.

8.      Given the substantial overlap between the class or classes of bondholders represented by the Bondholder Representative, and the bondholders who are creditors of the Debtor's estate, the Trustee and Bondholder Representative believed it was prudent for them to engage in discussions and perform an analysis of the claims to be asserted by the Bondholder Representative in order to prevent the Bondholder Representative from asserting claims that belong to the Debtor's estate, and to resolve any competing interests in the sources of recovery in any such litigation.  In order to share information, the Trustee and the Bondholder Representative entered into a common interest and confidentiality agreement.

9.      As part of the Trustee's due diligence, the Trustee and his counsel participated in, *inter alia*, ongoing oral and written communications with the Bondholder Representative and its counsel over the course of months with respect to the claims the Bondholder Representative intended to pursue.  Based on this review, the Trustee and his counsel determined that the claims the Bondholder Representative planned to assert belonged to the individual bondholders, were not property of the Debtor's estate, and could be independently pursued by the bondholders.

10.     While it was determined that the claims asserted by the Trustee and the claims asserted by the Bondholder Representative could be brought separately, it was apparent that the Bondholder Representative planned to sue some of the same individual defendants named in the Trustee Litigation.  Consequently, the same assets from which recovery could be made in the Trustee Litigation, including any insurance proceeds potentially recoverable under a primary

3

directors' and officers' liability policy issued to the Debtor by XL Insurance Company Limited and various excess directors' and officers' liability policies issued by Lloyds Syndicate 2003, Liberty Mutual Insurance Europe, Axis Insurance, and Syndicate 1919 (collectively, the "Policies"), would be implicated in the bondholders' proposed action.

11.    Due to the related nature of the Parties' claims against the same individuals, the Trustee and the Bondholder Representative believed that it was in the best interest of the Debtor's estate and its creditors, including the Debtor's bondholders, to resolve any potential dispute over the right to assets recovered from the bondholders' proposed action and to enter into an agreement that would allow the Trustee to cooperate with the Bondholder Representative and assure, among other things, an effective and efficient distribution of any recoveries obtained by the Bondholder Representative in such litigation.

12.    On December 29, 2015, the Bondholder Representative commenced an action in the State of Israel on behalf of a class or classes of holders of certain debentures issued by the Debtor (the "Bondholders") against certain former officers and directors, as well as the controlling shareholders (the "Bondholder Litigation").  The Bondholder Litigation is based upon claims for violations of Israeli securities laws and breaches of the Deeds of Trust, which, the Bondholder Representative alleges, give rise to personal liability of the Debtor's directors and officers directly to the Bondholders.  A certified English translation of the complaint filed in the Bondholder Litigation is attached hereto as Exhibit B.

## THE DISTRIBUTION AGREEMENT

13.    As a result of lengthy negotiations between the parties, on or about January 19, 2016, the Trustee and the Bondholder Representative agreed to the terms of the Distribution Agreement which reconciles any competing claims the Trustee and Bondholder Representative

4

may have to any recoveries in the Bondholder Litigation, allows the Bondholder Litigation to move forward, and provides certainty that any recovery from the Bondholder Litigation will be disbursed through the Debtor's estate to Bondholders entitled to participate in such recovery.

14.     A summary of the key terms of the Distribution Agreement is as follows:[2]

(a)     The Distribution Agreement shall be effective only upon (i) approval by the Bankruptcy Court, and (ii) approval by the Israeli Court having jurisdiction over the Bondholder Litigation;

(b)     Subject to and in accordance with the approval of the Bankruptcy Court and the Israeli Court, the net amount of any recovery obtained by the Bondholder Representative on behalf of a class or classes of the Debtor's bondholders, whether by settlement or legal judgment, shall be turned over to the Trustee and administered and disbursed to Bondholders as part of the Ampal bankruptcy estate;

(c)     The Parties will confer with each other regarding the terms of any proposed settlement and compromise of their respective claims, and nothing in the Distribution Agreement shall in any way limit the right of either Party to assert claims or to settle and compromise such claims without the consent of the other Party, so long as the claims and defenses of the non-settling Party are in no way limited or modified as a result of such settlement; and

(d)     If (i) the settlement and compromise of the claims asserted by one Party requires the settlement and compromise of the claims asserted by the other Party to the Distribution Agreement, and (ii) the Parties disagree about whether or not the terms any such proposed settlement, as well as the allocation of any settlement proceeds to the Parties' respective claims, are fair and reasonable to the Parties under the circumstances, the Parties will proceed to binding arbitration in accordance with the Distribution Agreement.

## **RELIEF REQUESTED AND BASIS THEREFOR**

---

[2] The summary of the Distribution Agreement set forth herein is provided solely for the convenience of the Court, and is not intended to be a comprehensive recitation of all of the terms of the Distribution Agreement. The summary is qualified in its entirety by the actual terms of the Distribution Agreement, and to the extent that there is any inconsistency between the summary provided for herein and the actual terms of the Distribution Agreement, the actual terms of the Distribution Agreement, as approved, shall control.

5

15.      Entry into the Distribution Agreement is in the best interest of the Debtor's estate and should be approved under Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to achieve fairness and justice in the reorganization process. *See, e.g., In re Momentum Manufacturing Corporation*, 25 F.3d 1132, 1136 (2nd Cir. 1994) ("[B]ankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process."); *In re Croton River Club, Inc.*, 52 F.3d 41 (2nd Cir. 1994) (holding that bankruptcy courts have broad equity power to manage affairs of debtors); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy ... is that equitable principles govern").   The purpose of section 105(a) of the Bankruptcy Code is to assure that bankruptcy courts have the power to take what-ever action "is appropriate or necessary in aid of the exercise of their jurisdiction." 2 Collier on Bankruptcy ¶ 105.05 (16th ed. 2012).

16.      Moreover, Bankruptcy Rule 9019(a) provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).   Settlements and compromises such as those among the Debtors and the Claimants are favored in bankruptcy.  *See In re Lehigh Valley Professional Sports Clubs, Inc.*, 2000 Bankr. LEXIS 520 (Bankr. E.D. Pa., dated May 5, 2000).  Indeed, as the court in *Lehigh Valley* stated:

6

> It is well accepted that compromises are favored in bankruptcy in order to minimize the cost of litigation to the estate and expedite its administration, and that the approval of a compromise is within the sound discretion of the bankruptcy judge who must assess and balance the value of the claim being compromised against the value to the estate of the acceptance of the compromise proposal.

*Lehigh Valley*, at \*17-\*18.

17.     The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). It is the responsibility of a court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). "[I]n applying its discretion, the court…must act with regard to what is right and equitable under the circumstances and the law, and dictated by the reason and conscience of the judge to a just result." *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998). Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

18.     In determining whether to approve a compromise or settlement, the Court should consider whether such compromise or settlement is in the best interests of the Debtor's estate. *In re Depo*, 77 B.R. 381, 383 (N.D.N.Y. 1987), *aff'd*, 863 F.2d 45 (2d Cir. 1988). However, in ruling on a compromise or settlement, the "bankruptcy court does not substitute its judgment for that of the trustee [or debtor in possession]." *Depo*, 77 B.R. at 384. In addition, the bankruptcy court is not "to decide numerous questions of law and fact raised...but rather to canvass the issues and see whether the settlement fall[s] below the lowest point in the range of

7

reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983), <u>cert. denied</u>, 464 U.S. 822 (1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972), <u>cert. denied</u>, 409 U.S. 1039 (1972)).  *See In re Holywell Corp.*, 93 B.R. 291, 294 (Bankr. S.D. Fla. 1988) ("In order to exercise this discretion properly, the Court must consider all the relevant facts and evaluate whether the compromise suggested falls below the 'lowest point in the range of reasonableness'") (quoting *In re Teltronics Services, Inc.*, 762 F.2d 185, 189 (2d Cir. 1985)).

19.     With regard to the Policies implicated by the Bondholder Litigation, although it is well established that a liability policy is considered property of a debtor's estate under section 541 of the Bankruptcy Code, the proceeds are not necessarily so.  *See In re Continental Airlines*, 203 F.3d 203, 216 (3d Cir. 2000) (the "proceeds from [an] insurance policy should be evaluated separately from the debtor's interest in the policy itself"); *see also In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1400-01 (5th Cir. 1987) (proceeds of D&O policy which did not provide liability coverage for third-party claims against the debtor not property of the estate); *In re MF Global Holdings Ltd.*, 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012) (quoting *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del. 2010)) ("courts are in disagreement over whether the proceeds of a liability policy are property of the estate"); *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004) ("individual insureds…have a right to use the policies' proceeds to cover their defense and settlement costs in litigation"); *In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 52-54 (S.D.N.Y. 2003); *Ochs v. Lipson (In re First Central Fin. Corp.)*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) *aff'd in an unreported decision*, No. 99-CV-6730 (TCP), 2000 U.S. Dist. LEXIS 22005 (E.D.N.Y. Mar. 2, 2000) ("While a majority of courts consider a D&O policy estate property, there is an increasing view that a distinction should be drawn when considering treatment of proceeds arising under such policies") (citation

8

omitted). *Cf. In re Eastwind Group, Inc.*, 303 B.R. 743, 748 (Bankr. E.D. Pa. 2004) (where securities laws violations were asserted both against the directors and officers and the debtor, the proceeds of a D&O policy providing entity coverage for securities claims were property of the estate); *In re CyberMedica, Inc.*, 280 B.R. 12 (Bankr. D. Mass.

20.     Because the case law is not uniform on the question of whether the proceeds of liability insurance policies are property of the estate under section 541 of the Bankruptcy Code (and thereby subject to the automatic stay contained in section 362 of the Bankruptcy Code), the prospect of a dispute and potential litigation over the use of the proceeds from the Policies exists absent a compromise regarding the administration and distribution of those proceeds.  As a result of, and in exchange for, *inter alia*, the Bondholder Representative's consent in the Distribution Agreement to allow any recovery in the Bondholder Litigation to be disbursed in the Ampal bankruptcy estate, the Trustee has agreed not to take a position as to whether the proceeds of the Policies are property of the Debtor's estate and therefore subject to the automatic stay.   In connection therewith, the Trustee agrees, subject to this Court's approval, that to the extent the automatic stay is deemed applicable, the stay will be deemed modified to the extent necessary to allow the Bondholder Litigation to proceed.[3]

21.     The Trustee and his counsel have conducted significant due diligence in connection with the Bondholder Litigation, engaging in months of discussions with the Bondholder Representative over the Bondholder Litigation and analyzing the Policies. In addition, the Trustee and the Bondholder Representative engaged in negotiations over the course

---

[3] As a result of Court's dismissal of certain claims in the Trustee Litigation, the Trustee's remaining claims against Irit Eluz seek damages well below the coverage afforded under the applicable insurance policies, thereby significantly mitigating any competing rights to proceeds awarded in the Bondholder Litigation.  Thus, any recovery in the Bondholder Litigation that results in a reduction of the Bondholders' claims in this case will be a direct benefit to the Debtor's estate and its creditors.

9

of those months in order to arrive at an agreement that would resolve any potential dispute between the Trustee and Bondholder Representative over the proceeds recovered from the Bondholder Litigation, allow the Bondholder Litigation to proceed with monitoring and oversight from the Trustee, and ensure the effective administration and distribution of any recovery from Bondholder Litigation through the Debtor's estate.   The product of those negotiations is reflected in the Distribution Agreement, and the Trustee has determined that entering into the Distribution Agreement is in the best interest of the Debtor's estate and its creditors.   By entering into the Distribution Agreement, the Trustee has avoided any potential dispute of whether the proceeds of the Policies are property of the estate.

22.    The Distribution Agreement is fair and equitable, falls well within the range of reasonableness, and, among other things, enables the Trustee and Bondholder Representative to avoid the cost of a dispute over the right to the proceeds of the Policies.   Pursuant to the Distribution Agreement, the net recovery obtained by the Bondholder Representative on behalf of the Bondholders will be turned over to the Trustee and administered and disbursed to the Bondholders as part of the Ampal bankruptcy estate in accordance with the approvals of this Court and the Israeli Court having jurisdiction over the Bondholder Litigation.   As set forth in the Spizz Declaration, the turnover process included in the Distribution Agreement provides significant benefit to the Debtor's estate because it allows the Trustee to track each Bondholder's recovery from the Bondholder Litigation, which in turn will reduce the Bondholders' claims in this case.   This will also ensure that any distribution made to the Bondholders from the Debtor's estate will not be duplicative of their recovery from the Bondholder Litigation.

23.    While the potential for competing claims were greater during the time the Distribution Agreement was being negotiated, due to the Court's recent dismissal of certain

claims in the Trustee Litigation the Trustee's remaining claims against Irit Eluz seek damages well below the coverage limits under the applicable Policies. Therefore, the likelihood of the Trustee and the Bondholder Representative competing for the same proceeds and other assets has been greatly reduced. Thus, any recovery in the Bondholder Litigation that results in a reduction of the Bondholders' claims in this case will be a direct benefit to the Debtor's estate and its creditors.

24.     For all the reasons set forth above, and in the Spizz Declaration, the proposed Distribution Agreement between the Trustee and Bondholder Representative constitutes a sound exercise of the Trustee's business judgment, is in the best interest of the Debtor's estate, and should be approved.

25.     No prior motion has been filed for the relief requested herein.

## NOTICE

26.     Notice of this Motion was provided to (i) Andrew D. Velez-Rivera, Esq., Office of the United States Trustee for the Southern District of New York, (ii) counsel to the Bondholder Representative, (iii) and all parties in accordance with this Court's Order Granting Chapter 7 Trustee's Motion to Limit Notice and to Establish Case Management Procedures, entered on September 13, 2013 [Dkt. No. 342]. The Trustee submits that no further notice of this Motion need be given.

11

## <u>CONCLUSION</u>

27.    For all of the foregoing reasons, the Distribution Agreement falls well within the

requisite standards for approval.  Therefore, the Trustee respectfully requests that the Court enter

the proposed order, attached hereto as <u>Exhibit C</u>, granting the Motion approving the Distribution

Agreement pursuant to Sections 105(a) and 362 of the Bankruptcy Code, and Rule 9019(a) of the

Bankruptcy Rules, and granting such other and further relief as it deems just and proper.


