**BID PROCEDURES HEARING DATE AND TIME: APRIL 18, 2024 at 10:00 a.m.  (EDT)**
**OBJECTION DEADLINE: APRIL 11, 2024 at 5:00 p.m. (EDT)**

**SALE HEARING DATE AND TIME:  TBA**

**TARTER KRINSKY & DROGIN LLP**
Attorneys for Alex Spizz, Chapter 7 Trustee
1350 Broadway
New York, New York 10018
(212) 216-8000
Alex Spizz, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK
----------------------------------------------------------------x

In re:                                                  Chapter 7

AMPAL-AMERICAN ISRAEL CORPORATION,          Case No. 12-13689 (DSJ)

                                 Debtor.
----------------------------------------------------------------x

**TRUSTEE'S MOTION FOR ORDERS PURSUANT TO SECTIONS 105(a) AND 363(b), (f) AND (m) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004, (I) AUTHORIZING AND APPROVING TRUSTEE'S ENTRY INTO A STALKING HORSE PURCHASE AGREEMENT FOR TRUSTEE'S SALE OF ESTATE'S INTEREST IN YAKHIN MATAYIM LTD. AND ESTATE'S INTEREST IN ETZ VA'NIR LTD., (II) APPROVING AUCTION PROCEDURES AND NOTICE OF THE AUCTION RELATING THERETO AND SCHEDULING THE AUCTION AND THE SALE HEARING, (III) APPROVING SALE TO THE STALKING HORSE PURCHASER OR A PARTY MAKING A HIGHER AND BETTER OFFER, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND (IV) GRANTING RELATED RELIEF**

TO:    THE HONORABLE DAVID S. JONES
       UNITED STATES BANKRUPTCY JUDGE

Alex Spizz, as Chapter 7 trustee (the "Trustee") for Ampal-American Israel Corporation

(the "Debtor"), through the Trustee's counsel Tarter Krinsky & Drogin LLP ("TKD"), hereby

submits this motion (the "Motion") pursuant to sections 105(a) and 363(b), (f) and (m) of title

11, United States Code (the "Bankruptcy Code"), Rule 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York ("LBR"), and the amended guidelines adopted by General Order M-383, (i) for entry of an order substantially in the form annexed hereto as **Exhibit "A"** (the "Bid Procedures Order"): (a) authorizing the Trustee to enter into that certain stalking horse agreement annexed hereto as **Exhibit "B"** (the "Stalking Horse Agreement"), subject to higher and better offers, for the Trustee's sale (the "Sale") of the Debtor's bankruptcy estate's ("Estate") interest in Yakhin Matayim Ltd. (the "Yakhin Matayim Shares")[1] and the Estate's interest in Etz Va'Nir Ltd. (the "Etz Va'Nir Shares"),[2] as more particularly described in the Stalking Horse Agreement, (b) approving the proposed bidding procedures (the "Bid Procedures") set forth in the bid process letter (the "Bid Process Letter") annexed hereto as **Exhibit "C"**; (c) approving the form of that certain *Share Purchase Agreement* (the "SPA") annexed hereto as **Exhibit "D"** which the Trustee proposes to enter into with a competing qualified bidder for the Estate's Yakhin Matayim Shares and Etz Va'Nir Shares (collectively, the "Purchased Shares"), (d) scheduling an auction (the "Auction") of the Purchased Shares (if a qualified competing bid other than the Stalking Horse Bid [defined below] is timely received) and a hearing to approve the Sale, and (e) approving the form of notice of the Bid Procedures, the Auction and the Sale; and (ii) after completion of the Sale hearing, entry of an order (the "Sale Order") pursuant to Bankruptcy Code sections 105(a) and 363(b), (f) and (m), Bankruptcy Rule 6004 and LBR 6004-1: (a) authorizing and approving the Trustee's Sale of the Purchased Shares either to Yakhin Hakal Ltd. (the "Stalking Horse Purchaser") or to another qualified

---

[1] As set forth below, the Debtor is the record holder of the Yakhin Matayim Shares consisting of 1,650,000 Ordinary Shares A New-Old ILS 0.0001 (50% of the Ordinary Shares A) of Yakhin Matayim Ltd. The Yakhin Matayim Shares are property of the Debtor's Estate.