Dated: New York, New York                    TROUTMAN SANDERS LLP
      February 2, 2016


                                    By:  */s/ John P. Campo*
                                          John P. Campo
                                          J. David Dantzler, Jr.
                                          Brett D. Goodman
                                          875 Third Avenue
                                          New York, New York 10022
                                          Tel.:  (212) 704-6000


                                        *Special Counsel to the Trustee*

27744556v10

# EXHIBIT A

# DISTRIBUTION AGREEMENT

## DISTRIBUTION AGREEMENT

This Distribution Agreement (hereafter the "Agreement") is made and entered into as of the 19th day of January 2016, by and between Alex Spizz, the Chapter 7 Trustee for Ampal-American Israel Corporation ("the Trustee") and Forest Value Fund II (the "Bondholder Representative"), a holder of Ampal Debentures Series A, Series B and Series C (the "Ampal Debentures").

WHEREAS, the Trustee was elected by bondholders and other creditors of Ampal-American Israel Corporation ("Ampal") in Bankruptcy Case No. 12-13689 (SMB), pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

WHEREAS, as part of the administration of Ampal's bankruptcy estate, the Trustee has commenced litigation against certain former directors and officers, as well as the controlling shareholder of Ampal, in the Bankruptcy Court (the "Trustee Litigation"); and

WHEREAS, the Bondholder Representative has filed a class action in the Israeli court in Tel Aviv Yafo (the "Israeli Court") asserting claims on behalf of bondholders against certain former directors and officers, as well as controlling shareholders, including claims for violations of Israeli securities laws, violations of Israeli corporate laws and breach of the Trust deeds signed between Ampal and each of the Indenture Trustees for each of the Ampal Debentures (the "Bondholder Litigation"); and

WHEREAS, the Trustee has determined that the claims asserted in the Bondholder Litigation are claims that belong to the individual Ampal bondholders and are not property of the Ampal bankruptcy estate; and

WHEREAS, the Trustee Litigation and the Bondholder Litigation each involve claims against some of the same individual defendants and may be covered by the same insurance policies; and

WHEREAS, the Trustee and the Bondholder Representative desire to provide a mechanism that resolves potential disputes regarding whether the subject insurance policies and the related proceeds are assets of the Ampal bankruptcy estate; and

WHEREAS, given the substantial overlap between the class or classes of Ampal bondholders represented by the Bondholder Representative and the Ampal bondholders who are creditors in the Ampal bankruptcy estate, the Trustee believes that it is in the best interest of Ampal's creditors, including bondholders, for him to cooperate with the Bondholder Representative to assure, among other things, the effective administration of claims and distribution of assets of the Ampal bankruptcy estate; and

WHEREAS, for the same reasons, the Bondholder Representative believes that it is in the best interest of the Ampal bondholders to assure, among other things, an effective and efficient distribution of any recoveries obtained by the Bondholder Representative in the Bondholder Litigation.

NOW, THEREFORE, in order to accomplish the goals set forth above and in order to memorialize their understanding, the Parties agree as follows:

1.      This Agreement shall be effective only upon: (a) approval by the Bankruptcy Court; and (b) approval by the Israeli Court.

2.       Subject to and in accordance with the approval of both the Bankruptcy Court and the Israeli Court, the net amount of any recovery obtained by the Bondholder Representative on behalf of a class or classes of Ampal's bondholders, whether by settlement or legal judgment,

shall be turned over to the Trustee and administered and disbursed to bondholders as part of the Ampal bankruptcy estate. Nothing in this Paragraph 2 is intended, nor should be construed, to: (a) modify or limit any requirements under the laws of the United States or Israel regarding court approval of settlements; (b) confer or limit any right or claim of any creditor of Ampal, including but not limited to a bondholder who is not a member of the class or classes of bondholders represented by the Bondholder Representative; or, (c) confer or limit any right or claim of any member of the class or classes of bondholders represented by the Bondholder Representative to receive a portion of the recovery obtained by the Bondholder Representative and administered and disbursed by the Trustee. As used in this Paragraph 2, "the net amount of any recovery" means the gross amount recovered by the Bondholder Representative less attorneys' fees, a representative plaintiff's fees to the Bondholder Representative and other costs and expenses incurred in the Bondholder Litigation as approved by the Israeli Court.

3.    The Parties agree that they will confer with each other regarding the terms of any proposed settlement and compromise of their respective claims. Notwithstanding the foregoing, neither the existence of this Agreement nor anything in this Agreement, shall in any way limit the right of either Party to assert claims or to settle and compromise such claims without the consent of the other Party, so long as the claims and defenses of the non-settling Party are in no way limited or modified as a result of such settlement.

4.    If (i) the settlement and compromise of the claims asserted by one Party requires the settlement and compromise of the claims asserted by the other Party to this Agreement, and (ii) the Parties disagree about whether or not the terms of any such proposed settlement, as well as the allocation of any settlement proceeds to the Parties' respective claims, are fair and

reasonable to the Parties under the circumstances, the Parties agree to submit to binding

arbitration in accordance with the following terms:

a.      Any dispute between the Parties related to or arising from a proposed

settlement shall be submitted to an arbitrator selected by the Parties by

mutual agreement (the "Arbitrator").  If agreement is not reached within

two days of the Demand Date (defined below), then the Arbitrator shall be

appointed by the International Chamber of Commerce through its office in

New York, New York.

b.      The arbitration proceeding shall commence upon the delivery by one Party

to the other of a written notice demanding arbitration pursuant to this

Paragraph ("the Demand Date").

c.      Within five days of the Demand Date, or as soon thereafter as the

Arbitrator has been appointed: (i) the Party that contends that the proposed

settlement should be consummated shall provide the Arbitrator with the

most current draft of the written settlement agreement, or a summary of

the material terms of the proposed settlement if there is no draft

agreement, along with pleadings and papers filed in that Party's litigation

that might be relevant to the Arbitrator's assessment of the proposed

settlement; and (ii) the Party that contends that the proposed settlement

should not be consummated shall provide the Arbitrator with pleadings

and papers filed in that Party's litigation that might be relevant to the

Arbitrator's assessment of the proposed settlement.

4

d.      Within fifteen days of the Demand Date, the Arbitrator will conduct a

telephonic conference with counsel for the Parties for the purpose of

discussing the Parties' respective positions regarding the proposed

settlement.  Except for the materials identified in subparagraph (c) above,

the Parties shall not provide any other written materials, including position

statements or arguments, unless specifically requested to do so by the

Arbitrator.  In the sole discretion of the Arbitrator, additional telephonic

conferences may be conducted with either or both of the Parties.

e.      Each party will furnish to the Arbitrator pleadings and other documents

and information relating to the disputed issues as the Arbitrator may

request, either before or after the telephonic conferences described in

subparagraph (d) above.

f.      A copy of all documents and materials provided to the Arbitrator,

including the initial arbitration demand, shall be simultaneously provided

to the other Party by the producing Party.

g.      Within twenty days of the Demand Date, the Arbitrator will notify the

Parties, in writing, of the Arbitrator's decision, which shall be one of the

following:

(i)      The terms of the proposed settlement are fair and reasonable to the
         Parties under the circumstances and should be consummated; *or*,

(ii)     The terms of the proposed settlement are not fair and reasonable to
         the Parties under the circumstances and should not be
         consummated.

h.      Notwithstanding the foregoing subparagraph (g) above, the Arbitrator is

authorized to engage in efforts to mediate the dispute between the Parties

5

if, in the sole discretion of the Arbitrator, such efforts could lead to an agreement between the Parties.  The date by which a decision is to be made by the Arbitrator in accordance with subparagraph (g) above shall not be extended, however, without the express written consent of each of the Parties.

i.     The Arbitrator's decision will be considered as a final and binding resolution of the disagreement between the Parties, will not be subject to appeal and may be entered as an order in any court of competent jurisdiction in the United States and/or Israel, if and to the extent necessary to enforce the Arbitrator's decision.  Each Party agrees to submit to the jurisdiction of the United States Bankruptcy Court for the Southern District of New York for purposes of the enforcement of any such order.  No Party will sue the other except for enforcement of the Arbitrator's decision if the other Party is not performing in accordance with the Arbitrator's decision. The provisions of this Agreement will be binding on the Arbitrator.

j.     If the Arbitrator determines that the proposed settlement is fair and reasonable to the Parties under the circumstances, then both Parties will support the settlement in approval proceedings before the Bankruptcy Court and the Israeli Court.

k.     If the Arbitrator determines that the proposed settlement is not fair and reasonable to the Parties under the circumstances, then neither Party will

present the proposed settlement for approval by the Bankruptcy Court or

the Israeli Court without the express written consent of the other Party.

l.    The Parties will equally bear the costs and fees of the arbitration.

m.    Any arbitration proceeding will be conducted on a confidential basis.

n.    The terms and conditions concerning the conduct of the arbitration may

only be modified in a writing consented to and signed by each Party and

the Arbitrator.

5.    Counsel to the Parties who participate in the litigations and/or investigations

referred to herein represent only their respective individual client, and it is expressly agreed and

understood by the Parties that no joint representation or attorney-client relationship is created by

this Agreement or the litigations referred to herein.

6.    This Agreement may not be altered, amended or modified in any respect except

by a writing executed by each of the Parties, and, to the extent necessary, approved by the

Bankruptcy Court and/or the Israeli court having jurisdiction over the Bondholder Litigation.

7.    By executing this Agreement, the Parties acknowledge that they are represented

by counsel and have had the opportunity to consult with counsel regarding this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement.

Forest Value Fund II (Israeli LP No. 550234405)

/s/ Alex Spizz
Alex Spizz, Trustee

Chapter 7 Trustee of Ampal-American
Israel Corporation

/s/ Yaron Tamir
By: Yarom Tamir
Title:  Manager of the General Partner

/s/ Guy Gissin
Counsel for the Bondholder Representative

# EXHIBIT B

# CERTIFIED ENGLISH TRANSLATION OF BONDHOLDER LITIGATION COMPLAINT

27744556v10



450 7th Avenue
10th Floor
New York, NY  10123
Tel 212.643.8800
Fax 212.643.0005
www.morningtrans.com

# TRANSLATION CERTIFICATION

**County of New York**
**State of New York**

Date: February 1, 2016

To whom it may concern:

This is to certify that the attached translation from Hebrew into English is an accurate representation of the documents received by this office.

The documents are designated as:

- Motion to Approve a Class Action (pursuant to Item 5 of the Second Supplement to the Class Action Law, 5766-2006)

Austin Lowe, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

## REDACTED SIGNATURE

Signature of Austin Lowe

Accurate Translation Services 24/7

**In the Commercial Division of the District Court**                    Class Action -12-15
**in Tel Aviv-Yafo**

**In the matter of:**     **Forest Value Fund II Limited Partnership      Ltd. Partnership no. 550234405**
by its Counsel, Adv. Guy Gissin and/or Yoel Freilich and/or Amir Paz
of Gissin & Co. Advocates
Habarzel St. 38B, Tel Aviv 6971054
Tel: 03-7467777; Fax: 03-7467700

<u>Petitioner;</u>

v.

1.   **Joseph A. Maiman, ID 012770533**
Hanasi Yitzhak Ben-Zvi St. 112, Herzliya 4639413
2.   **Irit Eluz, ID 022803076**
Mendes St. 11, Ramat Gan 526311
3.   **Estate of Yehuda Karni, deceased, ID 002446276**
Raoul Wallenberg St. 32/516, Tel Aviv 6971929
4.   **Revital Degani, ID 054029582**
Rambam St. 15/6, Ra'anana 4360108
5.   **Menahem Hemi Morag, ID 050744226**
Negba St. 26, Nes Ziona 7402016
6.   **Daniel Vaknin, ID 069257210**
Ben Zvi Simon St. 38, Givatayim 5363304
7.   **Gideon Weinstein, ID 003948361**
HaOren St. 8, Ra'anana 4357408
8.   **Joseph Yerushalmi, ID 003194096**
Zipman St. 95 (Entrance F), Ra'anana 4346317
9.   **Leo Malamud, ID 12770574**
Havazelet Hasharon St. 33, Herzliya
10.  **Eitan Haber, ID 8156833**
Ben Zvi St. 19, Ramat Gan
11.  **Sabih Saylan, ID 13616982**
Abba Eban 10, Herzliya 46733
12.  **Erez Meltzer, ID 065861338**
Hama'ayan 55, Ra'anana
13.  **Nimrod Novik, ID 4873097**
Ha'Eshel 5, Ra'anana

<u>Respondents;</u>

<u>**Amount of personal claim:**</u> NIS 28,007,455 (estimated)
<u>**Amount of claim of all members of the group:**</u> Cannot be quantified financially.[1]

## <u>Motion to Approve a Class Action</u>
### <u>(pursuant to Item 5 of the Second Supplement to the Class Action Law, 5766-2006)</u>

---

[1] As will be detailed below, as of this time the amount Ampal owed to the bondholders totals some NIS 210,000,000 for Series A, some NIS 644,370,000 for holders of Series B, and some NIS 255,000,000 for holders of Series C. At the same time, the compensation amount for the group must be evaluated and calculated in light of the information defining the class.

The Honorable Court is asked to make use of its authority by virtue of the Class Action Law, 5766-2006 (hereinafter "Class Action Law") and to order as follows:

a.    To approve the conduct of the above-captioned action as a class action in accordance with the Class Action Law, in accordance with the following version of the class action and in accordance with the causes of action and remedies to be detailed below;

b.    To define the class in accordance with Sec. 10 and 14(a) of the Class Action Law as: "**Anyone who purchased bonds of Ampal-American Israel Corporation (hereinafter: "Ampal" and/or "Company") before February 5, 2013 and held it for a time**";[2]

c.    To determine the identity of the Representative Plaintiff and his counsel in accordance with that stated above in the caption of the Motion, in accordance with Sec. 14(a)(1)-14(a)(2) of the Class Action Law;

d.    Solely as an alternative, to approve the action as a class action with any amendment that the Honorable Court may order for it, as the Court sees fit, for the purpose of assuring the fair and efficient conduct of the class action, in accordance with Sec. 13 of the Class Action Law;

e.    To accept the action, to impose on the Respondents responsibility and liability as specified in the action and to grant the members of the group the remedies requested in the action;

f.    To order the Respondents to pay the costs of filing the motion.

All emphases in the citations below are not in the original unless otherwise indicated.

## A.    Introduction

1.    The subject of the above-captioned action is the compensation of the damage to the public consisting of holders of bonds issued by Ampal on the Securities Exchange in Tel Aviv.