[2] As set forth below, the Debtor is the record holder of the Etz Va'Nir Shares consisting of 300,000 Ordinary Shares A New-Old ILS 0.0001 (50% of the Ordinary Shares A) of Etz Va'Nir Ltd. The Etz Va'Nir Shares are property of the Debtor's Estate.

bidder submitting a higher or otherwise better offer (the "Successful Bidder"), free and clear of all liens, claims, encumbrances and interests, and (b) granting related relief.  In support of this Motion, the Trustee respectfully states as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The statutory and other predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 363(b), (f) and (m), Bankruptcy Rules 2002 and 6004, LBR 6004-1 and the Guidelines For The Conduct of Asset Sales, updated June 17, 2013.

## BACKGROUND

A.      **General**

3.      On August 29, 2012 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of the Bankruptcy Code [Docket No. 1].

4.      The Debtor was an investment company, incorporated in New York, which primarily acquired interests in companies located or operating in Israel in the energy, chemicals, real estate, project development and leisure sectors.  As of the Petition Date the Debtor's principal assets were its direct and indirect equity holdings in over 80 corporations (the "Subsidiaries"), and the Debtor's business consisted of managing its equity investments in the Subsidiaries.  None of the Debtor's Subsidiaries is a debtor in this or any other U.S. Bankruptcy Court and none is the subject of any bankruptcy case, insolvency proceeding or receivership proceeding outside of the United States except for the shares of Gadot Chemical Tankers and

Terminals Ltd. ("Gadot"), which were in receivership in Israel and sold in the receivership for $73.3 million.[3]

6.      5.      On September 25, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") [Docket No. 27].

6.      On April 8, 2013, the Court ordered the appointment of a Chapter 11 trustee and the Office of the U.S. Trustee thereafter designated Michael Luskin as Chapter 11 trustee [Docket No. 240].

7.      Michael Luskin, as Chapter 11 trustee, moved to convert this case to Chapter 7 on the grounds that, among other things, the Debtor was administratively insolvent [Docket No. 248].

8.      By Order dated May 2, 2013 (the "Conversion Date"), the Court converted the case to one under Chapter 7 [Docket No. 258].

9.      On May 3, 2013, the Office of the U.S. Trustee appointed Alan Nisselson as interim Chapter 7 trustee [Docket No. 260].

10.      On May 20, 2013 (the "Election Date"), Alex Spizz was elected Chapter 7 Trustee of the Debtor pursuant to section 702 of the Bankruptcy Code and was duly qualified thereafter.

11.      On June 27, 2013, an Order was entered authorizing the retention of Spizz Cohen & Serchuk, P.C. as attorneys for the Trustee, effective as of May 20, 2013 [Docket No. 298].

12.      Pursuant to the "Order Authorizing Chapter 7 Trustee To Exercise Debtor's Shareholder Rights" entered on July 25, 2013 [Docket No. 325] (the "Shareholder Rights Order"), the Trustee was authorized, effective as of May 20, 2013, "to exercise the Debtor's

---

[3] The proceeds of the sale were used to pay the obligation of Merhav Ampal Group, Ltd ("MAG"), a subsidiary of the Debtor, to Israel Discount Bank ("IDB"). The Debtor guaranteed MAG's obligation to IDB and IDB filed a claim in these proceedings in the amount of $76,107.151. As a result of the sale IDB withdrew its claim.

shareholders rights with respect to the business and affairs of the Debtor's subsidiaries, as provided for under New York law or other applicable law that may be appropriate." (Shareholders Rights Order at p. 1-2).

13.    On July 29, 2015, this Court entered an Order authorizing the retention of TKD in place of Spizz Cohen & Serchuk, P.C. as substitute counsel to the Trustee effective as of April 13, 2015 [Docket No. 615].

14.    The Trustee had fully administered all scheduled and known assets of the Estate and was prepared to close this case in 2023 when he learned in or about March 2023 that the Debtor had an interest in Yakhin Matayim Ltd., a privately owned Israeli corporation, which interest was not scheduled by the Debtor in its bankruptcy schedules.  An investigation by the Trustee revealed that the Debtor owned shares representing 50% of the outstanding stock of Yakhin Matayim Ltd. which were non-voting and not entitled to dividends or distributions. Yakhin Matayim Ltd. leased farmland through an agreement with the Israeli government. The Trustee determined that the most favorable way to monetize the Debtor's interest in Yakhin Matayim Ltd. was to sell Debtor's shares in Yakhin Matayim Ltd. to the other 50% shareholder (i.e. the Stalking Horse Purchaser).  The Trustee negotiated a stock purchase agreement with the Stalking Horse Purchaser and this Court approved the Trustee's retention of PWC Kesselman as accountants to assist in structuring the stock purchase agreement to reduce the Debtor's / Estate's Israeli tax exposure. Before the Trustee could finalize the agreement and file a motion to approve the sale, war broke out in Israel and the negotiations were put on hold.