2.    The above-captioned action is an appeal to order the Respondents, the controlling member (who, during the relevant period, also held the title of CEO of the Company) and officers at Ampal to repay and compensate all the debts owed by the Company to the holders of its bonds, by virtue of various causes of action, among them the offenses of negligence, but particularly in light of that stated in Sec. 52K of the Securities Law, 5728-1968 (hereinafter: "**Securities Law**"), which states:

> **52K. Liability of issuer**
> **(a) An issuer is liable to the holder of securities issued by him for any damage caused him because the issuer violated any provision of this Law or of regulations under it, or a provision of the trusteeship deed, according to which the issuer has an obligation toward the trustee for holders of the certificates of obligation which he issued.**
>
> **(b) The liability said in subsection (a) shall also apply to Directors of the issuer, to its general manager and to controlling members of the issuer.**

3.    In this matter the provisions of the trusteeship deeds state and detail the obligations of the Company toward the bondholders. These obligations were violated and the Company failed to pay its debts to the bondholders. For this reason, in accordance with Sec. 52K (b) of the Securities Law, **direct** liability for the totality of the damage caused to the holders of the certificates of obligation is imposed not only on the Company, but also on the Company's directors, its general managers and its controlling members.

---

[2] At least, and solely by way of caution, limiting the class to "**Anyone who purchased bonds of Ampal-American Israel Corporation (hereinafter: "Ampal" and/or "Company") before February 5, 2013 and still holds the aforementioned bonds".**

4.  The facts to be detailed below in this motion reveal the sad story of Ampal, with its past as an old, established public company, which had years of stability, until it came to be controlled by Respondent 1, Mr. Joseph Maiman (hereinafter "**Maiman**"), who first arranged to empty it of the majority of its assets and to leave it with great stores of cash, which he then arranged to "extract" from it in any possible way (whether by way of sale of assets under his control to the Company, by way of payment of inflated management fees to the Company he controlled, by way of receiving "loans" under partisan terms against worthless collateral and absurd repayment terms), etc.

5.  The violating actions to be detailed below demonstrate how Maiman made the Company's treasury his own, with the assistance of his right hand, Respondent 2, Ms. Irit Eluz (hereinafter: "**Eluz**"), who served as CFO and as a director of Ampal as well as their protection of the officers and members of the board of directors who kept quiet and allowed these actions to occur without disturbance. In doing so, the Respondents left Ampal's bondholders facing a bleak reality, without their money.

6.  Such violating actions, which brought about the collapse of the Company and the non-fulfillment of its obligations toward the bondholders, or at least made a great contribution to them, included a multitude of approvals of transactions by controlling members (including with corporations tied to the controlling member) such as payment of "management and consulting fees" in fantastical amounts to a company under the complete control of Maiman, as well as granting a loan in the amount of some 20 million dollars to a company under Maiman's control, which was given without receiving proper collateral, while extending the term for its repayment year by year (including at a time near its collapse) without any real basis for doing so, the payment of huge salaries and bonuses that did not reflect the true economic condition of the Company, etc.

7.  As will be detailed below, the process of approving these transactions was defect from top to bottom. A significant part of the approvals for these transactions were made by a committee of directors, which was called a "special committee." As we will see below, the decisions made by the committee were defective, and for a reason. The decisions in the special committee were also made without being based on complete information (to put it mildly), in some of the cases even without the directors who approved the aforementioned transactions having been presented with any opinion before approving them (when such opinions were necessary for the approval of the transactions).

8.  Instead, they relied almost absolutely on the many verbal statements by the controlling member (Mr. Maiman) and on the part of Ms. Eluz.

9.  In addition, by approving the aforementioned transactions, the members of the board of directors did not express their opinion as to Ampal's economic state at that time, while the transactions approved were approved in situations in which the company was mired in significant losses and even **close to the first meeting held between representatives of the Company and the bondholders.**

10. After Maiman exhausted the Company's treasury enough to undermine its liquidity and after the Company was beset by serious economic difficulties, which prevented it from fulfilling its obligations (including to the bondholders), in the dead of night, and in the midst of negotiations with the bondholders, the Company turned to bankruptcy proceedings in the US. This was done as a tactical measure, with the purpose of leaving the means of control in the hands of the leaders of the Company, to get protection from creditors and to evade the conduct of proceedings in a court in Israel (despite the fact that the primary concentration of the Company's creditors was in Israel) and to distance the Israeli bondholders from the ability to act to protect their rights, by means of piling on impossible expenses, despite the clear provisions in the trusteeship deeds that state that the sole place of jurisdiction is to be in Israel and the law applicable to the bonds is that of Israel.

11. In such a situation, the facts that will be detailed below will leave no doubt that the controlling member and the Respondent officers violated every possible obligation toward the Company's bondholders. In this case, since the violations are expressed first and foremost in the violation of the trusteeship deed according to which the bonds were issued, **in accordance with Sec. 52K of the Securities Law, direct and full liability is imposed on the controlling members, the directors and the general managers for the damage to the bondholders.**

12. **Thus: In accordance with the provisions of Sec. 52M(1) of the Securities Law, the controlling members, the directors and the general manager may be exempted from this direct liability <u>only</u> to the extent that they prove that they took all appropriate steps to prevent the violation. The significance of this omission pursuant to the Law is that the direct and full liability for the damage to the bondholders is imposed on their shoulders, and the <u>burden of proving otherwise is theirs</u>.**

13. As will be detailed below, the Respondents not only did not take any active actions to prevent the aforementioned violation in real time, but they added actions and omissions that intensified the Company's state, all while conducting themselves in a way that must at least be characterized as negligent. As if that were not enough, when the Company was in the midst of Chapter 11 proceedings ("a sort of freeze on proceedings") they had the outline of a debt settlement that had been offered by Petitioner, which gained support from institutional bodies and was well accepted by the special committee of the Company. Notwithstanding that stated above, the Respondents elected not to act in accordance with that outline and to continue on the path to the fiasco which had been known from the start.

14. Based on that stated above, and as will be stated in greater detail below, the Honorable Court is asked to approve the conduct of the present action as a class action and to order the Respondents to give full compensation to Ampal's bondholders for non-payment of the payments required for the bondholders.

## B. <u>The Parties</u>

15. Petitioner, Forest Value Fund II, which is managed by an experienced investment fund manager in the capital markets and holds investments for its limited partners, holds Ampal's bonds from Series A, B and C, which were purchased by it.

   • Copy of a printout of the purchase of Ampal bonds by Petitioner is attached and marked as **Exhibit 1**.

16. At all of the relevant times, Respondent 1, Mr. Joseph A. Maiman, was the controlling member of the Company, holding 61.85% of its shares, and served as the Company's general manager (CEO), as chairman of the board of directors and as head of the Company's executive committee until he stopped serving with the Company's entry into bankruptcy proceedings.

17. Maiman was appointed as chairman of the board of directors of Ampal on April 25, 2002, before the issue of the bonds on the Securities Exchange in Tel Aviv, and was appointed general manager of the Company on September 22, 2006.

   • Copy of the immediate report concerning details on the opening information on officers is attached and marked as **Exhibit 2.**
   • Copy of the immediate report concerning the appointment of Maiman as general manager, president of the Company and chairman of the board of directors is attached and marked as **Exhibit 3.**

18. Respondent 2, Ms. Irit Eluz, with an abundant past history in the business, among other things as the right hand of Maiman and his trusted confidante was the assistant general manager of Ampal and assistant CFO at Ampal. She started serving as a director on May 5, 2010.

   • Copy of the immediate report concerning the appointment of Eluz and Saylan is attached and marked as **Exhibit 4.**

19. Respondent 3, Mr. Yehuda Karni, (hereinafter: "**Karni**"), served as a member of the board of directors starting on August 16, 2002 (see report concerning opening information, Exhibit 2 above) until May 11, 2011 and served as chairman of the audit committee, chairman of the compensation and options committee, as a member of the executive committee and chairman of the special committee.

5

- Copy of the immediate report concerning the end of Karni's service and the appointment of Degani is attached and marked as **Exhibit 5.**

20. Petitioner recently learned that unfortunately Mr. Karni passed away and therefore this action is being filed against, among others, his estate.

21. Respondent 4, Ms. Revital Degani (hereinafter "**Degani**") served as a member of the Company's board of directors starting on May 11, 2011 and served as a member of certain board of directors committees, among them the special committee, Ms. Degani in practice substituted for the deceased Mr. Karni and was appointed upon his departure (see immediate report concerning Degani and departure of Karni, Exhibit 5 above).

22. Respondent 5, Mr. Menahem Hemi Morag (hereinafter "**Morag**"), served as a member of the board of directors from January 27, 2004, before the Company was listed for trading in Tel Aviv (see report on opening information, Exhibit 2 above).

23. Respondent 6, Mr. Daniel Vaknin (hereinafter "**Vaknin**"), served as a member of the board of directors from November 5, 2008 and served as a member of the audit committee (starting on May 5, 2011 he served as chairman of the committee), as a member of the compensation and options committee (starting on May 5, 2011 he served as chairman of the committee).

- Copy of the immediate report concerning the appointment of Vaknin is attached and marked as **Exhibit 6**.

24. Respondent 7, Mr. Gideon Weinstein (hereinafter: "**Weinstein**"), served as a member of the board of directors from November 9, 2009 until he removed his name from consideration for reappointment to the board of directors of the Company on April 26, 2012 (some 4 months before the Company initiated bankruptcy proceedings in the US).

25. Respondent 8, Dr. Joseph Yerushalmi ("**Yerushalmi**"), served as a member of the board of directors from August 16, 2002 (see immediate report, Exhibit 2 above) until he removed his name from consideration for reappointment to the board of directors of the Company on April 26, 2012 (some 4 months before the Company initiated bankruptcy proceedings in the US) and served on the executive committee.

- Copy of the immediate report concerning the withdrawal of the candidacies of Yerushalmi and Weinstein is attached and marked as **Exhibit 7**.

26. Respondent 9, Mr. Leo Malamud (hereinafter: "**Malamud**"), served as a member of the board of directors from March 6, 2002 (see immediate report, Exhibit 2 above) and served as a member of the executive committee. Parallel to his service at Ampal Malamud held senior posts at companies tied to Maiman, among them deputy chairman of the board of directors of Merhav (as defined below).

27. Respondent 10, Mr. Eitan Haber (hereinafter: "**Haber**") served as a member of the board of directors from August 16, 2002 (see immediate report, Exhibit 2 above) until November 9, 2009. Despite the fact that Haber did not serve formally as a member of one or the other committee, Haber was present at a meeting of the special committee that was held on December 4, 2008 as a "member of the committee."

- Copy of the immediate report concerning the end of service by Haber is attached and marked as **Exhibit 8**.

28. Respondent 11, Sabih Saylan ("**Saylan**"), served as a member of the board of directors from May 10, 2010 (see immediate report, Exhibit 4 above).

29. Respondent 12, Mr. Erez Meltzer ("**Meltzer**"), served as a member of the board of directors from November 5, 2008.

30. Respondent 13, Mr. Nimrod Novik (hereinafter "**Novik**"), served as a member of the board of directors from September 19, 2006 until September 6, 2011, when his service ended.

- Copy of the immediate report concerning the end of Novik's service is attached and marked as **Exhibit 9**.

## C.   Factual background

31.  At the times relevant to the action Ampal-American Israel Corporation was an American public holding company (incorporated under the laws of the State of New York), the shares of which were listed for trading on the Nasdaq in New York and the bonds it issued were traded on the Securities Exchange in Tel Aviv.

32.  In about 2002 control of Ampal was acquired by Maiman, who owned additional companies and properties aside from Ampal, such as Merhav M.N.P., Private Company 510618556 (hereinafter: "**Merhav**").

- Copy of the printout from the Companies Registrar for Merhav Company is attached and marked as **Exhibit 10**.

33.  On August 1, 2007 Ampal published a prospectus in the electronic disclosure system for the purpose of a public issue of bonds (Series A), in the amount of NIS 250,000,000 nominal value, which were to be repaid in 5 equal annual payments on November 20 of each of the years 2011 to 2015 (inclusive), bearing interest at the rate of 5.75% annually, all in accordance with the terms of the trusteeship deed signed between the Company and the trustee.

- Copy of the trusteeship deed for Series A is attached and marked as **Exhibit 11**.

34.  On April 8, 2008 Ampal published another prospectus for the purpose of another public issue of bonds (Series B), in the amount of NIS 450,000,000 nominal value, which were to be repaid in 5 equal annual payments on January 31 of each of the years 2008 to 2016 (inclusive), bearing interest at a rate to be determined centrally and that would not exceed 6.9% and with principal and interest linked to the consumer price interest for March 2008, all in accordance with the terms of the trusteeship deed signed between the Company and the trustee.

- Copy of the trusteeship deed for Series B is attached and marked as **Exhibit 12**.

35.  On September 2, 2010 Ampal published another prospectus for the purpose of a third public issue of bonds (Series C), in the amount of up to NIS 145,000,000 nominal value, which were to be partially repaid in 5 annual payments on September 7 of each of the years 2014 to 2018, with the unpaid balance to have been repaid by 2019, all in accordance with the terms of the trusteeship deed signed between the Company and the trustee.

- Copy of the trusteeship deed for Series C is attached and marked as **Exhibit 13**.

36. **It should be marginally noted that even though this is a company that was incorporated under the laws of the United States, in accordance with the provisions governing trusteeship deeds, jurisdiction is granted to the competent courts in the District of Tel Aviv and the provisions of the trusteeship deed are governed by the laws of the State of Israel.[3]**

37.  Similarly, from the fact that the Company issued bonds on the Securities Exchange in Tel Aviv, at least, the relationships, rights and obligations between it and the bondholders are governed by the provisions of the Securities Law and the forum for any legal dispute in these matters is that of Israeli courts and Israeli law.

38.  Before Ampal was acquired by Maiman Ampal had a significant inventory of assets and holdings such as Granite Hacarmel Company which at the relevant time held the Sonol Oil Company, holdings in the Blue Square

---

[3] Sec. 30 of the trusteeship deed for Series A, Sec. 29 of the trusteeship deed for Series B, Sec. 29 of the trusteeship deed for Series C.

Company, the Mirs Communication Company holdings in a number of high tech companies and the Epsilon investment firm.

39. After the Company was acquired by Maiman, the Company began to realize the various assets that it owned, including the holdings detailed above.

- Copy of selected reports concerning the realization of holdings in these companies is attached and marked as **Exhibit 14**.

40. It is suspected that Maiman acted to liquidate the Company's good assets in order to achieve maximum liquidity with which he planned to execute insider transactions.