B.    **The Purchased Shares**

15.    The Debtor is the record holder of the Yakhin Matayim Shares, consisting of 1,650,000 Ordinary Shares A New-Old ILS 0.0001 (50% of the Ordinary Shares A) of Yakhin Matayim Ltd. and the record holder of the Etz Va'Nir Shares, consisting of 300,000 Ordinary

Shares A New-Old ILS 0.0001 (50% of the Ordinary Shares A) of Etz Va'Nir Ltd. Yakhin Matayim Ltd. and Etz Va'Nir Ltd. are referred to in the SPA, together, as the "Acquired Companies." The Purchased Shares are property of the Debtor's Estate pursuant to section 541(a) of the Bankruptcy Code.

16.    The Stalking Horse Purchaser offered $4 million U.S. Dollars (plus VAT, if applicable) for the Purchased Shares (the "Stalking Horse Bid") and on March 17, 2024, the Trustee and the Stalking Horse Purchaser entered into the Stalking Horse Agreement, subject to higher and better offers and subject to Bankruptcy Court approval.

17.    The Trustee now seeks to sell the Purchased Shares to the Stalking Horse Purchaser or to another qualified bidder submitting a higher or otherwise better offer and to then close the case as soon as possible in 2024.

## RELIEF REQUESTED

18.    By this Motion, the Trustee seeks entry of the Bid Procedures Order, substantially in the form attached hereto as **Exhibit "A"**:

i.    authorizing the Trustee to enter into the Stalking Horse Agreement annexed hereto as **Exhibit "B"**, subject to higher and better offers;

ii.    approving the proposed Bid Procedures (as set forth in the Bid Process Letter annexed hereto as **Exhibit "C"**) for submitting bids for the Purchased Shares (the "Bids"), including setting a deadline for Qualified Bidders (as defined in in the Bid Process Letter) to make a binding offer in accordance with the Bid Procedures;

iii.    authorizing the Trustee to conduct an Auction of the Purchased Shares within sixty (60) days after approval of the Bid Procedures Order;

iv.    approving certain notice procedures with respect to the Sale of the Purchased Shares;

      v.        approving the form of the SPA, substantially in the form annexed hereto as **Exhibit "D"**; and

      vi.       setting a Sale hearing (the "<u>Sale Hearing</u>") to approve the Sale, free and clear of all liens, claims, encumbrances and interest, at the Court's earliest convenience but not later than June 14 2024.

19.     In addition, provided that the Court enters the Bid Procedures Order, the Trustee further requests entry of the Sale Order, upon completion of the Sale Hearing, (i) authorizing and approving the Sale either to the Stalking Horse Purchaser or to any other Successful Bidder, as the case may be, free and clear of all liens, claims, encumbrances and interests.

20.     The Trustee believes it is in the best interest of the Debtor's Estate and creditors to promptly pursue the Sale of the Purchased Shares in accordance with the proposed Bid Procedures set forth in the Bid Process Letter attached hereto as **Exhibit "C"**.

## SUMMARY OF THE BID PROCEDURES AND SPA

21.     The Trustee requests that the Bid Procedures set forth in the Bid Process Letter annexed hereto as **Exhibit "C"** shall govern the Sale process. The proposed form of SPA, which is annexed hereto as **Exhibit "D"**, is consistent with such Bid Procedures.

22.     A summary of the proposed Bid Procedures and SPA is as follows:[4]

<u>Minimum Purchase Price</u>: The SPA contemplates the Trustee's Sale to the purchaser of the Purchased Shares (the "<u>Proposed Transaction</u>") with a minimum purchase price of USD 4.5 million, without any price adjustments and on the basis of an AS-IS transaction, with limited representations and minimal conditions precedent.

<u>Modifications</u>: The SPA and the Paying Agent Agreement ("<u>PAA</u>") annexed to the SPA are not subject to any modification, except to good

---

[4] This summary is provided for convenience only and is qualified in its entirety by the Bid Process Letter attached hereto as **Exhibit "C"**. To the extent that there is any discrepancy, the terms and conditions of the Bid Process Letter shall control. Interested parties are urged to read the Bid Process Letter in full.

faith adjustments in connection with any special characteristic of the offeree, submitted as part of the Binding Offer.