41. Thus, parallel to this Maiman started selling to Ampal various properties owned by him and/or by companies he controlled, among them 12.5% of the holdings in East Mediterranean Gas & Co. (hereinafter: "**EMG**"), an Egyptian company, which at the relevant time operated the gas pipeline through which the supply of gas from the Sinai Desert in Egypt was provided.

42. Over the course of Ampal's life, Ampal also acquired ownership in the communications company Smile 012, which it realized later, a year and a half before it entered into bankruptcy proceedings.

43. In time, a chain of events started that led to a deterioration in the Company's position and later on to its collapse, which was expressed, among other things, in the irregularities of the approval of transactions by controlling members in the amounts of tens of millions of dollars that, as will be detailed below, contributed greatly to the emptying out of Ampal's treasury.

44. Of course this situation was exacerbated by the situation in which EMG's gas pipeline was subject to terror attacks that occurred in the Sinai Desert, in which the gas pipeline suffered a number of attacks that resulted in disruptions in its operation.

45. As a direct result of this, and as will be detailed below, out of tactical considerations, Ampal itself turned to bankruptcy proceedings in the US under Chapter 11 (proceedings that are similar to a "freezing of proceedings," the purpose of which is to provide the company protection against creditors, while it continues as a going concern) in the midst of negotiations for a debt settlement with the bondholders.

46. Afterwards, on February 5, 2013, when it was understood that in its economic state at the relevant period Ampal had no economic hope, the Bankruptcy Court in the Southern District of New York converted Ampal's bankruptcy proceedings to Chapter 7 proceedings (proceedings to liquidate the company).

- Copy of the decision by the Court in the Southern District of New York converting the Chapter 11 proceedings to liquidation pursuant to Chapter 7 is attached and market as **Exhibit 15**.

47. As of the present time, Ampal is operating under the management of a trustee of the Bankruptcy Court of the Southern District of new York, Attorney Alex Spizz (hereinafter: "**Trustee**").

48. For the sake of proper disclosure this is the time to note that this action is being filed with the consent of the Trustee, as will be clarified, that within the scope of the bankruptcy proceedings conducted by him in the US, an action was filed by him against some of the Respondents, with causes of action different than those claimed in this action,.

49. This Motion to Approve differs from the action filed by the Trustee with the Court in the US in that it is concerned with a suit by the bondholders from the public and with causes of action that stem from the holding of the aforementioned bonds.

- Copy of the action filed by the Trustee is attached and marked as **Exhibit 16**.

**D. The violating actions taken by the Respondents when they were entrusted with managing the Company's affairs**

50. As detailed above, the Respondents executed a series of insider transactions that the Company made with Merhav, which is wholly owned by Maiman.

51. In order to approve insider transactions and controlling member transactions, the Company's board of directors was assisted by a board of directors committee called the special committee (hereinafter: "**special committee**"), which at times was assisted by the services of outside consultants (jurists and economists).

52. The special committee was defined by the Company as a committee in which "independent directors" serve, the purpose of which, it is claimed, is to discuss the approval of transactions with affiliated parties.

53. Among the members of the committee were Karni, Vaknin and Morag, until the end of Karni's term of office and his replacement by Degani. In addition, it should be clarified that over the course of one of the meetings of the special committee, on December 4, 2008, Mr. Haber was present as a committee member, even though he did officially serve as a member of the committee and assisted in approving an insider transaction (concerning the postponement of the repayment date of the loan that will be discussed at length below in this motion for approval).

54. Even if according to a bland description of the committee's role, it was envisioned as one that would examine those insider transactions strictly and with extreme caution, this committee was nothing but a true "**rubber stamp**," which did not fulfill its role properly. As we will see below, **each of the insider transactions that are the subject of this Motion to Approve was approved by the committee unanimously**, while most of the discussions of insider transactions were conducted in the presence of the controlling member or those affiliated with him, who arranged to present the transaction to the committee members themselves.[4]

55. Not only that, but even the procedure for passing resolutions in the special committee was not conducted properly, such that the committee members based their decision on vague explanations, and it is clear that they did not seek at all to first review all the information and documents that were relevant in order to arrive at an informed decision.

56. In order to demonstrate concretely the shoddy manner in which decisions were made, a number of examples will be brought that show that this committee was maintained only "solely as a formality," with all that implies.

**D.1 Approval of an agreement to pay management and consulting fees to the Merhav Company in huge sums without presenting any justification therefor**

**D.1.a. First management agreement**

57. On February 15, 2009 the special committee convened at the request of the Company's management to discuss and approve Ampal entering into an agreement to pay management fees and consulting fees to Merhav (which, as stated, is a private company under Maiman's control) in the amount of NIS 10,000,000 plus VAT for the year (hereinafter: "**first management agreement**").

58. At this meeting Karni, Morag and Vaknin were present as committee members and Eluz and Adv. Botbin were invited as well.

---

[4] To the best of Petitioner's understanding, there were no insider transactions during the relevant period other than those detailed in this Motion to Approve.

59. Over the course of the meeting Eluz presented to the members of the special committee the central points of the first management agreement and **recommended to the members of the special committee that they approve the agreement**.

60. Thus, Eluz argued at the meeting that in the year 2008 Merhav had provided management services to Ampal that had allegedly been provided to the satisfaction of Ampal without it having paid Merhav management fees. Therefore, it was argued by Eluz, the consideration for the management and consulting services (in the amount of some NIS 10,000,000 constituted fair consideration, in her opinion, without her having brought any detailed opinion or any document constituting support for the existence of such "management" actions and others that were implemented, much less those that allegedly justified the payment of the management and consulting fees.

61. From that stated in the minutes of the meeting it appears that the members of the special committee did not even express any interest in this and did not seek to obtain documents and support that proved Eluz's words before adopting the resolution, and relied on her presentation alone.

62. Not only that, but during the meeting Eluz also explained that the management agreement would be reviewed and that Merhav would provide detailed written updates and reports quarterly concerning the services to be provided to Ampal within the scope of the first management agreement.

63. Based on Eluz's words during the meeting, and based on them alone, the special committee resolved at the end of the meeting:

    63.1  To approve **in principle** the first management agreement between Ampal and Merhav;

    63.2  The approval was given in accordance with an assessment argued by Eluz during the meeting that were made by Ampal management about the services that it was claimed had been provided by Merhav, which were said to be worth NIS 10,000 plus VAT for the year;

    63.3  Aside from this payment no additional payment would be made to Merhav for its expenses or additional management fees;

    63.4  Ampal had the right to terminate this agreement for any reason whatsoever subject to giving 30 days' notice and paying the proportionate share of the management and consulting fees at the time notice was given;

    63.5  After Ampal's management would finalize understandings with Merhav with regard to the provisions of the agreement, the committee would be persuaded to discuss and approve the agreement.

    • Copy of the minutes of the special committee meeting on February 15, 2009 is attached and marked as **Exhibit 17**.

    • The first management agreement is attached and marked as **Exhibit 18**.

64. It should be emphasized that the resolution to approve the first management agreement was adopted by the special committee **without it having the complete information necessary**, without having requested and without having been presented with the appropriate data and documents, without the members of the committee having consulted professionals in the legal or economic field, and without any lively discussion having taken place in the special committee.

65. Instead, the committee members relied absolutely blindly on the words of Eluz and accepted her statements from the perspective of "ours is not to reason why," while the "discussion" that took place at the meeting was a sterile discussion that did not delve into the basis for the decision. This is all the more astounding since this is a payment for management services **the costs of which totaled quite a few million shekels**.

66. Instead, the committee sanctioned Eluz's words, when it was known that the latter was subject to a conflict of interests since she was the confidante of Maiman.

67. Not only did the special committee or any of its units not seek to examine the data and documents in real time, they did not even see fit to subsequently obtain the written reports on the provision of the management and consulting services that had been promised during the meeting and that it was stated during the meeting would be delivered, and in accordance with which it had given that "approval in principle."

68. In fact, by the special committee's approval in principle to enter into the first management agreement, the special committee acted as a "rubber stamp" and approved in principle Ampal's entering into an agreement based on unfounded information and based on amorphous data, which cannot constitute a basis for the approval of contracting in such significant amounts, at **annual costs of NIS 10,000,000!!!**

69. Therefore, and without reversing the burdens of proof set forth by Sec. 52A of the Securities Law (which imposes direct responsibility for damage to bondholders for violation of provisions of the trusteeship deed), in light of that stated above, it is clear that it would be difficult to impossible to argue that the Respondents did everything in their power (under the standards required in the Securities Law) for the Company to fulfill its obligations, in accordance with the trusteeship deed, toward the bondholders.

70. Without detracting from that stated above, it is clear that this is negligence from several aspects – **First**, negligence by members of the special committee who gave their approval in principle to Ampal's entering into the first management agreement without holding a true discussion of the terms of the agreement and without having verified the reasonableness of the agreement and its consequences for the Company. **Second**, the negligence by members of the Company's board of directors, which did not supervise the actions of the committee and allowed the Company to act in accordance with the provisions of the agreement despite the defect in its approval.

### D.1.b **Approval of the second management agreement between Ampal and Merhav increasing the amount of management and consulting fees retroactively, also without any justification**

71. On December 19, 2010, another meeting of the special committee was convened. At this meeting Karni, Vaknin and Morag took part as members of the committee, while Maiman and Eluz were also present at the meeting.

72. Already now it should be stated that the fact of Maiman's and Eluz's presence at the meeting of the special committee, under the circumstances, when it was intended to examine and determine the terms for the propriety of insider transactions, violates the independence of the committee and its lack of alleged dependence on the controlling member.

73. As part of the subjects discussed during the course of the meeting, Eluz indicated that over the course of the year 2010 Merhav's compensation would be "short" for the services it had provided to Ampal. This was after only a year and a half earlier Eluz had stood at the meeting of the special committee and explained why the sum set in the first management agreement was, in her opinion, fair.

74. A review of the minutes of the meeting reveals only a brief explanation given by Eluz to the special committee (of a few lines), with no explanation whatsoever of why it was claimed that Merhav's compensation would be "short" and why there appeared to be a lack of consistency between the management and consulting fees that Ampal paid and the services that Merhav allegedly actually provided, which necessitated the increase in management and consulting fees to Merhav.

75. Not only does this explanation not satisfactory, but the members of the committee did not demand the presentation of any document authenticating this claimed "short compensation," including documents authenticating Merhav's expenses or alternatively, documents indicating the services it had provided to Ampal, for which payment in the amount of Nis 10,000,000 did not constitute sufficient payment to cover.

76. All of this was even in spite of Merhav's obligation, as part of the first management agreement, and as was presented by Eluz, too, at the meeting of the special committee that dealt with the approval of the first management agreement according to which Merhav was to provide **detailed reports on a quarterly basis to Ampal** concerning the services provided by it.

77. In addition, this time, too, the members of the special committee were not aided by legal or economic opinions with respect to whether the transaction was worthwhile and its consequences on the Company. The only thing presented to the members of the special committee was a long Excel document that purported to detail various expenses made by Merhav in which more was concealed than was revealed and in any event included nothing that would show why Merhav's compensation was allegedly "short" or what the anticipated business benefit might be to Ampal.

- Copy of the document presented to the members of the special committee on December 19, 2010 is attached and marked as **Exhibit 19**.

78. Once more, instead of getting full and detailed information as was mandated, this time, too, the special committee sanctioned the words of Eluz from the perspective of "ours is not to reason why."

79. Accordingly, the special committee, which had approved the first management agreement a year and a half before, under the presumption that aside from the management fees Ampal would not assume Merhav's expenses, saw fit to approve an alternate management agreement, directing, among other things, the retroactive payment to Merhav totaling 50% of Merhav's expenses (hereinafter: "**second management agreement**").

80. Thus, the special committee decided:

80.1 To approve in principle the second management agreement, which was to also include a percentage of Merhav's expenses, to be based on reports from Merhav's management concerning services provided to Ampal. The second management agreement was to be effective retroactively, starting from January 1, 2010 and would replace the first management agreement;

80.2 To ask that Eluz draw up a report on the services that Merhav had provided over the course of 2010 and to submit this report to review by the special committee;

80.3 Subject to receiving a report concerning the year 2010 to receiving a report concerning the year 2010 and its approval by the special committee, Ampal would bear 50% of Merhav's expenses.

81. From a reading of the second management agreement the following picture emerges:

81.1. Unlike the first management agreement which included a fixed annual consideration (in the amount of NIS 10,000,000) the amount that Ampal would have to pay Merhav for the management and consulting fees would be determined by negotiations between Merhav and the special committee at or near the end of each fiscal year.

81.2 The negotiations between the special committee and Merhav would be based on a data presentation indicating the expenses incurred by Merhav that were related to the provision of the services to Ampal over the period relevant to each agreement;

8.13 The second management agreement also stated that for the year 2010 Ampal would pay Merhav a **retroactive payment in the amount of NIS 24,157,000** allegedly representing 50% of Merhav's expenses in 2010 for the management services provided to Ampal as claimed (more than double the amount that was set for Ampal to pay Merhav in the first management agreement).

- Copy of the minutes dealing with the approval of the second management agreement is attached and marked as **Exhibit 20**.

- Copy of the second management agreement is attached and marked as **Exhibit 21**.

82. It is superfluous to note that the second management agreement, too, which in effect doubled the consideration for management fees agreed upon in the first management agreement, was approved by the special committee without prior consultation and obtaining an economic or legal opinion on the fundamentals of the agreement and the reasonableness of this agreement, despite the fact that the terms of this agreement were much worse for Ampal than the terms of the first management agreement, which also did not benefit Ampal.

83. To the best of Petitioner's knowledge, the members of the special committee were not exposed at any stage to any "written report" or summarizing document that indicated the amount of the expenses incurred by Merhav for the purpose of providing the claimed services to Ampal. and from a reading of the minutes of the meetings of the special committee and the minutes from the meetings of the board of directors that are in the possession of the Petitioner's counsel, in the meetings that were convened after the approval of the agreement the members of the special committee or the members of the board of directors did not see fit to even ask questions on the subject and/or to indicate that the committee had not yet received any such written reports.

84. By their omission the members of the special committee and the members of the board of directors failed in their roles, in that they based their decisions that, by their nature, have consequences on the Company's liquidity and that allowed the controlling member to withdraw considerable funds from Ampal by devious means without the process of reaching decisions having been conducted properly and without any supervision on the part of members of the special committee/members of the board of directors in the matter of the fulfillment of the **conditions that they themselves approved** in order to adopt the resolutions.