Timing of the Auction: The Auction shall commence at the sole discretion of the Trustee, provided that it shall commence no later than sixty (60) days following the date that the Bid Procedures Order is approved by the Bankruptcy Court.

Bidding Increments: In an event that there is more than one bid (including the Stalking Horse Bid), the Auction will continue, if necessary, in increments of USD 10,000.

Qualifications To Bid: Only (a) bidders who have provided the Trustee with sufficient documentation showing the bidder's financial ability, at the sole satisfaction of the Trustee, and who have provided a good faith deposit with the Trustee in the amount of USD 450,000 ("Deposit"), and (b) the Stalking Horse Bidder, shall be deemed qualified to participate in this bidding process ("Qualified Bidder").

Auction Format/Appearance At Auction: If more than one Qualified Bidder participates in the Auction, such process will be conducted live via Zoom (or any other video communication means, per the Trustee's sole discretion), and all Qualified Bidders and the Stalking Horse Purchaser shall have the right to participate in the Auction. All bids must be made during the live Auction.

Additional Requirements of the Successful Bidder: At the conclusion of the Auction, the Trustee, in his sole discretion, and subject to Bankruptcy Court approval, shall identify the highest and/or best bid for the Purchased Shares (the "Successful Bidder")[5] and the second highest and/or second-best bid for the Purchased Shares (the "Runner-Up Bidder"). If the Successful Bidder fails to consummate the Proposed Transaction, in accordance with the SPA (or in accordance with the Stalking Horse Agreement, if the Successful Bidder is the Stalking Horse Purchaser), not due to the Trustee's fault, then the Trustee will have the right to consummate the Proposed Transaction with the Runner-Up Bidder, and retain the deposit of the Successful Bidder, as liquidated damages for all loss, damage and expense suffered by the Trustee. If the Successful Bidder consummates the Proposed Transaction, then the Runner-Up Bidder shall receive back its Deposit within five (5) business days after the closing of

---

[5] The Trustee's determination of which Qualified Bid at the Auction is the highest and otherwise best offer shall take into account any factors the Trustee reasonably deems relevant to the value of the Qualified Bid to the Estate and may include, among other things, the following:  (a) the amount and nature of the consideration; (b) the number, type and nature of any changes to the SPA; (c) the extent to which such modifications are likely to delay closing of the sale of the Purchased Shares and the cost to the Debtor's Estate of such modifications or delay; (d) the amount and nature of the consideration to be received by the Trustee; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (f) the net benefit to the Estate.

the Proposed Transaction with the Successful Bidder, and any other Qualified Bidder shall receive back its Deposit within five (5) business days following the Auction; Deposits shall be transferred from the paying agent, according to a PAA to be signed by all Qualified Bidders.

By submitting the Binding Offer, the bidder acknowledges that the Sale of the Purchased Shares is subject to the Israel Land Authority (the "ILA") consent and ILA protocol; that such consent may be conditional on the payment of a consent fee, among other requirements of the ILA, that the bidder shall solely bear all ILA expenses, costs, fees and levies in connection with the Proposed Transaction (including without limitation the ILA Consent Fee, if applicable), even if the demand for payment for such fees or levies will be addressed to the Acquired Companies; and that this is the bidder responsibility to procure the relevant legal advice regarding said ILA consent.  The Trustee and Ampal shall bear no responsibility whatsoever in connection with the ILA consent requirements and shall bear no expense or liability in this regard.

No Financing Contingencies: Offer must include confirmation of fully committed financing for all funds necessary to consummate the Proposed Transaction and that your Binding Offer is not subject to any financing conditions precedent.

Due Diligence: The Bid Procedures provide for potential bidders to conduct due diligence on Yakhin Matayim Ltd. and Etz Va'Nir Ltd. (together, the "Acquired Companies").  Offers must include confirmations that you, and your financing sources, if applicable, have satisfactorily completed your due diligence and received all requested information and documents, and that you have no further due diligence requirements.

No Contingent Bids: Offers must include confirmation that your Binding Offer will remain open for acceptance, will not be revoked or amended during the period beginning on the date of submission of the Binding Offer and ending on the date the Bankruptcy Court approves the Sale of the Purchased Shares.