85. These conditions were intended to assure supervision of the consideration paid by Ampal to Merhav in accordance with these agreements, to be informed of the business logic on which these decisions were allegedly based and of the scope of actions and services allegedly provided by Merhav to Ampal.

86. By this omission Irit Eluz also failed in her role as one who served as CFO at Ampal during the relevant period and held the senior financial job at Ampal at the time, when she did not provide the relevant official documents to the members of the committee during that entire period (in accordance with the resolutions of the committee and the second management agreement) while at the same time urging the members of the committee to approve the management agreements, without presenting to them any document evidencing that these decisions would be taken for the good of the company at the meeting, all for the personal interests of Merhav and Maiman.

87. It is superfluous to note that even other officers who were not members of that committee did not act in any way to clarify whether the committee worked as intended and did not exercise independent or additional discretion with regard to the demand to bring the committee's conclusions up for approval by the board of directors, or at least to supervise the committee's activity.

**D.1.c. <u>Both management agreements were approved and signed while Ampal was posting significant losses in its financial statements</u>**

88. As if all that were not enough, a reading of Ampal's financial statements reveals that the first management agreement, which was approved in principle by the special committee on February 15, 2009, was approved while in its financial statements for the third quarter of 2008 Ampal's posted losses in the amount of some 12 million (US) dollars, and shortly thereafter, on March 31, 2009 in the periodic financial statements for the year 2008 Ampal posted losses in the amount of 16 million US dollars.

- Copy of the financial statements for the third quarter of 2008 is attached and marked as **Exhibit 22**.

- Copy of the periodic and annual financial statements for the year 2008 published on March 31, 2009 is attached and marked as **Exhibit 23**.

89. The second management agreement was approved by the special committee on December 19, 2010 while in the quarterly financial statements for the third quarter of 2010 Ampal posted losses in the amount of some 36 million dollars, while in the annual financial statements for the year 2010 Ampal posted losses in the amount of some 45 million dollars!

- Copy of the financial statements for the third quarter of 2010 is attached and marked as **Exhibit 24**.

- Copy of the periodic and annual financial statements for the year 2010 published on March 31, 2011 is attached and marked as **Exhibit 25**.

90. One cannot help but see, under the circumstances described above, and without detracting from the burdens of proof imposed on the officers in accordance with Sec. 52K of the Securities Law, that it would be difficult to impossible to argue that the officers, the controlling member and general manager took all appropriate measures to prevent the violation of the Company's obligations toward the bondholders.

91. Moreover, and without this constituting agreement to a reversal of the burdens of proof set forth in Sec. 52K of the Securities Law, these instances demonstrate that the resolutions constituted truly unreasonable behavior, contrary to what is expected of a reasonable director, and constitutes a willful blindness, since how else is it possible that they would approve management agreements in huge amounts for a company controlled by the controlling member, all the more so when some of these were approved retroactively, while the scope of the Company's losses was growing from quarter to quarter.

**D.2 <u>Postponing the repayment date for the loan in the amount of some 20 million dollars that Merhav had taken from Ampal to invest in an "ethanol" project in Colombia, repeatedly over 5 years without providing appropriate collateral and without the Respondents having properly verified whether Maiman or Merhav would fulfill their obligations to repay the loan</u>**

92. During the board of directors meeting that was held on August 9, 2007 Eluz informed the members of Ampal's board of directors that in the relevant period Merhav had a number of projects in the field of "alternative energy," one of which was a project to produce energy from ethanol in Colombia (hereinafter: "**project**").

- Copy of the minutes of the board of directors meeting on August 9, 2007 is attached and marked as **Exhibit 26**.

93. On November 15, 2007 the Company's board of directors convened in order to discuss the special committee's recommendation to approve the granting of a loan in the amount of (US)$ 20,000,000 to Merhav for the purposes of investment in the project, with the repayment date set as December 31, 2008 (hereinafter: "**loan**") at a meeting at which Maiman, Karni, Morag, Yerushalmi, Novik, Malamud and Mr. Jack Biggio were present as directors.

- Copy of the minutes of the board of directors meeting on November 15, 2007 is attached and marked as **Exhibit 27**.

94. The scope of the loan agreement between Merhav and Ampal included an option mechanism for Ampal by which Merhav's debt could be converted in a way that instead of repaying the loan Ampal could acquire up to 35% of the shares in the project from Merhav, from the time the bank financing for the project was achieved ("hereinafter: "option").

95. The loan agreement also provided that repayment of the loan would be secured by encumbering Merhav's holdings in Ampal (a total of 4,476,386 shares).

96. Notwithstanding the fact that this is an agreement that in its essence is a loan and option agreement (as stated in the minutes of the meeting) that includes an option mechanism for the Company to obtain rights to the project instead of repayment of the loan in cash, the agreement was publicly reported as an "option agreement" and was painted to the public as an "asset" that had been acquired by Ampal, while the fact that the agreement was based on a loan to a private company owned by the controlling member was mentioned only marginally in the report.

- Copy of the immediate report dated December 31, 2007 is attached and marked as **Exhibit 28**.

97. Close to the date that had been set for repayment of the loan, in a board of directors meeting that took place on November 5, 2008, in the midst of the world economic crisis, Maiman informed the members of the board of directors that finalizing the terms for the financing of the project and the receipt of the financing would take place over the course of the first half of 2009 and as a result he was asking for the postponement of the repayment date for the loan.

98. Following that, the special committee convened on December 4, 2008 in order to discuss the issue of postponing the repayment date for the loan to December 31, 2009; this meeting was attended by Karni and Haber as members of the committee and aside from them, Eluz and Mr. Yoram Firon were present.

99. The special committee was assisted by an economic opinion that, from the part that was attached to the minutes and is in possession of the Petitioner, clearly was not based on real data, but rather on Maiman's statement according to which the finalizing of the terms of the financing was impending. During this meeting, at which Mr. Collins (representative of the committee's economic advisors) was present, the latter limited the opinion by saying that it was being provided without any verification of the suitability of the project by the economic advisors.

**100. At this point it must be noted that the opinion given by the economic advisors included shocking information, according to which there had been a dramatic drop in the value of the collateral provided to secure the loan (4,476,386 Ampal shares held by Merhav) within less than a year, <u>from some 30.6 million (US) dollars, reflecting 153% of the value of the loan, to only 5.19 million (US) dollars (!) reflecting 26% of the value of the loan.</u>**

101. **This fact "passed right by" the members of the special committee, without even one of the committee members drawing the attention of the committee or those present at the meeting to this matter or asking how such a dramatic drop in the value of Ampal's shares had occurred.**

102. In light of this, one can only wonder whether the members of the committee read and considered the economic opinion given or perhaps did so only in order to "fulfill their obligation," while absolutely relying on the statement by Maiman. Either way, there is not and cannot be any doubt that by these omissions the members of the special committee enabled the Company to enter into an agreement that was not for the Company's benefit, but rather for the benefit of the controlling member alone.

103. In the end, the opinion recommended that the special committee approve the postponement of the repayment date for the loan subject to the provision of a personal guarantee by Maiman and subject to receiving the right to conduct negotiations for increase the share that Ampal would receive if it elected to exercise the option in the project in accordance with the loan agreement.

104. In the end, the opinion recommended that the special committee approve the postponement of the repayment date for the loan subject to the provision of a personal guarantee by Maiman and subject to receiving the right to conduct negotiations for increase the share that Ampal would receive if it elected to exercise the option in the project in accordance with the loan agreement.

105. The meeting was adjourned after the special committee had recommended, off the record, to support an extension of the loan repayment date without any formal resolution in the Company's board of directors as a result.

- Copy of the minutes of the special committee meeting on December 4, 2008 is attached and marked as **Exhibit 29**.

- Copy of the immediate report published by the Company on January 4, 2009 concerning extension of the date for repayment of the loan is attached and marked as **Exhibit 30**.

106. One year later, at the meeting of the special committee on December 15, 2009, the extension of the date for repayment of the loan was once again discussed, for one additional year (until December 31, 2010). Karni, Morag and Vaknin were present at the meeting as committee members.

107. At that same meeting the special committee discussed the intention to exercise the option and thus to "pay off" the loan. This possibility was conditioned on finalizing the terms of the financing for the project with Banco do Brasil, and obtaining financing for the project (a scenario that in fact did not play out, while all the economic assessments and discussions at that meeting were based on the fact that finalizing the financing terms was just around the corner and that the project was taking on flesh and sinew).

108. In accordance with this and based on an immediate report published by the Company on January 8, 2010, Ampal and Merhav concluded a sort of "agreement to exercise the option" (hereinafter: "**exercise agreement**"), such that in accordance with its provisions the exercise of the option would be subject to, among other things, obtaining the financing from Banco do Brasil or any other third party. Likewise, as part of the exercise agreement, a provision was included concerning the extension of the date for the repayment of the loan to one of the following dates (whichever was first): (**a**) the date on which the financing for the project was received; (**b**) December 31, 2010.

- Copy of the minutes of the special committee meeting on December 15, 2010 is attached and marked as **Exhibit 31**.
- Copy of the immediate report published by the Company on January 8, 2010 concerning the signing of the exercise agreement and postponement of the date for the repayment of the loan is attached and marked as **Exhibit 32**.

109. Since the condition precedent for the exercise of the option was not realized, we must conclude that there was no real content to this agreement other than the postponement of the date for the repayment of the loan. Thus, the special committee in practice approved the postponement of the date for the repayment of the loan once again, this time without having requested additional collateral or additional conditions that might benefit Ampal and without having examined whether Maiman or Merhav had the economic ability to repay the loan.

110. Toward the end of 2010 the same ritual was repeated, in which Maiman once again asked that the special committee convene to discuss the postponement of the repayment date for the loan, for the 3rd consecutive time, while he claimed once again that obtaining the financing for the project was "just a matter of time" and that finalizing the terms of the financing was around the corner.

111. Accordingly, on December 19, 2010 the special committee was convened for the "annual discussion" of the postponement of the repayment date for the loan. At this meeting Karni, Vaknin and Morag were present as members of the committee and Maiman and Eluz were also present (see minutes, Exhibit 20 above).

112. As stated, this time as well, Maiman used the same arguments, that finalizing the terms of the financing was nearer than ever and was anticipated to be completed by March-April of 2011, and that in his opinion there were even potential partners who were willing to invest in the project, and the possibility of an initial public offering on a foreign exchange for the project company was being considered.

113. This time, too, the special committee approved the postponement of the date for the repayment of the loan for another year, without any proper verification of the information and without receiving additional collateral, without its position having improved and without having verified Maiman's or Merhav's ability to repay the loan.

- Copy of the immediate report published by the Company on January 7, 2011 concerning the postponement of the repayment date for the loan is attached and marked as **Exhibit 33**.

114. After the months of March-April 2011 passed and the financing terms with respect to the project had not been finalized, and no financing had been received for the project, Maiman once again turned to the members of the special committee for the purpose of postponing the repayment date for the loan for another year.

115. This time, the members of the committee were to weigh the request by Maiman (in the name of Merhav) more carefully, **both** because over the course of 2011 the Company reported several times on disruptions that had occurred in the supply of gas through the gas pipeline in Egypt that belongs to EMG as a result of terrorist attacks – something that could worsen Ampal's and Merhav's economic situation **and** against the background of the shaky financial situation in which Ampal was mired in t hose days, when it could not meet its obligations to its bondholders.

- Copy of several immediate reports published over the course of 2011 concerning the gas supply is attached and marked as **Exhibit 34**.

116. For the purpose of holding a discussion on the extension of the date for the repayment of the loan, the special committee convened for a discussion that, as stated, turned into a set ritual over the course of the Company's operation – a discussion on the postponement of the repayment date for the loan.

117. At the special committee meeting, which was convened on November 12, 2011 and at which Vaknin, Morag and Degani were present as members of the committee not and to which Eluz and Mr. Yoram Firon were also invited, there was a discussion relating to the fact that the terms for the financing of the project had not been finalized and signed and that there was no financing for the project, while the costs of the project were skyrocketing and over the years had risen beyond what had been anticipated. **Despite that stated above, it was decided at the end of the meeting to approve the postponement of the date for repayment of the loan by one additional year, until December 31, 2012.**

118. Notwithstanding the great importance of this resolution for the approval of the loan under these circumstances, against the background of the lack of clarity concerning EMG, in this discussion the special committee did not avail itself of an economic opinion or any other professional opinion.

- Copy of the immediate report concerning published by the Company on December 9, 2011 concerning the postponement of the date for repayment of the loan is attached and marked as **Exhibit 35**.

119. **In another context, it must be noted that aside from the shoddy manner in which the resolution was adopted, this resolution constitutes a real "grab."**

120. **Only a few months before, on May 11, 2011, representatives of Ampal[5] had met with the trustees for the series of bonds, and at this meeting the trustees expressed their concern for Ampal's future based on the business results that it showed and based on the crisis in Egypt, which was interfering with the gas supply at EMG.**

121. **In the summary of the meeting that was reported publicly there was not the slightest mention of the Company's intention to postpone the date for the repayment of the loan by one additional year or the intent of Maiman (who was not present at the meeting) to ask for a postponement of the loan's**

---

[5] Maiman, Eluz, Mr. Amit Mansour and Mr. Yoram Firon

**repayment. It is almost certain that if this matter had come up at the meeting the trustees would have expressed their protest on the matter and would have weighed their next steps, in light of such conduct.**

- Copy of the immediate report dated June 13, 2011 concerning the meeting between Ampal's representatives and the trustees is attached and marked as **Exhibit 36**.

122. **It is not superfluous to note that during the special committee meeting the matter of holding talks with the bond trustees or the Company's intent to approach the bondholders in the near future to discuss the bond terms did not arise and was not even hinted at, either on the part of the committee members, or on the part of Eluz (who took part in the meeting with the trustees and who, during the relevant period, was entrusted with the financial management of the Company), and who not only did not bring up the topic for discussion, but even supported the approval of the postponement of the date for the repayment of the loan, nor on the part of the others present at the meeting.**

- Copy of the immediate report published by the Company on December 19, 2011 is attached and marked as **Exhibit 37**.