Bidder's Costs and Expenses: Bidders will bear their own costs and expenses relating to their investigation and evaluation of this opportunity, including the fees and disbursements of your own legal, financial and other advisers. The Trustee and none of Ampal or its affiliates or the Acquired Companies, its affiliates, related parties, attorneys, or representatives shall have any obligation to you in this regard.

23.    The SPA, as stated above, has a minimum purchase price of $4.5 million U.S.

Dollars, while the purchase price under the Stalking Horse Agreement is $4 million U.S. Dollars.

There are certain other differences between the SPA and the Stalking Horse Agreement (including but not limited to the deletion of various paragraphs relating to the bidding and auction process). Annex A2 and Annex A3 to the SPA are English translations of those documents.

## BASIS FOR THE RELIEF REQUESTED

**A.    The Bankruptcy Court Has Authority To Approve The Trustee's Sale Of The Purchased Shares**

24.    Section 363(b) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

**B.    The Sale of The Purchased Shares Pursuant to the Bid Procedures is in the Best Interests of the Estate and Creditors**

25.    As set forth above, Bankruptcy Code section 363(b) provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Courts in the Second Circuit and others, in applying section 363(b), have required that the sale of debtor's assets be based upon the sound business judgment of the debtor in possession or trustee. See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); In re Gen. Motors Corp., 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009).

26.    The business judgment of a trustee is entitled to great deference. In re MF Glob. Inc., 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015); see also In re Borders Grp., Inc., 453 B.R. 477,

483 (Bankr.S.D.N.Y.2011). A trustee generally satisfies the business judgment standard if he or she "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr.S.D.N.Y.1992) appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del.1985)). "Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross negligence.' " Borders, 453 B.R. at 482 (quoting Integrated Res., 147 B.R. at 656).

27.    A debtor in possession's or trustee's business judgment is entitled to great deference with respect to the procedures to be used in selling assets from the estate. See, e.g., Integrated Res., Inc., 147 B.R at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

28.    Bankruptcy courts applying section 363 frequently have considered and approved bidding procedures in advance of a proposed sale of property of the estate. See, e.g., In re Adelphia Communications Corp., 336 B.R. 610, 629-30 (Bankr. S.D.N.Y. 2006) ("It is the common practice for bankruptcy courts, in connection with the sales of businesses or lines of business, to enter orders approving bidding procedures and bidding-related obligations . . . before being asked to approve the resulting sale itself."); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 878-879 (Bankr. S.D.N.Y. 1990) (noting that the bankruptcy court had entered an order requiring that overbids be made in specified minimum increments with deposits); Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774, 775 (9th Cir. 1982) (noting that the district

court had required specified minimum overbid amounts, deposits, and the form of purchase agreement to be used by bidders).

29.    In analyzing the propriety of bidding procedures, a court will examine whether such procedures allow third parties to submit higher and better bids and whether potential bidders have sufficient time to conduct their own due diligence.  In re Fin. News Networks, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), appeal dismissed, 931 F.2d 217 (2d Cir. 1991); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (requiring bid procedures that allow for "an open and fair public sale designed to maximize value for the estate.").  Moreover, the hallmarks of good faith in any sale procedure are the receipt of adequate value through higher and better offers and full and accurate disclosure of the terms of the proposed sale to third parties invited to bid.

### 1.    The Proposed Bid Procedures Will Maximize Value of the Purchased Shares by Allowing Competing Bidders to Participate in an Auction

30.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, e.g., Integrated Res.. Inc., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1998)); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

31.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales.  See, e.g., Integrated Res., Inc., 147 B.R.

at 659 (stating such procedures should "encourage bidding and [ ] maximize the value of the Debtors' assets"); <u>Financial News Network, Inc.</u>, 126 B.R. at 156 (S.D.N.Y. 1991) (stating that "court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [ ] provide for a fair and efficient resolution of bankrupt estates").

32.    Here, the proposed Bid Procedures will allow and encourage interested parties to submit competing Bids for the Purchased Shares, thereby maximizing the value the Trustee may receive for the Purchased Shares.  By inviting others to participate in the Auction, the Trustee will be able to determine the highest and best price possible for the Purchased Shares. The Bid Procedures will increase the likelihood the Trustee will receive the greatest consideration possible for the Purchased Shares and will facilitate a competitive and fair bidding process.