123. **In fact, in none of the board of directors meetings or those of the special committee that preceded the Company's insolvency did matters pertaining to the bondholders or the manner in which the Company would fulfill its obligations toward them come up.**

124. At the end of 2012, when the date for repayment of the loan was about to pass, Merhav and Maiman informed Ampal that in light of the deterioration in their economic situation, and liquidity difficulties stemming from, among other things, the new developments in the gas pipeline in Egypt belonging to EMG, **they could not repay the loan to Ampal!**

125. **At this stage, Ampal collapsed and fell into insolvency, in light of its failure to meet its financial obligations to its creditors, including to the bondholders.**

126. There is no doubt that by their negligence and their repeated omissions the members of the board of directors in general and the members of the special committee in particular pushed the Company toward the abyss, when any postponement granted to Merhav (which, as stated, is a private company controlled by Maiman) for repayment of the loan worsened the Company's economic situation and brought it closer to its predestined end – collapsing and being left as an empty vessel.

127. An examination of the approvals of the extension of the date for the repayment of the loan granted by the special committee annually testifies to the fact that these resolutions were adopted without getting the full and exact information that the members of the committee should have received. How is this so?

128. Anyone observing the manner in which Ampal received the approvals by the special committee to postpone the date for repayment of the loan would initially be led to believe that the lion's share were given after the alleged holding of a discussion in the special committee.

129. The problem is that all the discussions that took place in the committee and every opinion given were based on the "working assumption" that receiving the financing for the project and finalizing the financial terms were just around the corner. In the absence of fulfillment of this working assumption, there is no significance to the discussions that took place or to the opinions given over the years.

130. **Over the course of all the discussions on the approval of the postponement of the date for repayment of the loan, the members of the committee did not receive from Merhav or from anyone else any written document that testified to the fact that the receipt of financing for the project was near; rather, in this matter they contented themselves solely with verbal statements given by Maiman, upon which they constructed heaps of discussions and assessments for four whole year!**

131. **This is all the more so when we speak of a committee that dares to call itself a "special committee" allegedly characterized by independence, when the basis for the discussions it conducts in the matter of postponement of the repayment of the loan for huge sums to a company controlled by its controlling member <u>revolves entirely around verbal statements by the controlling member himself!</u>**

132. And it must be emphasized that the more time that passed, the more significant losses Ampal accumulated form year to year and at the end of the day, it was plunged into insolvency. In light of all that stated above, the Company's board of directors, as the responsible board of directors, should have ordered the special committee to conduct itself with professional skepticism vis-à-vis the controlling member and to examine the situation before adopting resolutions that worsened its liquidity situation. Instead, the directors acted with indifference, which worsened Ampal's situation.

133. In addition, over the course of the years, when Ampal was asked to postpone the date for the repayment of the loan year after year, the special committee did not bother to request a written confirmation from Merhav that its economic situation enabled it to repay the loan at any given time. This omission, among others, left Ampal (and the bondholders in particular) facing a bleak reality when it received notice from Merhav that the latter could not repay the loan at the end of the day. This is all the more so in light of the fact that Ampal's board of directors knew or should have known that the damage to EMG's gas pipeline impaired Merhav's liquidity.

134. Under these circumstances it is inconceivable that both against the background of repeated attacks around Egypt that jeopardized the investment in EMG as well as the Company's inability to meet its obligations toward the bondholders, Ampal would not demand such confirmation or at least additional collateral to secure repayment of the loan.

135. To complete the picture it should be noted that during the past few years bankruptcy proceedings have been conducted in the US to realize the personal guarantees that Maiman provided for the benefit of Ampal.

136. Recently a judgment was handed down in the US Court ordering Maiman to return the loan funds to Ampal's liquidation treasury. If the judgment is executed by Maiman by the time this action is decided and compensation is ordered, and as a result funds are paid to the bondholders, then the amount of compensation ordered for the group is to be reduced by the money they receive as a result of realizing the collateral.

137. As of now an appeal of the judgment is pending.

### D.3. The Company granted Maiman extraordinary salary and bonuses that did not reflect the Company's condition during that period.

138. In addition to all the omissions described above, and the fact that between them and the concern as to whether the Company would meet its obligations to the bondholders, a look at the reports that Ampal sent to the American securities authority (the SEC) from time to time reveals that over the course of the years the Respondents, headed by Mr. Maiman, withdrew huge sums for salary and bonuses, while these did not reflect the Company's performance at that time and certainly were not consistent with the obligation to do everything possible to prevent the violation of the trusteeship deed.

139. Thus, in 2009, when Ampal showed significant losses in its financial statements in the amount of 21 million dollars, Ampal paid salary, bonuses and other consideration in the total amount of $6,040,145, of which Maiman received a salary in the amount of $1,071,7894, bonuses in the amount of $1,006,623 and other consideration in the amount of 168,865; Eluz received salary in the amount of $357,265, bonuses in the amount of $905,960 and other consideration in the amount of $124,432; and Meltzer received salary in the amount of $514,553, bonuses in the amount of $476,821 and other consideration in the amount of $136,282.[6]

- Copy of financial statements for the year 2009 is attached and marked as **Exhibit 38**.

---

[6] In addition, Meltzer also received options In the amount of $331,535.

- Copy of the relevant pages from the Company's report to the SEC for the year 2009 is attached and marked as **Exhibit 39**.

140. In 2010, when Ampal showed significant losses in its financial statements in the amount of some 45 million dollars (see Exhibit 25 above), Ampal paid salary, bonuses and other consideration to Maiman, Eluz and Meltzer in the total amount of $6,390,354, of which Maiman received salary in the amount of $1,494,275, bonuses in the amount of $1,267,963, other consideration in the amount of $233,780 and compensation in options in the amount of $447,255, Eluz received salary in the amount of $440,450, bonuses in the amount of $1,014,370, other consideration in the amount of $152,562 and compensation in options in the amount of $269,668, Meltzer received salary in the amount of $535,292, bonuses in the amount of $380,744 and other consideration in the amount of $163,995.

- Copy of the relevant pages from the Company's report to the SEC for the year 2010 is attached and marked as **Exhibit 40**.

141. A reading of the data reveals a situation that is not less than shocking. It appears that there is no correlation between Ampal's financial results and the salary and bonuses paid to its leaders, the amounts of which increase despite the sharp increase in the rate of losses shown in the financial statements.

142. In 2010, when Ampal showed significant losses in the amount of some 95 million dollars, Ampal paid Maiman, Eluz and Meltzer salary, bonuses and other consideration in the total amount of $4,080,619, of which Maiman received salary in the amount of $1,209,671, and other consideration in the amount of $610,795, Eluz received salary in the amount of $518,413, and other consideration in the amount of $581,740 and Meltzer received salary in the amount of $495,136, bonuses in the amount of $510,338 and other consideration in the amount of $154,992.

- Copy of financial statements for the year 2011 is attached and marked as **Exhibit 41**.

- Copy of the relevant pages from the Company's report to the SEC for the year 2011 is attached and marked as **Exhibit 42**.

**D.3.a** **The Company granted Maiman a bonus that deviated from the compensation plan that had been established a few months before the start of negotiations with the bondholders**

143. In the course of the Company's management, it established various mechanisms for compensating its officers, whether in cash or in cash equivalents, called the Incentive Plan 2000 (hereinafter "**compensation plan**").

- Copy of the Incentive Plan 2000 compensation plan is attached and marked as **Exhibit 43**.

144. Sec. 11 of the compensation plan (Article 11) deals with the compensation of officers in the Company in accordance with their performance and their efforts (performance-based awards).

145. Sec. 11.1(b) of the compensation plan sets forth the general principles for compensating officers. In accordance with this section, and the discretion of the compensation committee entrusted with determining eligibility for compensation and its rate as stated above. This section states:

> "Performance-Based Awards be granted to Participants at any time from time to time, as shall be determined by the Committee. The Committee shall have complete discretion in determining the number, amount and timing of awards granted to each Participant. Such Performance-Based Awards may take the form of, without limitation, cash, Shares or any combination thereof."

146. Notwithstanding the broad discretion that is apparently given to the compensation committee, when it comes to granting compensation based on performance and effort, Sec. 11.1(c) of the compensation plan sets a ceiling for the compensation in the amount of $1,000,000 for each officer to be compensated by the Company for each tax year. This section states:

> "... The maximum amount of Performance-Based Awards to be awarded to any employee <u>during the fiscal year shall be $1,000,000</u>.

147. To complete the picture, it should be noted that in accordance with that stated in the compensation plan, the Company is not "bound" to compensation by this plan and it may crate other mechanisms to compensate its officers.

148. On March 7, 2011 Ampal's compensation committee convened for the purpose of discussing the granting of a "special bonus" to Maiman in his role as general manager and chairman of the board of directors, for his claimed "work and achievements" in the deal in which the Company's holdings in 012 Smile were sold. At that meeting Karni, Morag and Vaknin were present as members of the committee, as well as Eluz and Maiman himself (hereinafter: "**bonus**").

149. During the discussion Morag noted that he was bothered by the timing of granting the bonus, in light of the state of EMG and the consequences for Ampal. In response Eluz stated that in light of the profits anticipated in the next quarterly report (for September 2011), as a result of the sale of 012 Smile, there was no obstacle to granting the bonus to Maiman. This convinced the committee, and it **granted Maiman a generous bonus of $1,500,000**.

- Copy of the minutes of the compensation committee dated march 7, 2011 is attached and marked as **Exhibit 44**.

150. From a reading of the minutes of the meeting of the compensation committee it appears that there was no discussion of the question of why the committee elected to deviate from the compensation policy written in the compensation plan, when **there is a specific arrangement in this** plan to compensate in cash (or cash equivalents) in cases like this that relate to compensation of officers based on their performance and their efforts.

151. Petitioner believes that it is likely that the members of the committee elected to deviate from this compensation plan because in the relevant part of the plan, which deals with compensation of officers at this level the **company was limited** in compensating the officers up to the amount of $1,000,000., while the committee members wanted to grant a more generous bonus to the Company that exceeded the limit in the compensation plan by $500,000.

152. Moreover, since this compensation was not given in accordance with the Company's regular compensation plan given the intention to grant said bonus to Maiman who, in addition to serving as general manager and as chairman of the board of directors of the Company is also the controlling member, the company must bring this compensation for additional approval by the special committee, since this is a transaction that is also a transaction with a controlling member.

153. Without detracting from that stated above, the reason that Eluz presented to Morag with respect to the timing of the granting of the bonus is a reason that has no value whatsoever. Thus, in order to assuage Morag and with the aim of "justifying" the granting of the bonus, Eluz claimed that in its next financial statements Ampal was anticipated to show nice profits.

154. The problem is that this statement conceals more than it reveals and in the same breath Eluz did not see fit to note that those "profits" that Ampal anticipated showing in its financial statements had their source in a one-time capital transaction (the sale of 012) and would have no continued effect or consequences on the Company's liquidity situation in the long run; of course this also took into account the recurring attacks on the gas pipeline in Egypt, which was one of the Company's primary assets during the relevant period.

155. The proof of that stated above is that 9 months after the date the resolution was adopted and the bonus was granted the leaders of the company sought to meet with the trustees for the bondholders in order to discuss finalizing a debt agreement, against the background of Ampal's inability to meet its obligations toward the bondholders.

156. In this case, too, as in other cases, the directors did not request relevant information and data and did not try to act in an informed manner. It is superfluous to note, and without detracting from the burden of proof pursuant to Sec. 52O of the Securities Law that they did not even consider how these actions would affect their ability to meet the obligations pursuant to the trusteeship deed and/or which actions the Company should take to avoid violating the trusteeship deed to the extent possible.

**D.4**  **The attempts to reach a debt agreement and the company's turn to bankruptcy proceedings for tactical considerations**

157. On December 19, 2011 Ampal published an immediate report according to which it intended to hold a holders' meeting in the presence of all the trustees for the bond series, in order to discuss the postponement of payment of the principal for two years, against the background of the Company's business results, which did not allow it to meet its obligations toward the bondholders (see Exhibit 37 above) (hereinafter: "**holders' meeting**").

158. On January 1, 2012 a holders' meeting was held at which it was decided to appoint representation for the bondholders in order to conduct negotiations with the Company with the aim of arriving at an agreed-upon debt settlement.

159. At the same time, Petitioner will argue that over the course of the negotiations that it held with the bondholders' representatives, the whole time Ampal reserved for itself a tactical weapon, a "contingency plan" in the form of turning to bankruptcy proceedings in the US, if it decided that the negotiations would no longer be to its benefit or alternatively, if it felt "threatened" by the bondholders in Israel, thus evading hearings in the Court in Israel (which are not generally inclined to grant protection from creditors to holding companies).

160. It should be noted parenthetically that the negotiations that were conducted between the Company and the bondholders were held just before Amendment 18 to the Companies Law 5759-1999 took effect, pursuant to which any debt settlement between a company and its bondholders requires the intervention of the Honorable Court, and would be subject to the appointment of an expert by the Honorable court, with the expert being required to weigh, among other things, an alternative that included liquidation of the Company; it was this, apparently, that the Company wished to avoid.

161. The significance of this was that a settlement with the bondholders would compel the Company to submit to the control of the Court and thus would deny it the opportunity (a) to turn to bankruptcy proceedings in the US, and the ability to conduct the Company independently in accordance with the provisions of US law under protection from creditors; (b) it would be compelled to submit to the control of a court in which an expert would be appointed whose job it would be to weigh, among other things, the liquidation of the company/

162. In light of all that stated above, and taking into account these considerations, they decided to turn to the Bankruptcy Court in the US in a Chapter 11 proceeding.

- Copy of the immediate report dated August 29, 2012 concerning the Chapter 11 proceedings is attached and marked as **Exhibit 45**.

163. In this way Ampal created another advantage vis-à-vis the bondholders when it took refuge under the protection of the Court in the US as a tactical weapon in the negotiations between it and the bondholders, and restricted the bondholders' ability to act judicially to exhaust their rights, because such recourse under those circumstances would have been associated with the investment of tremendous resources such as retaining the services of attorneys in the US, etc.

- Copy of the immediate report dated August 31, 2012 is attached and marked as **Exhibit 46**.

## E.    Costs of the action and the Respondent's responsibility

164. As stated, pursuant to Sec. 52K of the Securities Law, since they violated the provisions of the trusteeship deed and the bondholders suffered damage, the controlling member, the directors and the general manager are directly liable for their damage.

165. Without detracting from that stated above and without altering the burdens stemming from Sec. 52M of the Securities Law, the web of facts described above clearly shows that the Respondents will have a hard time pleading that they took **all suitable measures to avoid the violation**.

166. Not only that but the facts of the case show that the Respondents violated every possible obligation and conducted themselves in a manner that is at least negligent, and that this negligence caused damage to the members of the group.