33.    The proposed Bid Procedures will allow the Trustee to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  The Bid Procedures (1) will encourage, rather than hinder, bidding for the Purchased Shares, (2) are consistent with other procedures previously approved by courts in this district, and (3) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. <u>Accord</u> <u>Integrated Res., Inc.</u>, 147 B.R. at 650-56; <u>In re Randall's Island Family Golf Ctrs., Inc.</u>, 261 B.R. 96 (Bankr. S.D.N.Y. 2001) <u>aff'd</u>, 272 B.R. 521, (S.D.N.Y. 2002); <u>In re 995 Fifth Ave. Assocs., L.P.</u>, 96 B.R. 24 (Bankr. S.D.N.Y. 1989).

### 2.    <u>Potential Bidders Will Have Time to Conduct Due Diligence</u>

34.    The Trustee's counsel will send notice of this Motion and the Bid Process Letter to the United States Trustee and all creditors and parties in interest as well as any parties who may have expressed interest in acquiring the Purchased Shares, promptly after the Court's consideration of the proposed Bid Procedures.  The Trustee will also publish a notice of the sale

in an Israeli newspaper. The Bid Procedures will allow any prospective bidders and other interested parties time before the Bid Deadline to conduct any due diligence required through a virtual data room. If other interested parties are discovered, the Trustee though his counsel will provide every possible opportunity to such parties to conduct the due diligence such parties need to submit the best possible Qualified Bid. Therefore, potential bidders will have time to conduct due diligence with respect to the Purchased Shares, to the extent not already concluded.

### 3. The Trustee Will Provide Full and Accurate Disclosure of the Terms of the Sale to Potential Bidders

35. The terms of the Sale of the Purchased Shares are contained in the SPA, the form of which is attached hereto as **Exhibit "D"** and will be provided to each potential bidder. Potential bidders will also receive a copy of the Bid Procedures Order and the Bid Process Letter. Therefore, the Trustee will have provided full and accurate disclosure of the terms of the prospective Sale of the Purchased Shares to all potential bidders.

36. For all of these reasons, the Court should approve the Bid Procedures as a sound exercise of the Trustee's business judgment.

### C. The Trustee Has Articulated a Reasonable Business Justification for the Sale of the Purchased Shares

37. Ample justification exists for approval of the proposed Sale of the Purchased Shares. Section 363 of the Bankruptcy Code authorizes a trustee, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

38. A sale of a debtor's assets outside of the ordinary course of business should be approved if supported by a sound business purpose. See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Global Crossing Ltd., 295 B.R. 726 (Bankr. S.D.N.Y. 2003); see also Meyers v. Martin (In re Martin), 91 F.3d 389,

395 (3d Cir. 1996); <u>Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re</u>

<u>Montgomery Ward Holding Corp.),</u> 242 B.R. 147, 153 (D. Del. 1999); <u>In re Del. & Hudson Ry.</u>

<u>Co.</u>, 124 B.R. 169, 176 (D. Del. 1991); <u>In re Trans World Airlines, Inc.</u>, No. 01-00056 (PJW),

2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

39.     Courts typically consider the following factors in determining whether to approve

a sale under section 363: (i) whether a sound business justification exists for the sale; (ii) whether

adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale

will produce a fair and reasonable price for the property; and (iv) whether the parties have acted

in good faith.  <u>See</u> <u>In re Del. & Hudson Ry.</u>, 124 B.R. at 176; <u>In re Phoenix Steel Corp.</u>, 82 B.R.

334, 335-36 (Bankr. D. Del. 1987); <u>In re United Healthcare Sys., Inc.</u>, No. 97¬1159, 1997 WL

176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

40.     A sound business purpose for the sale of a debtor's assets outside the ordinary

course of business may be found where such a sale is necessary to preserve the value of assets

for the estate, its creditors, or interest holders.  <u>See, e.g.</u>, <u>In re Abbotts Dairies of Pa. Inc.</u>, 788

F.2d 143 (3d Cir. 1986); <u>Lionel Corp.</u>, 722 F.2d 1063.  In fact, the paramount goal in any

proposed sale of property of the estate is to maximize the proceeds received by the estate.  <u>See</u>

<u>Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)</u>, 107 F.3d 558, 564-65 (8th

Cir. 1997) (In bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the

estate at hand"); <u>Integrated Res., Inc.</u>, 147 B.R. at 659 ("It is a well-established principle of

bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest

price or greatest overall benefit possible for the estate." (quoting <u>Cello Bag Co. v. Champion</u>

<u>Int'l Corp. (In re Atlanta Packaging Prods., Inc.)</u>, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988))),

appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

41.    Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos Related Litigants and/or Creditors v. Johns Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a trustee's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, as set forth above, when applying the "business judgment" standard, courts show great deference to a trustee's business decisions.