166.1 Thus, it is clear that Maiman did not comply with any standard obligation of care toward the Company's bondholders. All along, he gave preference to his own personal interests over the Company's ability to repay its creditors, when he elected to "milk" the funds that could have served to pay off the Company's debts at every opportunity, whether by way of paying scandalous management fees to Merhav, without any justification having been shown for them or whether by taking the loan for the project in Colombia, while not repaying it to the Company, without any relationship to the Company's ability to repay, which deteriorated from bad to worse as time passed. In effect, Maiman took a risk at the expense of the Company's bondholders, who in essence financed Maiman's bet on the project in Colombia. All of this, at the same time that the Company was already obviously close to insolvency.

166.2 Eluz, both in her "hat" as director and in that of Ampal's CFO, who allegedly was entrusted with the management of the Company's funds in a cautious and measured manner, also did not take the required steps to see to it that the trusteeship deed could be fulfilled. She violated the duty of to which she was obligated toward the bondholders on a continual basis, when she recommended to the members of the special committee, time after time, to approve transactions by controlling members in huge sums, while the Company was posting high financial losses in its statements and alternatively was already "close to bankruptcy." Eluz further failed by getting supporting documents evidencing Merhav's costs.

166.3 The members of the board of directors and the officers violated duties of care toward the Company's bondholders and toward the Company. Their omissions were expressed by, among other things, the fact that they shrugged off their authority and blindly accepted all the findings of the special committee, which had clearly been taken without having the relevant information, without checking whether the management agreements were being performed and whether Merhav and/or Eluz were providing all the information and appropriate documents before signing or after signing them, as was mandated by its provisions.

166.4 The members of the special committee violated the duties of care toward the bondholders, among other ways, when they did not conduct the right discussions in the committee in an intelligent and informed manner, they failed to get the information required in all matters relating to the management agreements and the postponement of the repayment date for the loan, relied on a verbal presentation made by Maiman concerning obtaining the financing for the project, without asking for any written document describing the progress of the process for obtaining the financing for the project or any economic assessment showing that Merhav or Maiman had the ability to repay the loans at any given time, and when they approved the postponement of the repayment date for the loan without having the sense to get additional collateral when it was needed.

166.5 **Thus, this is not a case of "Monday morning quarterbacking" but of elementary knowledge that the members of the board of directors should have demanded in real time as required by the circumstances**.

## E.1  The Respondents' responsibility pursuant to Sec. 52K of the Securities Law.

167. Sec. 52K of the Securities Law, 5728-1968 states the following:

> **52K. Liability of issuer**
> (a) An issuer is liable to the holder of securities issued by him for any damage caused him because the issuer violated any provision of this Law or of regulations under it, **or a provision of the trusteeship deed, according to which the issuer has an obligation toward the trustee for holders of the certificates of obligation which he issued.**
>
> **(b) The liability said in subsection (a) shall also apply to Directors of the issuer, to its general manager and to controlling members of the issuer.**

168. This provision therefore sets up a presumption that when damage is caused to the holders of the Company's securities (among them bonds), among other things as a result of a violation of **the provisions of the trusteeship deed**, then as a direct result of this violation, direct personal and statutory liability in the matter is imposed on the directors of the issuer, the general manager and the controlling member of the issuer.

169. This presumption did not come out of thin air and its purpose is to increase the ability of the securities holders to use civil enforcement to seek compensation for their damage when their rights have been frozen, with the purpose of strict adherence to the law, the regulations, and in our case, also the provisions of the trusteeship deed. IN this matter we cite the words of the scholar Dr. Lea Paserman-Josefov in her book,[7] in which she discussed at length the importance of the aforementioned obligation:

> **"Section 52M of the Securities Law imposes liability for a violation of the provisions of the Securities Law or regulations pursuant to it** [as well as for any of the provisions of the trusteeship deed, the undersigned]. **The provision in the section once again concretizes the fact that the lawmaker sees the protection of investors in securities as a very important goal, because he did not content himself with the existence of 'a violation of a statutory obligation' in the Torts Ordinance, but felt the need to cite the offense of a 'violation of a statutory obligation' that is particular to the securities laws … Those liable pursuant to the Section are the issuer, the directors of the issuer, the general manager and the controlling member of the issuer."**

On this issue, see also Class Action (District Court of Tel Aviv) 29437-04-13 **Schenker v. Habas Investments (1960) Ltd.** (published in Nevo, August 24, 2015).

170. On this issue, see also the words of the scholar Prof. Tsipora Cohen[8], who states:

---

[7] Lea Paserman-Josefov, **Securities Law, Duty of Disclosure** 515-516 (2009).

[8] Tsipora Cohen, **Company shareholders – Rights of action and remedies** 418 (1990)

> "**It appears that this right of action** [among other things, by virtue of Sec. 52K of the Securities Act, the undersigned] **… was intended to serve two purposes: 1. To grant compensation to the shareholder for the damage caused him as a result of said violation. 2. To serve as an efficient tool to assure the observance of the provisions of the law and the regulations. The risk of bearing civil liability will lead to greater strictness in observing the provisions of the law and the regulations [in our case, the provisions of the trusteeship deed as well, the undersigned].**

171. It should be stressed that imposing liability on the controlling member or one of the officers listed in this provision does not extend to commission of an offense on their part toward the investors and is not the regular "piercing the veil" between the Company and the controlling members.

172. **This is about imposing direct liability on the controlling member and the officers for the violation of the terms embodied in the security. The controlling members and the officers must know that the bonds issued by the Company must be repaid and if and to the extent that the Company violates the terms of the trusteeship deed, then choosing not to do so will impose personal liability on them, unless they themselves can prove that they took all the measures required to prevent the violation.**

173. There are those who interpret that the purpose of this provision of the law is to constitute a solution to the problems of representation that arise again and again and thus to achieve a balance in practice between the inferiority of the investors form the public as compared with the controlling member, in obtaining information on the company and the power in the hands of the controlling members that may allow them to prevent or stop the violations of the law that are carried out at the company. On this issue, we cite the words of the scholar Mr. Fellman, who states that:[9]

> "**Imposing personal liability on the controlling member in effect pierces the statutory veil and directly ties the controlling member of the issuer to the third party. This is in order to impose tortious liability on the controlling member for the violation of the provision of the law; thus in practice the cost of monitoring the compliance with the provisions of the law are imposed on the controlling member, too. The inferiority of the investing public in obtaining information on the company deserves to be balanced by this provision.**"

## E.1.a      The burden of proof in this action is reversed and is imposed on the Respondents

174. In this case Sec. 52M of the Securities Law continues to state that in an action filed in accordance with the provisions of Sec. 52K of the Securities Act, **the burden of demonstration is transferred to the shoulders** of the Respondents, who are required, in practice, to prove that they took all the appropriate steps to prevent the violation, as stated in the section:

> **52M**. **Liability does not apply**.
> The liability under sections 52K and 52L shall not apply –
> (1) **to any person who proved that he took all appropriate steps to prevent the violation;**
> (2) to any person who proved that he did not know about the violation and was not required to or could not know about it;
> (3) in favor of any person, who was proved to have bought the issuer's securities while he knew or should have known of the violation."

175. These words are given even greater force in light of the words of the Supreme Court in Civil Appeal 345/03 **Reichert v. Heirs of Moshe Shemesh, deceased,** Judgments 62(2) 437 (published in Nevo, June 7, 2007) (hereinafter: "**Reichert case**"):

---

[9] Abraham Fellman, **Company Law in Israel, in Law and in Practice** (Vol. I), 484-485 (Fourth edition edited by Dr. Hadara Bar-Mor) (1994)

"In our case I am not required to examine the general duty of care and it is sufficient to examine the Appellant's liability by virtue of Sec. 52K together with Sec. 52M of the Securities Law, because these sections impose a duty of care on a controlling member, and the liability arising from these is greater than the regular liability for negligence.

…

**The liability of those bodies cited in the section is a special statutory liability. It is not regular tortious liability. It is not based on perpetrating an offense on the part of those bodies toward the investors. Moreover, the liability set forth in the Securities Law is more serious than the liability for the offense of negligence in the Torts Law.** First, the standard of conduct required that is required of the directors, the general manager and the controlling members is stricter than the standard of negligence. In order to be released from their responsibility to prove that they took all appropriate steps, while the regular standard of the duty of care is limiting to taking all reasonable steps (cf. T. Cohen, Rights of Action and Remedies (5751-1990), 406. Second, the transfer of the burden of proof to the plaintiff to prove that in our case the protections set forth in the Law are present is also stricter with the defendants as compared to general law. Third, it appears that the arrangement in the Securities Law is also stricter from the perspective of causality. The Law does require a causal connection between the violation of the provisions of the Law by the issuer and the damage to the investor, but the Law, apparently, does not require the existence of a causal connection between the violation of the standard of conduct on the part of the secondary bodies and the damage."

See and compare to the words of the Supreme Court as recently ruled in Permission for Civil Appeal 979/13 **Landmark Group Ltd. v. Harel Pia Trust Fund Ltd.** (published in Nevo, May 26, 2015).

176. In this context it should be noted that in accordance with the provisions of Sec. 52N of the Securities Law, the Respondents' liability is **joint and several**.

177. Another example, in addition to the many described, of the fact that the Respondents did not take all the reasonable steps to prevent the violation is expressed by their not implementing or at the least, not promoting, the "proposed outline for a debt settlement" that was sent on December 26, 2012 by Mr. Yaron Tamir **on behalf of the Petitioner** (hereinafter: "**Mr. Tamir**").

178. This outline is based on a number of principles, including the cycle of Ampal's debts to the bondholders, the conversion of the bondholders' debt to capital, payment of owner's' contribution by Maiman in return for shares, and more.

179. It must be noted that this proposed settlement outline was presented in real time by Mr. Tamir to a number of institutional investors who, during the relevant period, held a significant stake in Ampal's bonds, and **who supported this proposed outline**.

• Copy of the proposed outline for the debt settlement sent by Mr. Tamir to the Company's board of directors is attached and marked as **Exhibit 47**.

180. On December 27, 2012 during a discussion that took place in the special committee, among other things with regard to the continued operation of the Company, the members of the committee discussed the proposed outline for a settlement that had been sent by Mr. Tamir. Morag, Degani and Vaknin took part in this meeting (as committee members), and Maiman, Eluz, Mr. Yoram Firon, Mr. Amit Mansour, Ms. Leigh Botbin and Mr. Kent Henderson were also present.

181. During the discussion that took place at the special committee meeting, Eluz indicated that the proposed outline for the settlement was acceptable and economically logical. This position was shared by Vaknin, too. At the same time, according to what is stated in the minutes of the meeting, Eluz noted that she had told Mr. Tamir that since the Company was subject to bankruptcy proceedings, the Company was not authorized to conduct

independent negotiations based on this outline and that it had to submit the matter to the unsecured creditors' committee (UCC) that had been appointed by the Court in the US with the aim of opening negotiations based on this outline.

- Copy of the minutes of the meeting of the special committee on December 27, 2012 is attached and marked as **Exhibit 48**.

182. For reasons not clear to the Petitioner, in the end this outline was not implemented and was not promoted by Ampal, despite the fact that according to it, as detailed above, this outline was acceptable both to the Company and to the institutional investors who held significant stakes in Ampal's bonds.

183. It appears that the implementation of this outline could have brought the Parties to an agreed-upon debt settlement, and **would have been able to prevent the violation of the provisions of the trusteeship deed**. Instead, Ampal elected not to promote this proposal in any way whatsoever, when the results and the consequences of these actions are known. As stated, this is only one of many examples, on a subject for which, a priori, the burden of proof is laid on the shoulders of the Respondents.

### E.2. The violation is all the more severe in light of the Respondents' conduct considering the Company's economic situation

184. As has been detailed extensively, this was not a case like many other cases describing the spectacular failure of a company that issued bonds, had trouble making the repayments to their holders, and then collapsed. The case before us is an extreme one in which the violation could have been prevented.

185. Thus, the process of making decisions concerning the two management agreements was defective and negligent. This process was carried out, as was stated, without thought, without examining the relevant data and without weighing the economic situation of the Company, which was absorbing significant losses during the relevant period.

186. In addition, as we have shown, the process of adopting the resolutions concerning the postponement of the repayment date for the loan was also marred by an omission, and this is all the more severe, among other things, against the background of the fact that a not-insignificant share of the resolutions adopted in the matter were adopted when **the Company was close to insolvency.**

187. The special importance of the obligation to weigh the good of the creditors when the Company was at the edge of the abyss of insolvency was discussed by the scholar Eyal Geva in his article on the duty of care toward creditors in an environment of insolvency in the book by Joseph Gruss 197 (2015), in which he wrote that:

> **"In situations of approaching bankruptcy, the managers must act to protect the creditors' interests and their good, since they are the ones who will become the effective shareholders of the corporation. The conclusion that must be drawn from this proposition is that the purpose of the existence of the company from which the substantive content of the duty of care by its managers stems, is not a static matter, but rather changes in accordance with its economic situation**
> **…**
> **The idea that the economic situation of a company and it alone affects the obligations of the company's managers and piques their consciences toward the creditors is closely tied to the theoretical and practical foundations of corporate law in general and to the question of the purpose of a limited liability company's existence in particular."**

188. In this context it should be noted that aside from the cause of action stemming from the violation of the Securities Law, omissions by the Respondents rise to the level of negligence as defined in Sec. 35-36 of the Torts Ordinance [New Version].

## F.    The damage

189. Since there is no dispute that the provisions of the trusteeship deed were grossly violated, because the Company did not make the obligatory payments to the bondholders, the damage to the bondholders as a result of the violation of the provisions of the trusteeship deed is equal to the balance of the money (principal and interest) that the Company was to pay the bondholders.

190. Since the question is one of "calculation of damage" the Petitioner reserves its right to present various possible models for the calculation of the total damage caused to the individual and the group as well as to submit an expert opinion on this matter (as well as to demand that the Honorable Court order the appointment of an expert on its part).

191. In any event, the following is a calculation based on the sums owed and not repaid from the Company's obligation under the trusteeship deed:

191.1    Series A – the sum of NIS 210,000.00;

191.2    Series B – the sum of NIS 644,370,000;

191.3    Series C – the sum of NIS 250,000,000;

**Total -    the sum of NIS 1,104,370,000**

192. As was noted in Footnote 1 on the first page of this motion, the compensation amount for the group will be updated under consideration of the mechanism for defining the group, which will grant entitlement to compensation to anyone who purchased Ampal's bonds up to February 5, 2013 (and held them at that time) or based on a definition of the group to be determined by the Honorable Court in some other manner, if any.