### 4.    The Notice of the Sale of the Assets Will Be Accurate and Reasonable Under the Circumstances

42.    As set forth above, the Trustee will provide accurate and reasonable notice of the Sale of the Purchased Shares under all of the facts and circumstances of this case.

## D.    The Sale of the Purchased Shares Should Be Free and Clear of Liens, Claims, Encumbrances, and Interests

43.    Section 363(f) of the Bankruptcy Code provides that the Court may authorize a sale of property of the estate, "free and clear of any interest in such property of an entity other than the estate," if:

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in *bona fide* dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); <u>In re General Bearing Corp</u>., 136 B.R. 361, 363-64 (Bankr. S.D.N.Y. 1992).

44.      The Trustee does not believe there are any liens on the Purchased Shares. All creditors of the Debtor, including any holder of an alleged secured claim against the Purchased Shares, will be served with a copy of this Motion and will be given an opportunity to object to it. To the extent that they do not object to this Motion, they should be deemed to have consented to the proposed Sale under section 363(f)(2) of the Bankruptcy Code.  <u>See, e.g.</u>, <u>FutureSource, LLC v. Reuters, Ltd</u>., 312 F.3d 281 (7th Cir. 2002), <u>cert. denied</u>, 538 U.S. 962 (2003) (holding that failure to object may constitute consent, if there was adequate notice).

45.      Because the Trustee will satisfy one or more of the requirements of section 363(f) of the Bankruptcy Code, as will be demonstrated at the Sale Hearing, approving the Sale of the Purchased Shares free and clear of all interests is warranted.

## E.      The Successful Bidder is Entitled to Good Faith Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code

46.      The Trustee requests as part of the approval of the proposed Sale, that the Court find the Successful Bidder is qualified to acquire the Purchased Shares and will do so in good faith within the meaning of section 363(m) of the Bankruptcy Code.

47.      Pursuant to section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  <u>See</u> <u>Licensing by Paolo, Inc. v. Sinatra</u> (<u>In re Gucci</u>), 126 F.3d 380, 390 (2d Cir. 1997); <u>In re Mark Bell Furniture Warehouse, Inc.</u>, 992 F.2d 7, 9 (1st Cir. 1993); <u>In re Abbotts Dairies of Pa., Inc.</u>, 788 F.2d at 147; <u>Willemain v. Kivitz</u>, 764 F.2d 1019, 1023 (4th Cir. 1985)**.**

48.    Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith...." 11 U.S.C. § 363(m). Under section 363(m), "an appeal of a bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed property, unless the debtor or other complaining party] stays the foreclosure [or other] sale pending an appeal." <u>Mann v. Alexander Dawson, Inc. (In re Mann)</u>, 907 F.2d 923, 926 (9th Cir. 1990).  Section 363(m) fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" <u>Reloeb Co. v. LTV Corp (In re Chateaugay Corp.</u>, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting <u>In re Abbotts Dairies of Pa., Inc.</u>, 788 F.2d 143, 147 3d Cir. 1986).  <u>See also</u> <u>Allstate Ins. Co. v. Hughes</u>, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)…provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

49.    Finality of the Sale is important in this case because the Successful Bidder needs assurance that the purchase of the Purchased Shares will not be subject to future attack by objecting creditors.  Such assurance is necessary to generate the maximum purchase price for such Purchased Shares.

**F.    <u>The Court Should Waive the Fourteen Day Stay of the Sale Order</u>**

50.    The Trustee requests that the automatic fourteen (14) day stay under Bankruptcy Rules 6004(h) be waived.  This is warranted because the SPA provides for a closing to take place within seven days following the entry of the Sale Order.

12-13689-dsj    Doc 1009-1    Filed 03/19/24    Entered 03/19/24 16:43:38    Motion
Pg 19 of 22

**G.  The Manner of Notice and Schedule for the Bid Deadline and the Auction and Sale Hearing Are Reasonable and Appropriate Under the Circumstances**

51.     The Trustee also respectfully requests that the Court approve the manner of notice of the proposed Auction and Sale Hearing.  The Trustee submits that this relief will facilitate the Sale process and enable the Trustee to provide interested parties with adequate and sufficient notice of the Auction and related matters.