193. For the sake of good order, it should be clarified that in accordance with the provisions of American cogent law, since Ampal is in liquidation in the US, the compensation to the group will be transferred to the liquidation treasury and will be paid from it to the members of the group, when there is enough to service the claim. In any event, this will be done in accordance with instructions given by this Honorable Court.

## G.  The motion is subject to the terms of the law for conducting the action as a class action

## G.1 The Petitioner is allowed to submit this action as a class action

194. Sec. 3(a) of the Class Actions Law states as follows:

> **3.    The submitting of a group action**
> **No class action will be submitted unless it is a suit as specified in the second addition or in a matter set in an explicit instruction of the law, which allows for the submitting of a class action …"**

195. Item 5 of the second addition to the class action law states that a class action suit may be filed in a matter stemming from an affinity to equities, and in the words of the second addition to the Class Actions Law:

> **"A suit with grounds deriving from an affinity to equity or a unit; in this matter –**
> **"Affinity" – Ownership, possession, purchasing or selling";**
> **"Unit" – As defined by the company law as well as equities as defined in clause 52 of the equities law, 5728-1968."**

196. Thus, since the group defined at the start of this motion is comprised in its entirety of holders of securities and the cause of this action is therefore based on a gross violation of the provisions of a trusteeship deed, it is clear that this is an action with a direct affinity to securities.

197. Section 4 of the Class Actions Law states who is permitted to file a class action and in whose name. In accordance with the provision of this section the Petitioner must show that three cumulative conditions are fulfilled for the need to file the motion to approve:

197.1 The petitioner must show the existence of a cause of action one of the bases of which is damage, and the petitioner must show that they have incurred damage personally;

197.2 The cause of action falls under the definition of Sec. 3(a) above;

197.3 The suit raises essential questions of fact and law that are common to all the members of the group, as stated in the section:

> "**4. <u>Who is allowed to submit a request to approve a class action and in whose name</u>**
>
> **(a) These are allowed to submit a request for the approval of a class action to the court as detailed:**
> **(1) A person who has a cause to sue or in the matter as aforementioned in clause 3(a), which invoke essential questions of fact or trial which are shared by all the members listed with a group of people – in the name of that group;"**
> …
> **(b) In the matter of this clause, when one of the foundations of the cause is damage –**
> **(1) In a request for approval submitted by a person as aforementioned in small clause (a)(1) – it is enough that the supplicant show that damage was allegedly caused him;"**

198. As we will see below, these conditions are fulfilled in their entirety in our case.

199. First, the Petitioner is the owner of Ampal bonds in the nominal value of 20,306,438, which were purchased by it and are still held by it (see Exhibit 2 above).

200. Second, the Petitioner's cause of action is therefore anchored in the violation of the terms of the trusteeship deed, which occurred through ongoing actions and omissions of the Respondents over the course of Ampal's operation, and which culminated in insolvency and left its bondholders facing a bleak reality and caused them indescribable damage, which is estimated at the sum of **NIS 1,104,370,000**. In this matter, see the comprehensive discussion in Part H (which deals with the issue of the damage).

201. Without detracting from that stated above, the rule is that at the stage of approval of the action the Petitioner is not required to prove the scope of the damage[10] despite the fact that this component is obvious in light of the total sum of the bonds not yet redeemed.

## G.2 <u>The Honorable Court may approve this action as a class action</u>

202. Sec. 8(a) of the Class Action Law states the conditions for the approval by the Honorable Court of a class action suit as detailed below:

> "**8. <u>Approval of a class action by the court</u>**
> **(a) The court is allowed to approve a class action, if it finds that all the following conditions exist:**

---

[10] Class action (Central District Court) 14144-05-09 **Harel Funds Management Ltd. et al. v. Landmark Group Ltd**. (published in Nevo, December 27, 2012) (hereinafter: "**Landmark case**").

**(1) The suit raises essential questions of fact or trial which are shared by all the members of the group, and there is a reasonable possibility that the decision regarding those will be in favor of the group;**

**(2) A class action is the efficient and fair way of solving the dispute under the circumstances of the case;**

**(3) There exists a reasonable basis to assume that the interest of all the members of the group will be properly represented and managed; the defendant may not appeal or request to appeal a decision in this matter;**

**(4) There exists a reasonable basis to assume that the interest of all the members of the group will be honestly represented and managed.**"

203. As we will see below, these conditions are also fulfilled in their entirety.

### G.2.a. <u>The action raises essential questions of fact and law that are common to all the members of the group and there is a reasonable possibility that these will be decided in favor of the group.</u>

204. With regard to this condition precedent, the evidentiary standard required at this stage is low and a <u>reasonable possibility</u> that the dispute will be decided in favor of the Petitioner and the group suffices.[11]

205. In this case, there is no dispute that this condition is fulfilled, due to the fact that Ampal did not repay to Petitioner (or the other bondholders) the balance of the consideration for the bonds that had not yet been paid to them.

206. All of this, in light of the actions and omissions of the Respondents described, which led Ampal to the end of the abyss, and by doing so they pounded Ampal's ability to pay, and in fact until the situation in which Ampal no longer had the ability to meet its obligations toward the bondholders.

207. In light of that stated above, the Respondent and the representative group were harmed **as a result of those same causes of action** and therefore there can be no dispute as to the fact that the action fulfills the condition of Sec. 8(1) of the Class Actions Law, which states that this action raises questions that are common to all members of the group.

208. Similarly, in light of the causes of action described above and the anomalous conduct of the Respondents, **on whom the burden of proving that they acted appropriately is imposed**, there is no contest that a reasonable basis for these questions to be decided in favor of the group exists as well.

### G.2.b. <u>A class action is the most efficient and fairest way to decide the dispute under the circumstances of the case</u>

209. In this case, case law establishes a precedent that in the case of a representative action by holders of securities from the public, who by their nature constitute a "scattered group," this is a perfect example of the fact that the action must be adjudicated as a class action. These words are reinforced in light of the words of the Supreme Court in Permission for Civil Appeal 4556/94 Titzat v. Silberschatz, Decisions 49 (5) 774, 786 (hereinafter: "**Titzat case**"), which state:

**"The central considerations that are at the foundation of the class action are, as a rule, also at the foundation of the purpose of the class action in the area of securities. Thus, securities are disseminated to many investors. Each investor invested a small or medium sized sum to purchase the securities. At the same time, the total investment by the public in the company may be large. Therefore, find a representative plaintiff who will sue not only for his own right,**

---

[11] Landmark case, Par. 95-96 of the judgment.

but also for the (personal) rights of each of the members of the group as a whole. Often the damage to all the individuals in the group was caused by one and the same event, or a uniform series of events, such as misleading information in the prospectus. Moreover, the class action in the area of securities, which gives an incentive to a "small" shareholder to sue the company and its officers as part of a class, constitutes an important tool in the enforcement of securities law."

See also the words of the Supreme Court in Civil Appeal 345/03 Reichert v. Heirs of Moshe Shemesh, deceased, Judgments 62(2) 437 (published in Nevo, June 7, 2007), which stated:

"The class action seeks to promote efficiency… in litigation. The efficiency is achieved through the fact that the dispute is decided in one proceeding. This spares resources of both the Court and of the parties. It also prevents a lack of conformity in the rulings of courts in similar personal suits…."

Likewise, the words of this Honorable Court (the Honorable Judge Kabov), in the matter of the public importance and efficiency of conducting class actions on a cause stemming from a connection to securities in Class Action (Tel Aviv District) 2484-09-12 **Hatzlacha, The Consumers' Movement for the Promotion of a Fair Society v. Cohen** (published in Nevo, February 18, 2013):

"Research shows that the tool of the public action, representative or derivative, is an acute tool in the struggle for fairness in the capital markets and thus also for its development…"

## G.2.c. There exists a reasonable basis to assume that the interest of all the members of the group will be honestly represented and managed

210. In this matter case law ruled in the Titzat matter[12] that the requirement of appropriate representation of the group's interests is directed primarily at the question of whether the representative plaintiff can act with the proper degree of energy to manage the case, and if there will not be a conflict of interest between him and the other members of the group.

211. Further to this, the scholar Yishai Levitt even stated in his article Class Action according to the Securities Law, **Hapraklit** 42(3), 465, 474-475 (1995) as follows:

"A plaintiff must have a true interest in the suit that is consistent with the common interest of the members of the group… If the reasons are reasonable and his motives are pure, and the action is filed in order to achieve the interest that is common to all the members of the group, there is no impediment to his representing the group. However, it must be assured from the start that such plaintiff can in fact and intends to manage the action properly and that he will not lose interest in it before the ruling."

Also appropriate are the words of the scholar Prof. Tzipora Cohen in her article Class Actions according to the Companies Law **Shaarei Mishpat** 4(1) 61, 102-103, in which she says:

"The fulfillment of this condition is dependent on both the fact that the plaintiffs has interests similar to those of the members of the group, and on the fact that he has the ability to properly manage the suit … In the context of the plaintiff's ability to manage the suit, the court must verify "whether the plaintiff himself or his counsel have the required skills to act with a suitable degree of professionalism, seriousness and diligence and to manage the action efficiently."

---

[12] Par. 12 of the judgment

212. In this case the Petitioner has an interest in the action, which is consistent with the interest of the other members of the group, since they are all holders of Ampal bonds that were not redeemed on time as a result of the actions and omissions of the Respondents, who were entrusted with the Company's management during the relevant period.

213. In this case the Petitioner approached the Company a number of times before filing the Motion to Approve, both through presentation of a proposed outline for a debt settlement (which could have rendered the hearing of this Motion to Approve superfluous – see extensive discussion of this matter) and in the numerous warning letters according to which if Ampal did not repay its debt to the Petitioner, the Petitioner would initiate legal proceedings.

- Copy of warning letters sent by the Petitioner to the Company is attached and marked as **Exhibit 49**.

214. In accordance with case law, if the petitioner for approval approaches the respondent before filing the motion to approve, this indicates good faith on the part of the petitioner and the fact that the proceedings will be conducted properly.

215. The offices of Gissin & Co., which represents the Plaintiff is a firm with experience and a reputation in civil litigation in the area of securities, corporate bankruptcy and officers, as well as in representing the interests of bondholders.

## H.  **Compensation to the representative plaintiff and fees for the representative plaintiff's counsel**

216. In accordance with Regulations 11(a)(2) – 12(a)(2) of the Class Action Regulations, 5770-2010, the Petitioner must indicate in its motion the amount sought for an order of compensation to the representative plaintiff and the fee for its counsel. In this matter the plaintiff will ask to be compensated with an amount equal to 10% of the value of the benefit to be granted to the public. Fees for the representative plaintiff's counsel are to be calculated in accordance with a finding by the Supreme Court in Civil Appeal 2046/10 **Shemesh v. Reichert** (published in Nevo, May 23, 2012).

217. Thus, for each amount actually recovered **up to** NIS 5,000,000 counsel for the representative plaintiff will receive 25% of the value of the benefit for the public. for each amount actually recovered between NIS 5-10 million, counsel for the representative plaintiff will receive 20% of the value of the benefit to the public, while for each amount actually recovered that exceeds Nis 10,000,000, counsel for the representative plaintiff will, the Petitioner, will receive 10%.

218. It is clarified that this mechanism for fees does not include the discussion of the Motion to Approve itself and the expenses of the Petitioner's counsel.

## Conclusion

2.19. From all the above it is clear that the Respondents committed a gross and fundamental violation of the trusteeship deeds that were signed between them and the bondholders and therefore, they are to be ordered to pay the entire sum of the compensation to the group.

220. Therefore, the Honorable Court is asked to order as requested in the Motion.

221. This Motion is supported by the affidavits of Mr. Yaron Tamir, one of the Petitioner's managers.

222. It is mandated by law and by the interests of justice to grant the Motion.

32

[signature]              [signature]              [signature]
Guy Gissin, Adv.         Yoel Freilich, Adv.       Amir Paz, Adv.
Lic. no. 14736           Lic. no. 23000            Lic. no. 67563
                         **Gissin & Co. Advocates**
                         Counsel for the Petitioner

# EXHIBIT C

# PROPOSED ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- x
In re:                                            :    Chapter 7
                                                  :
AMPAL-AMERICAN ISRAEL CORPORATION,                :    Case No. 12-13689 (SMB)
                                                  :
                    Debtor.                       :
-------------------------------------------------------- x
```

## ORDER APPROVING CHAPTER 7 TRUSTEE'S MOTION
## FOR AN ORDER APPROVING CERTAIN DISTRIBUTION
## AGREEMENT PURSUANT TO SECTIONS 105 AND 362 OF
## THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019

Upon the motion[1] (the "Motion") of Alex Spizz (the "Trustee"), as the duly qualified

chapter 7 trustee for the estate of Ampal-American Israel Corporation (the "Debtor"), for entry

of an Order, pursuant to sections 105(a) and 362(d) of title 11 of the United States Code, 11

U.S.C. § 101, et. seq. (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure, approving that certain Distribution Agreement (the "Distribution

Agreement") entered into between the Trustee and Forest Value Fund II (the "Bondholder

Representative"); and upon the Declaration of Alex Spizz dated February 2, 2016; and it

appearing to the Court that it has jurisdiction over the matters raised in the Motion pursuant to 28

U.S.C. § 157 and 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and upon

the record of the hearing before the Court on March 1, 2016, including representations of counsel

for the Trustee; and proper notice of the Motion having been given; and no objections having

been filed to the Motion; and the Court having found that the settlement agreement reflects a

reasonable exercise of the Trustee's business judgment and is in the best interests of the Debtor's

estate;

**IT IS HEREBY ORDERED** that:

1.      The relief sought in the Motion is granted;

---

[11] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2.      The Trustee is hereby authorized to enter into the Distribution Agreement, a copy of which is attached to the Motion as Exhibit A;

3.      The terms of the Distribution Agreement are approved;

4.      To the extent applicable, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to allow the Bondholder Representative to proceed with the Bondholder Litigation;

5.      The Court will retain jurisdiction to consider any disputes or other issues that may arise relating to this Order and/or the Distribution Agreement;

6.      The Trustee is hereby authorized and empowered to take such actions as may be necessary and appropriate to implement the terms of the Distribution Agreement and this Order; and

7.      This Order shall be effective immediately upon entry by the Court;

Dated: New York, New York
        March ___, 2016

                                    **PROPOSED**
                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

2