52.     The Trustee proposes to give notice of the Bid Procedures Order, the Auction and the Sale Hearing in the following manner.  Within three (3) business days after entry of the Bid Procedures Order (the "Mailing Date"), the Trustee will serve notice of the Auction ("Notice of Auction and Sale Hearing"), substantially in the form attached hereto as **Exhibit "E"**, and a copy of the Bid Procedures Order, which will contain various dates and deadlines, by first class mail, to those parties identified in the Bid Procedures Order, including (i) the Office of the United States Trustee; (ii) Debtor's counsel; (iii) all creditors of the Debtor; (iv) all parties that are known or reasonably believed to have expressed an interest in acquiring the Purchased Shares; and (v) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "Auction and Sale Notice Parties").

53.     Those parties who desire a copy of the Bid Procedures Order and/or the form of the SPA, and do not receive such papers pursuant to the preceding paragraph, may contact the Trustee.

54.     In addition, on or before ten days after the entry of the Bid Procedures Order, subject to applicable submission deadlines, the Trustee will arrange to place an advertisement in a publication in Israel to be determined after consultation with Israeli counsel, advertising the Sale of the Purchased Shares; advising interested parties of the Bid deadline, the date of the

Auction, how parties can receive additional information; and containing the salient terms set forth in the Notice of Auction and Sale Hearing.

55.     The Trustee submits the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtor's creditors and other parties in interest, and also to all those who may bid on the Purchased Shares.  Accordingly, the Trustee submits that such notice constitutes good and sufficient notice under the circumstances with respect to this Motion, all proceedings to be held thereon, and the entry of an order or orders granting all of the relief requested herein.  The Trustee further submits that no further notice need be given.

56.     The Trustee submits the proposed notice of the Auction Procedures, Auction, Sale Hearing, and all related objection deadlines, comply fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale.  The Trustee respectfully requests that this Court approve the form of Notice of Auction and Sale Hearing, and notice procedures proposed above and in the proposed Bid Procedures Order.

## **NOTICE**

57.     The Trustee proposes to serve a Notice of the Hearing on this Motion and a copy of the Motion and all exhibits by first class mail or email upon (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to the Debtor; (iii) counsel to the Stalking Horse Purchaser; and (iv) all other parties that have filed a notice of appearance and demand for service of papers in this bankruptcy case under Bankruptcy Rule 2002 (the "Auction Procedures Notice Parties").

58.     The Trustee believes the foregoing notice procedures to the Auction Procedures Notice Parties, the Auction and Sale Notice Parties and other parties in interest is sufficient to provide effective notice of the Auction Procedures, the Auction and the Sale to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest

possible participation while minimizing the costs to the Estate.    Accordingly, the Trustee requests the Court find that notice in this manner is sufficient and that no further notice of the Auction or the Auction Procedures is required.

## NO PRIOR REQUEST

59.    No previous request for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Trustee respectfully requests that this Court:

(a)    after a hearing, enter the Bid Procedures Order (**Exhibit "A"**):

(i)    authorizing the Trustee to enter into the Stalking Horse Agreement (**Exhibit "B"**), subject to higher and better offers;

(ii)    approving the Bid Procedures contained in the Bid Process Letter (**Exhibit "C"**);

(iii)    authorizing the Trustee to conduct an Auction of the Purchased Shares within sixty (60) days after approval of the Bid Procedures Order;

(iv)    approving the Notice of Auction and Sale Hearing (**Exhibit "E"**)

(v)    approving the form of the SPA (**Exhibit "D"**); and

(vi)    scheduling an Auction and Sale Hearing;

(b)    after the Sale Hearing, enter the proposed Sale Order (substantially in the form annexed hereto as **Exhibit "F"**): authorizing and approving the Sale of the Purchased Shares to the Stalking Horse Purchaser or any other Successful Bidder, as the case may be, free and clear of all liens, claims, encumbrances and interests; and

(c)     grant such other and further relief as is just and proper.


Dated: New York, New York
        March 19, 2024

                                        **TARTER KRINSKY & DROGIN LLP**
                                        *Attorneys for Alex Spizz, Chapter 7 Trustee*


                                        By: /s/ Alex Spizz
                                            Alex Spizz, Esq.
                                            Jill Makower, Esq.
                                            1350 Broadway, 11th Floor
                                            New York, New York 10018
                                            (212) 216-8000
                                            aspizz@tarterkrinsky.com
                                            jmakower@tarterkrinsky.com